**THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re<br><br>AMERICAN CLASSIC VOYAGES CO., *et al*.,<br><br>                    Debtors. | Chapter 11<br>(Jointly Administered)<br><br>Case No. 01-10954 (KJC) |
| AMERICAN CLASSIC VOYAGES CO., *et al*.,<br>DEBTORS, by and through PAUL GUNTHER,<br>PLAN ADMINISTRATOR,<br><br>                    Plaintiffs,<br><br>          - against -<br><br>JP MORGAN CHASE BANK, NATIONAL CITY<br>BANK OF MICHIGAN/ILLINOIS, and HIBERNIA<br>NATIONAL BANK,<br><br>                    Defendants. | Adv. Pro. No. 03-56998 (KJC) |

**NOTICE OF APPEAL**

        PLEASE TAKE NOTICE that American Classic Voyages Co., *et al*., by and through its undersigned counsel, hereby appeals to the United States District Court for the District of Delaware from each and every part of the Order of the United States Bankruptcy Court for the District of Delaware (Carey, B.J.) entered on the 27th day of April, 2007 (Docket No. 180) which:  (i) held that the Plaintiffs have not proven that the Debtors were insolvent as required by Bankruptcy Code Section 547(b)(3); and (ii) entered judgment in favor of the Defendants and against the Plaintiffs.

61513

The names of all parties to the Order appealed from and the names, addresses, and telephone numbers of their respective attorneys are annexed hereto as Exhibit "A."

Dated:  May 7, 2007

**MONZACK AND MONACO P.A.**

/s/ Francis A. Monaco, Jr.
Francis A. Monaco, Jr., Esq. (No. 2078)
Joseph J. Bodnar, Esq. (No. 2512)
1202 North Orange Street, Suite 444
Wilmington, DE 19899
Telephone: (302) 656-8162

- and -

**ANDERSON KILL & OLICK, P.C.**
Mark D. Silverschotz, Esq.
Jeffrey E. Glen, Esq.
Luma S. Al-Shibib, Esq.
1251 Avenue of the Americas
New York, NY 10020
Telephone: (212) 278-1000

*Attorneys for American*
*Classic Voyages, Co., et al.*

## Exhibit A

| **Attorneys for JP Morgan Chase Bank** | |
|---|---|
| Laurie Selber Silverstein, Esq.<br>Gabriel R. MacConaill, Esq.<br>POTTER ANDERSON & CORROON, LLP<br>1313 North Market Street, 7th Floor<br>Wilmington, DE 19801 | Anthony G. Stamato, Esq.<br>Robert M. Spalding, Esq.<br>KAYE SCHOLER LLC<br>3 First National Plaza, Suite 4100<br>70 W. Madison Street<br>Chicago, IL 60603 |

| **Attorneys for Hibernia National Bank and National City Bank of the Midwest f/k/a National City Bank of Michigan/Illinois** | |
|---|---|
| Michael D. DeBaecke, Esq.<br>BLANK ROME LLP<br>1201 North Market Street, Suite 800<br>Wilmington, DE 19801 | Robert J. Sidman, Esq.<br>Tiffany Strelow Cobb, Esq.<br>VORYS, SATER, SEYMOUR and PEASE LLP<br>52 East Gay Street<br>Columbus, OH 43215 |

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

## APPEAL TRANSMITTAL SHEET

Case Number: _____  ○BK  ○AP

    If AP, related BK Case Number: _____


Title of Order Appealed:

_____

        Docket Number: _____       Date Entered: _____

Item Transmitted:  ○ Notice of Appeal      ○ Motion for Leave to Appeal
                  ○ Amended Notice of Appeal  ○ Cross Appeal
                  Docket Number: _____    Date Filed: _____

*Appellant/Cross Appellant:          *Appellee/Cross Appellee

_____   _____

Counsel for Appellant:              Counsel for Appellee:

_____   _____

_____   _____

_____   _____

_____   _____

_____   _____

*If additional room is needed, please attach a separate sheet.

Filing Fee paid?  ○Yes  ○No

IFP Motion Filed by Appellant?  ○ Yes  ○ No

Have Additional Appeals to the Same Order been Filed?  ○ Yes  ○ No

    If so, has District Court assigned a Civil Action Number?  ○Yes  ○No  Civil Action # _____

Additional  Notes:

_____


_____    By: _____
Date                              Deputy Clerk

_____
                                  FOR USE BY U.S. BANKRUPTCY COURT
Bankruptcy Court Appeal (BAP) Number: _____
7/6/06

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | : | CHAPTER 11 |
| | : | (Jointly Administered) |
| **AMERICAN CLASSIC VOYAGES CO.,** | : | |
| *et al.* | : | Case No. 01-10954 (KJC) |
| Debtors | : | |

| | | |
|---|---|---|
| | : | |
| **AMERICAN CLASSIC VOYAGES CO.,** | : | |
| *et al.*, Debtors, by and through | : | |
| Paul Gunther, Plan Administrator, | : | |
| Plaintiffs, | : | |
| v. | : | |
| | : | |
| **JP MORGAN CHASE BANK,** | : | |
| **NATIONAL CITY BANK OF** | : | |
| **MICHIGAN/ILLINOIS, AND** | : | |
| **HIBERNIA NATIONAL BANK,** | : | |
| Defendants | : | Adv. Pro. No. 03-56998 (KJC) |

## ORDER

AND NOW, this 27th day of April, 2007, upon consideration of certain issues raised in the Plaintiff's Complaint, and after trial on the merits of the Debtors' solvency in accordance with the Order of this Court dated January 23, 2006, and for the reasons set forth in the foregoing Opinion, it is hereby **ORDERED** and **DECREED** that the Plaintiffs have not proven that the Debtors were insolvent as required by Bankruptcy Code Section 547(b)(3). Accordingly, judgment is entered in favor of the Defendants and against the Plaintiffs.

BY THE COURT:

KEVIN J. CAREY
UNITED STATES BANKRUPTCY JUDGE

Copies to:

Frank A. Monaco, Jr., Esquire
Joseph J. Bodnar, Esquire
MONZACK and MONACO, P.A.
1201 N. Orange Street, Suite 400
Wilmington, DE 19801

Mark D. Silverschotz, Esquire
Jeffrey E. Glen, Esquire
Luma S. Al-Shibib, Esquire
ANDERSON KILL & OLICK, P.C.
1251 Avenue of the Americas
New York, NY 10020

Laurie Selber Silverstein, Esquire
Gabriel R. MacConaill, Esquire
POTTER ANDERSON & CORROON, LLP
1313 North Market Street, 7th Floor
Wilmington, DE 19801

Anthony G. Stamato, Esquire
Robert M. Spalding, Esquire
KAYE SCHOLER LLC
3 First National Plaza, Suite 4100
70 W. Madison Street
Chicago, IL 60603

Michael D. DeBaecke, Esquire
BLANK ROME LLP
1201 North Market Street, Suite 800
Wilmington, DE 19801

Robert J. Sidman, Esquire
Tiffany Strelow Cobb, Esquire
VORYS, SATER, SEYMOUR and PEASE LLP
52 East Gay Street
Columbus, OH 43215

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | : | CHAPTER 11 |
| | : | (Jointly Administered) |
| **AMERICAN CLASSIC VOYAGES CO.,** | : | |
| *et al.* | : | Case No. 01-10954 (KJC) |
| Debtors | : | |

| | | |
|---|---|---|
| | : | |
| **AMERICAN CLASSIC VOYAGES CO.,** | : | |
| *et al.*, Debtors, by and through | : | |
| Paul Gunther, Plan Administrator, | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| **JP MORGAN CHASE BANK,** | : | |
| **NATIONAL CITY BANK OF** | : | |
| **MICHIGAN/ILLINOIS, AND** | : | |
| **HIBERNIA NATIONAL BANK,** | : | |
| | : | |
| Defendants | : | Adv. Pro. No. 03-56998 (KJC) |

# OPINION[1]

## BY:   KEVIN J. CAREY, UNITED STATES BANKRUPTCY JUDGE

### BACKGROUND

On October 16, 2003, American Classic Voyages Company ("AMCV") and its affiliates,[2]

---

[1]This Opinion constitutes the findings of fact and conclusions of law required by Fed. R. Bankr. P. 7052. This court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b) and §157(a).  This is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(F).

[2]On October 19, 2001, AMCV filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  On October 22, 2001, the following AMCV affiliates filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code: Great Pacific NW Cruise Line, L.L.C.; DQCV, L.L.C. f/k/a Delta Queen Coastal Voyages, L.L.C.; Cape Cod Light, L.L.C.; Cape May Light, L.L.C.; DQSB II, Inc.; AMCV Holdings, Inc.; Ocean Development Co.; Great Hawaiian Cruise Line, Inc.; CAT II, Inc.; Great Independence Ship Co.; Great Hawaiian Properties Corporation; American Hawaii Properties Corporation; AMCV Cruise Operations, Inc.; TDQS Co. f/k/a The Delta Queen Steamboat Co.; Cruise America Travel, Incorporated; Great AQ Steamboat, L.L.C.; Great Ocean Cruise Line, L.L.C.; Great

by and through Paul Gunther, the Plan Administrator (the "Plaintiffs"), filed a complaint against

defendants JP Morgan Chase Bank ("Chase"), National City Bank of Michigan/Illinois ("NCB"),

and Hibernia National Bank ("Hibernia")(collectively, the "Banks" or the "Bank Defendants") to

avoid an allegedly preferential transfer pursuant to Sections 547(b) and 550(a) of the Bankruptcy

Code. 11 U.S.C. §§547 and 550. The transfer at issue is a payment made to the Banks on

August 14, 2001 in an amount exceeding $29 million dollars.

The Plaintiffs were pursuing preference actions against other defendants simultaneously

with this adversary proceeding. After a status conference held on November 30, 2005, the Court

(by my immediate predecessor in this adversary proceeding) issued an order directing that a

consolidated trial would be limited to the common issue of whether some or all of the Debtors

were solvent on the dates of the transfers at issue in the adversary proceedings and, to the extent

necessary, whether the Debtors were solvent on the petition dates.[3] (D.I. #117). On June 23,

2006, the parties filed a Joint Pretrial Memorandum ("JPM"). (D.I. #100, #110, and #133).

Prior to trial, the other adversary proceedings settled, but trial on the solvency issue moved

forward with the Bank Defendants.[4]

The solvency trial was held between July 20, 2006 and July 25, 2006. Thereafter, the

River Cruise Line, L.L.C. and DQSC Property Co. (collectively, the "Debtor Affiliates"; together with AMCV, the "Debtors"). On October 22, 2001, the Court entered an order granting AMCV's motion for joint administration. (AMCV main case, D.I. #34).

[3]To meet the elements of Bankruptcy Code §547(b), the solvency of the debtor must be determined as of the date of the transfer. 11 U.S.C. §547(b)(3); *See Travellers Int'l AG v. Trans World Airlines, Inc. (In re Trans World Airlines, Inc.),* 134 F.3d 188, 193 (3d Cir. 1998), *Lids Corp. v. Marathon Investment Partners, L.P. (In re Lids Corp.),* 281 B.R. 535, 540 (Bankr.D.Del. 2002).

[4]The settling defendants included in the consolidated solvency trial were American Airlines, Inc. (Adv. No. 03-51370), Equity Group Investments, LLC (Adv.No. 03-57043), and Atlantic Marine, Inc. (Adv. No. 03-57121).

Plaintiffs and the Banks submitted proposed findings of fact and conclusions of law and post-trial briefs. On October 11, 2006, the parties filed a "Notice of Completion of Briefing with Respect to Post-trial Solvency Briefing." (D.I. #178).

For the reasons set forth below, I conclude that the Plaintiffs have not proven, by a preponderance of the evidence, that the Debtors were insolvent on the date of the transfer.[5]

## FINDINGS OF FACT[6]

### The Debtor's Operations.

AMCV was a holding company, which, through its subsidiaries, operated four cruise lines under the brand names "The Delta Queen Steamboat Company," "American Hawaii Cruises," "United States Lines," and "Delta Queen Coastal Voyages." AMCV was incorporated in Delaware in 1985 and went public in 1992.

    a.    The Inland Waterway Cruise Lines.

The Delta Queen Steamboat Company ("DQSC") operated three paddlewheel steamboats

---

[5]As described later, the transfer at issue was made from a Merrill Lynch investment account, but the parties do not agree on which entity owned the disputed funds. The Plaintiffs argue that the account was owned solely by AMCV and, once the funds were placed into the Merrill Lynch investment account, they became property of AMCV. Therefore, the Plaintiffs argue that the transfer was made by AMCV to the Bank Defendants as guarantor of the loan between Delta Queen Steamboat Company ("DQSC") and the Defendants (defined *infra* as the "Chase Facility"). The Bank Defendants, relying on bank documents listing DQSC as the sole borrower, the June 30, 2001 Form 10-Q SEC filing (Defendant Trial Exhibit 151) and other documents, argue that the transfer was made by or on behalf of DQSC. The Plaintiffs argued that, by agreement (memorialized in a January 23, 2006 Court Order), the issue at trial was limited to the issue of solvency, not who the particular transferor was, a disputed fact which requires further discovery before being ripe for determination. The Court would normally be required to first identify who the transferor is, since it is that entity's solvency which is relevant to the preference analysis. Both experts, however, opined at trial on the solvency of AMCV and DQSC separately. Because I conclude that the Plaintiffs failed to prove the insolvency at the relevant time of either AMCV or DQSC, I need not make the determination of which entity was the transferor in the matter before me.

[6]Many of the facts in this section are taken from the Statement of Uncontested Facts attached as Schedule B to the JPM.

3

(the Delta Queen, the American Queen, and the Mississippi Queen) that provided overnight passenger cruises along the Mississippi River and other inland waterways of the United States. The DQSC also operated a vessel (the Columbia Queen), acquired in 1999, that provided overnight passenger cruises in the Pacific Northwest. DQSC was the largest provider of overnight cruises in the domestic waterways and rivers cruise market. (DTE 16 at 8).

On or about May 1, 1999, Delta Queen Coastal Voyages contracted with Atlantic Marine, Inc. ("AMI") to manufacture two new vessels (together, the "Coastal Vessels"), which were intended to cruise along the Atlantic Coast of the United States and Canada, with winter destinations in South and Central America. The first Coastal Vessel (the cv. Cape May Light) originally was scheduled for delivery on March 2001 and the second Coastal Vessel (the cv. Cape Cod Light) originally was scheduled for delivery in June 2001. AMI delivered the Cape May Light on April 12, 2001, and it was entered into service on May 5, 2001. Delivery of the Cape Cod Light was expected in the second quarter of 2002.

      b.    The Hawaiian Cruise Lines.

American Hawaiian Cruises, acquired by AMCV in 1993, operated a vessel (the Independence steamship) that provided overnight passenger cruises among the Hawaiian Islands. United States Lines also operated a vessel (the Patriot) that provided overnight passenger cruises among the Hawaiian Islands. In October 1999, AMCV acquired the rights to United States Lines' name and purchased the Patriot for $114.5 million from Holland American Lines ("HAL"). The purchase price was financed with $30 million in proceeds from the issuance of convertible preferred securities and an $84.5 million dollar promissory note issued to HAL and secured by the vessel.

4

Under the Passenger Vessel Act of 1886 and related United States laws, only U.S. ships that are (1) U.S. built, (2) owned by U.S. citizens, (3) operated by U.S. crews and officers, and (4) U.S. flagged by the U.S. Coast Guard are permitted to operate exclusively among U.S. ports, including the Hawaiian islands.[7]  AMCV was the only U.S.-flagged, large scale, overnight cruise line operator providing inter-island vacations among the Hawaiian islands.  Vessels not qualifying under the Passenger Vessel Act were required to include in their itineraries a call in at least one foreign port, adding a minimum of three sailing days on the Pacific Ocean, away from the Hawaiian Islands.  (Defendant Trial Exhibit No. 16, at 3, Annual Report for Year Ended December 31, 2000 filed on Form 10-K with the Securities and Exchange Commission).[8]

In 1997, the U.S. Flag Cruise Ship Pilot Project statute (the "Pilot Project Statute") was enacted to develop the U.S. flagged cruise ship industry and stimulate commercial construction of cruise ships in the United States.  Dept. of Defense Appropriations Act, Pub. L. 105-56, §8109, 111 Stat. 1203, 1244-45(Oct. 8, 1997).[9]

In March 1999, AMCV and certain of its subsidiaries executed agreements with Ingalls Shipbuilding (n/k/a Northrop Grumman Ship Systems, Inc.)("Ingalls") to construct two new vessels ("Project America Ship 1" and "Project America Ship 2"; collectively, the "Project America Ships").  The ships were intended to sail in the Hawaiian cruise market under the

---

[7]*See* 46 App. U.S.C.A. §289 (2001) *repealed by* Pub. L. 109-304, §19, (Oct. 6, 2006), 120 Stat. 1710, *re-codified as* 46 U.S.C.A. §55103 (2007).

[8]Hereinafter, Defendant's Trial Exhibits will be referred to as "DTE ___"; and Plaintiffs' Trial Exhibits will be referred to as "PTE___."

[9]Consequently, Federal law provided a potentially enormous benefit to the U.S. domestic Hawaiian cruise business, a result apparently intended.

United States Lines' banner.   The original contract with Ingalls called for delivery of Project

America Ship 1 in January 2003 and Project America Ship 2 in January 2004.   Pursuant to a

Settlement Agreement and Contract Modification dated August 15, 2001, the delivery dates were

extended to January 2004 and February 2005, respectively.

      c.      Funding for the Project America Ships and the Coastal Vessels.

The Debtors anticipated funding a significant portion of the ongoing construction of the

Project America Ships and Coastal Vessels through the issuance of debt instruments guaranteed

by the United States Maritime Administration's ("MARAD") Title XI ship financing guarantee

program.   Under that program, MARAD provided commitments to guarantee the payment of

private debt issued by the Debtors up to 87.5% of construction costs.   MARAD's guarantee was

secured by a lien on the vessels.   On April 8, 1999, the Debtors received a commitment from

MARAD for up to $1.1 billion in financing guarantees.

      d.      Headquarters Relocation.

On September 8, 2000, the Debtors announced their intention to relocate their corporate

and operational headquarters from Chicago and New Orleans to a new leased facility in Sunrise,

Florida.   Construction of the new headquarters was expected to be completed by November 2001

and relocation to be largely completed by early 2002.

**The Chase Facility.**

On February 25, 1999, DQSC, and certain of its subsidiaries and affiliates, entered into a

syndicated loan agreement with JPMorgan Chase Bank, Hibernia Bank, Bank One Louisiana,

NA, Credit Agicole Indosuez and The Bank of New York.   The loan agreement provided a

$70,000,000 revolving line of credit facility to DQSC (the "Chase Facility").

6

The Annual Report for Year Ended December 31, 1999 filed on Form 10-K with the Securities and Exchange Commission stated that the Chase Facility was "secured by all of the assets of The Delta Queen Steamboat Company, except for the American Queen." In particular, the Chase Facility was secured by pledges and first priority ship mortgages encumbering two of the Debtors' riverboats (the Mississippi Queen and the Delta Queen), and, generally, by certain miscellaneous assets consisting of the reservation system, inventory, customer database and related trademarks and tradenames.

On September 14, 2000, the Chase Facility was amended and restated, reducing the amount of the facility to $30 million (the "Amended and Restated Chase Facility"), of which $500,000 was set aside on December 15, 2000 pursuant to a letter of credit executed by DQSC in connection with an office lease agreement. The lenders under the Amended and Restated Chase Facility documents were the Bank Defendants (i.e., Chase, Hibernia, and NCB), with Chase as the administrative agent.

AMCV's quarterly report for the period ending June 30, 2001, filed on Form 10-Q with the Securities and Exchange Commission (the "June 30, 2001 Form 10-Q"), stated that the Amended and Restated Chase Facility was "secured by all of the assets of DQSC except the American Queen, Cape May Light, Cape Cod Light and the Columbia Queen." The Collateral securing the Amended and Restated Chase Facility remained the same as that under the $70 million line.

On September 14, 2000, AMCV executed an unsecured "Parent Guaranty" in favor of the Bank Defendants, which provides that "the Guarantor [AMCV] unconditionally and irrevocably guarantees ... all of the obligations of the Borrower under the Credit Agreement."

7

On January 10, 2001, DQSC drew $500,000 on the Amended and Restated Chase Facility. On May 22, 2001, DQSC, as borrower, drew on the Amended and Restated facility, faxing its Notice of Borrowing to the agent, Chase, requesting $29,5000,000. On the same date, each of the Banks transferred $9,833,333.33 to the DQSC Master Clearing Account (the "Funds"). From the DQSC Master Clearing Account, the Funds were transferred directly to an interest bearing Merrill Lynch investment account (Account Number 318-3271750-7)(the "Merrill Lynch Account").

The Funds identifiable as proceeds from the borrowing on the $30 million Amended and Restated Chase Facility remained in the Merrill Lynch Account and were untouched from the time of the initial borrowing until August 14, 2001, the date on which the borrowing was repaid (the "Transfer").

On August 14, 2001, the parties amended the Amended and Restated Chase Facility, reducing it to a $10 million line of credit ("Amendment No. 1 to the Amended and Restated Chase Facility"). The Amendment No. 1 to the Amended and Restated Chase Facility provided that "[t]his Amendment shall become effective as of the date on which the Agent [Chase] shall have received . . . (iii) repayment described in Section 1 of the Waiver . . . ." In turn, Section 1 of the Waiver, provided that "[i]n consideration of the foregoing waiver, the Borrower hereby agrees that concurrently with its execution hereof, the Borrower will repay the outstanding Revolving Loans, together with accrued and unpaid interest thereon and all amounts owing in connection therewith pursuant to Section 2.09(d) of the Credit Agreement . . . ."

DQSC never drew on the restructured $10 million line of credit.

8

### The Events of September 11, 2001 ("9/11")

On September 11, 2001, in a series of coordinated attacks, Islamic extremists hijacked four commercial jet airliners, two of which were flown intentionally into the World Trade Center Towers in New York City and one of which was flown intentionally into the Pentagon in Washington, D.C. The fourth airliner crashed into a field in rural Pennsylvania, having been diverted from its intended target (either the United States Capitol or the White House) by the airliner's determined passengers. Almost 3,000 people died. *See generally* THE 9/11 COMMISSION REPORT: FINAL REPORT OF THE NATIONAL COMMISSION ON TERRORIST ATTACKS UPON THE UNITED STATES, Executive Summary (July 22, 2004) *available at* http://www.9-11commission.gov/report/index.htm.[10]

### Bankruptcy and Disposition of the Vessels.

Scarcely one month after 9/11, AMCV sought bankruptcy relief.[11] Upon filing for bankruptcy, all of AMCV's cruise operations were cancelled except those on the Delta Queen, which was scheduled to continue operating until January 5, 2002, after which the Delta Queen ceased operations. Starting in late 2001 and into 2002, in connection with the bankruptcy cases, the Debtors disposed of all of their vessels through auction sale to third parties, abandonment or transfer to MARAD. MARAD held liens on the Columbia Queen, American Queen, Coastal

---

[10] I take judicial notice of this portion of The 9/11 Commission Report pursuant to Fed.R.Evd. 201, made applicable to this proceeding pursuant to Fed.R.Bankr.P. 9017. ("Federal Rule of Evidence 201 authorizes a court to take judicial notice of an adjudicative fact 'not subject to reasonable dispute'...[and] so long as it is not unfair to a party to do so and does not undermine the trial court's fact finding authority." *In re Indian Palms Assoc.*, 61 F.3d 197, 205 (3d Cir. 1995)).

[11] AMCV's bankruptcy petition was filed on October 19, 2001. The Debtor Affiliates filed their petitions on October 22, 2001. *See* n.2, *supra.*

Vessels, the Independence, and the Project America Ships.

In late 2001, the Debtors retained Chanin Capital Partners and American Marine Advisors as financial advisors to find a strategic or financial buyer or investor for the Delta Queen Riverboats, the Coastal Vessels, and their respective franchises. The vessels were disposed of as follows:

(1)    <u>The Independence.</u> The Independence was abandoned by the Debtors pursuant to court order dated October 30, 2001.

(2)    <u>The Patriot.</u> The Patriot was sold at public auction in January 2002 to HAL for a credit bid of $79,769,783, which was the then outstanding amount of principal and accrued interest secured by HAL's lien on the Patriot.

(3)    <u>The Delta Queen Riverboats.</u> According to the Disclosure Statement, on May 3, 2002, an auction was held for the sale of the Delta Queen Riverboats and the related assets. The auction consisted of six bidding lots comprised of various combinations of the four vessels and the related assets as follows:

(a)    Lot 1 was comprised of the Delta Queen and the Mississippi Queen;
(b)    Lot 2 was comprised of the American Queen;
(c)    Lot 3 was comprised of the Columbia Queen;
(d)    Lot 4 was a combination of Lots 1 and 2;
(e)    Lot 5 was a combination of Lots 1 and 3; and
(f)    Lot 6 was a combination of Lots 1, 2, and 3.

Lot 4, which was comprised of Lots 1 and 2, was sold at auction to Delaware North Companies, Inc. ("DNC") for $80.9 million, consisting of $33,588,490.60 in cash, a promissory note of $2,788,509.40, and assumption of certain obligations to MARAD in the amount of $44,523,000. Bidding on Lot 3 for the Columbia Queen did not exceed the reserve set

10

by MARAD, accordingly the vessel was not sold at auction. Instead, with court approval, MARAD exercised its rights with respect to the Columbia Queen.

 (4) <u>The Coastal Vessels.</u>  On March 18, 2002, the Bankruptcy Court signed a Stipulation and Order Granting Limited Modification of the Automatic Stay as to the Cape Cod Light, whereby the Debtors turned over the Cape Cod Light to MARAD and AMI. On April 9, 2002, the Bankruptcy Court signed a Stipulation and Order Granting Limited Modification of the Automatic Stay as to the Cape May Light, whereby the Debtors turned over the Cape May Light to MARAD and AMI.

 (5) <u>The Project America Vessels.</u>

After the bankruptcy filing, the Project America Vessels also were turned over to MARAD. In May 2002, MARAD authorized Ingalls to sell the hull and equipment of the Project America Vessels to Norweigan Cruise Lines and account to MARAD for the net profits. (PTE 76, at 2-3). MARAD agreed that $14 million of the sale proceeds were attributable to the Project America Vessels, although $12 million of those sale proceeds "were necessary to complete the hull sufficiently to make it floatable and towable in international waters." (*Id.*). MARAD retained only $2 million of the net sale proceeds from the Project America Vessels. (*Id.*).

## DISCUSSION

To recover a preferential transfer, the Plaintiffs must show that the Transfer satisfies all five elements of §547(b) of the Bankruptcy Code; specifically, that the Transfer was:

 (1) to or for the benefit of a creditor;
 (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

11

(3)    made while the debtor was insolvent;

(4)    made on or within 90 days before the date of the filing of the petition (unless the payee was an insider); and

(5)    that enables such creditor to receive more than such creditor would receive if the case had been a chapter 7 liquidation and the creditor had not received the transfers.

11 U.S.C. §547(b). By agreement of the parties, the only element addressed at trial was the third

element. Pursuant to Bankruptcy Code §547(f), "the debtor is presumed to have been insolvent

on and during the 90 days immediately preceding the date of the filing of the petition." 11

U.S.C. §547(f). Federal Rule of Evidence 301, made applicable hereto by Fed.R.Bankr.P. 9017,

provides that:

> [A] presumption imposes on the party against whom it is directed the burden of going forward with evidence to rebut or meet the presumption, but does not shift to such party the burden of proof in the sense of the risk of nonpersuasion, which remains throughout the trial upon the party on whom it was originally cast.

Fed.R.Evd 301; *Homeplace of America, Inc. v. Salton, Inc. (In re Waccamaw's Homeplace)*, 325

B.R. 524, 528-29 (Bankr.D.Del. 2005). A creditor may rebut the Bankruptcy Code §547(f)

presumption "by introducing some evidence that the debtor was not in fact insolvent at the time

of the transfer. If the creditor introduces such evidence, the trustee must prove insolvency by a

preponderance of the evidence." *Lawson v. Ford Motor Co. (In re Roblin Indus., Inc.)*, 78 F.3d

30, 34 (2d Cir. 1996).

Pursuant to Bankruptcy Code §101(32), a corporation is "insolvent" when the "the sum of

such entity's debts is greater than all of such entity's property, at fair valuation...." 11 U.S.C.

§101(32). In determining a "fair valuation" of the entity's assets, an initial decision to be made

is whether to value the assets on a going concern basis or a liquidation basis. *See Heilig-Meyers*

*Co. v. Wachovia Bank (In re Heilig-Meyers Co.)*, 319 B.R. 447, 457 (Bankr.E.D.Va. 2004) *aff'd*

328 B.R. 471 (E.D.Va. 2005) in which the Court wrote:

> The conclusion that a debtor is a going concern or on its deathbed dictates whether to value the debtor's assets based on their liquidation value or the value they would fetch if sold over a reasonable period of time; the assumption being that a going concern could wait for a better offer and presumably a higher price. As such, there is value to being a going concern.

*Heilig-Meyers,* 328 B.R. at 477.

If liquidation in bankruptcy was not "clearly imminent" on the transfer date, then the entity should be valued as a going concern. *Travellers Int'l AG v. Trans World Airlines, Inc. (In re Trans World Airlines, Inc.)*, 134 F.3d 188, 193 (3d Cir. 1998); *Moody v. Security Pacific Business Credit, Inc.*, 971 F.2d 1056, 1067 (3d Cir. 1992). "[A] business does not have to be thriving in order to receive a going concern valuation. Before the going concern valuation is to be abandoned, the business must be 'wholly inoperative, defunct or dead on its feet.'" *Fryman v. Century Factors (In re Art Shirt Ltd., Inc.)*, 93 BR 333, 341 (E.D.Pa. 1988) *citing In re Bellanca Aircraft Corp.*, 56 B.R. 339, 387 (Bankr.D.Minn. 1985). *See also Heilig-Meyers*, 319 B.R. at 457 ("The going concern threshold is very low; a debtor may be financially unstable, but it is still a going concern as long as the amount it could realize from converting its assets to cash in the ordinary course of business exceeds the expenses of conducting business.").

The Bank Defendants' expert, Brian Calvert, opined that both AMCV and DQSC were operating as going concerns on the August 14, 2001 (the "Transfer Date"), and there was nothing to indicate that this was about to change. (Tr. at 74). In support of his opinion, Calvert noted that capital markets were providing financing to the Debtors and predicting robust prospects for the cruise industry. (*Id.*). Moreover, projections and public documents prepared by the Debtors just prior to the Transfer Date were forward-looking and gave no indication of any going concern

13

issues. (*Id.*). The Trustee's expert, Perry Mandarino, agreed that AMCV and its operating subsidiaries continued to operate up until the time of the bankruptcy filing.[12]  (Tr. at 489-90).

AMCV's June 30, 2001 Form 10-Q stated that the company believed it would have adequate access to capital resources, both internally and externally, to meet current short-term and long-term capital commitments and working capital needs. (DTE 151, p.17). On the Transfer Date, the Chase Facility was amended and reduced to a $10 million revolving credit facility that the Debtors did not draw upon. Furthermore, deposition testimony by the Debtors' officers indicated that the Debtor was operating as a viable, going concern prior to 9/11. For example, Randall Talcott ("Talcott"), the vice-president of finance, treasurer, and chief accounting officer for AMCV, testified that, prior to September 11, 2001, the Debtors had sufficient liquidity to continue operating as a viable going-concern. (DTE 183, Talcott Dep. 4/6/05 at 94, 112). Philip Calian ("Calian"), chief executive officer of AMCV, testified that, by the summer of 2001, the Debtors' recovery plan projected increased bookings through the end of the year, which would increase the Debtor's overall yield. (DTE 184, Calian Dep. 4/7/05 at 167-72).

The evidence in this case supports the conclusion that the Debtors were operating as a going concern on the Transfer Date. AMCV and DQSC should be valued, for present purposes, on a going concern basis.

---

[12]Mandarino, however, noted that not all of the cruise ships were operating as of June 30, 2001 [the date he used for valuing the assets] or the Transfer Date because some of the ships were still under construction. (Tr. at 488 - 90). This does not alter the fact that AMCV and DQSC were operating throughout the summer of 2001, including the Transfer Date. The Plaintiffs also argue that the Debtors' hiring of a bankruptcy attorney prior to the Transfer Date provides evidence that the companies were preparing for a liquidation. Talcott's deposition testimony, however, explained that the attorney was hired to aid in the restructure process. (DTE 189, at 57).

14

a.    The Banks' Evidence to Rebut the Presumption of Insolvency.

To rebut the presumption of insolvency, the Banks presented Calvert's expert testimony,

who opined that both DQSC and AMCV were solvent as of the Transfer Date. Calvert employed

a going concern valuation method, the Discounted Cash Flow method ("DCF"), and valued the

asset side of their balance sheets accordingly.[13]   The DCF analysis relies upon three main

components: (i) the size of the expected future cash streams to be generated by the business; (ii)

the discount rate employed in determining the present value of these income streams (also known

as the weighted average cost of capital or "WACC"); and (iii) the terminal multiplier used to

capture any residual value remaining in the business at the end of the projection period. *In re*

*Cellular Information Systems, Inc.*, 171 BR 926, 930 (Bankr.S.D.N.Y. 1994);(Tr. 46-47).

Calvert reviewed projections prepared by AMCV as of July 31, 2001, which included

balance sheet, income statement and cash flow data for years ending December 31, 2001 through

December 31, 2006 (the "July 2001 Projections").[14] (*See* DTE 138, 139 and 140; Tr. at 76).

Calvert also prepared a cash flow calculation, showing the "free cash flow," i.e., the cash flows

that would be available to debt and equity holders during the projection period. (Tr. at 76; DTE

141). Calvert then applied a discount factor of 10.17% to the free cash flow figures to arrive at

---

[13]Calvert testified that there are four basic approaches for valuing the assets of a going concern:
the market comparison approach, the comparable transaction approach, the asset-based approach, and the
discounted cash flow approach. (Tr. at 44). He believes the DCF approach is the most "economically
rigorous" because the approach analyzes factors that an investor considers when evaluating an asset, by
looking at expected future cash flows to be generated by a company and, then, applying a discount rate to
those cash flows, based upon risk, to arrive at their present value. (*See* Tr. at 44-45). *See also Chartwell
Litigation Trust v. Addus Healthcare, Inc. (In re Med Diversified, Inc.)*, 334 B.R. 89, 99 (Bankr.E.D.N.Y.
2005)(noting that leading authorities on business valuation recognize that the DCF method is the most
reliable method for determining the value of a business).

[14]The complete July 2001 Projections were submitted as DTE 47.

15

the discounted cash flow amounts for years ending December 31, 2001 through December 31, 2006. (DTE 141). His calculations to determine the discount factor of 10.17% are set forth on DTE 136 and DTE 137.

Finally, he calculated the terminal value for AMCV using two different methods - - the Exit Multiple Approach and the Gordon Growth Approach.[15] (DTE 142). Based on these analyses, he arrived at a business enterprise value for AMCV in the range $805 - $824 million. (DTE 142). Calvert then subtracted the amount of AMCV's debt and preferred stock ($577,039,000) from the enterprise value, and determined that the difference (or Shareholder (Equity) Value) for AMCV remained positive in the range of $228 - $247 million. His conclusion, therefore, was that AMCV was solvent as of the Transfer Date.[16]

Calvert prepared a similar analysis for DQSC, starting with a review of the July 2001 Projections related to the balance sheet, income statement, and cash flow information for DQSC for the years ending December 31, 2001 through December 31, 2006. (DTE 143, DTE 144, DTE 145). He prepared a discounted cash flow calculation for DQSC, applying the same discount rate

---

[15]The Exit Multiple Approach calculates terminal value by using a comparable company analysis to compute a multiple that can be applied to the terminal year's EBITDA. (Peter V. Pantaleo and Barry W. Ridings, *Reorganization Value*, 51 BUS.LAW. 419, 428 (1996); Tr. at 103-05.) In this case, Calvert used a multiple of 8.5, which he determined from his comparables. (DTE 167). The Gordon Growth Approach, also known as the Perpetuity Method, calculates terminal value by adjusting the company's "normalized cash flow," (which is a level of cash flow that is seen as sufficiently stable and representative of a normal year - - usually the cash flow for the final year of the projection period) with a discount rate that is computed by reducing the WACC by the real growth rate assumed for the cash flows and by the inflation rate implied in the WACC. (Pantaleo, 51 BUS. LAW at 429-30; Tr. at 99-101). In this case, Calvert anticipated a growth rate of two percent and adjusted the WACC accordingly.

[16]Calvert's valuations of AMCV and DQSC were made as of the date of the July 2001 Projections, i.e., July 31, 2001. Because this date is close in time (within two weeks) to the Transfer Date, and there was no evidence of any material change in the Debtor's financial condition between July 31, 2001 and the Transfer Date, Calvert opined that the valuation made as of July 31, 2001 was relevant in determining the solvency of AMCV and DQSC on the Transfer Date. (Tr. at 136-37). I agree.

of 10.17% to the free cash flows of DQSC. (DTE 146). He used both the Exit Multiple Approach and Gordon Growth Approach to determine terminal values for DQSC and then calculated the business enterprise value for DQSC in the range of $305 to 351 million. (DTE 147). After subtracting the amount of DQSC's debt in the amount of $154,252,000, he determined that the difference (or Shareholder Value) for DQSC was in the positive range of $151 to $196 million. Calvert concluded that DQSC also was solvent as of the Transfer Date.

The Plaintiffs argue that Calvert's analysis is flawed and, therefore, the Banks failed to rebut the presumption of insolvency. First, they argue that Calvert's reliance on reports and projections prepared by the Debtors' management for determining the future cash flows is misplaced, since those reports and projections were speculative and inconsistent with the Debtors' past performance and current financial situation. The Plaintiffs argue that, beginning in 1999, the Debtors embarked on a plan to expand their fleet of ships, which increased their debt substantially and caused the Debtors' financial condition to deteriorate into insolvency. (See Tr. at 366-68). In particular, the Debtors' operations expanded from three paddlewheel steamboats cruising on the Mississippi River and one ship servicing the Hawaiian Islands, to a much larger fleet by adding six new ships: the Debtors purchased two existing ships (the Columbia Queen, which serviced the Pacific Northwest, and the Patriot, which serviced the Hawaiian Islands) and contracted for the building of four new ships (the Coastal Vessels and the Project America Ships).

The Plaintiffs' expert, Perry Mandarino ("Mandarino"), testified that, as a result of this expansion, the Debtors' indebtedness grew from approximately $84.6 million as of December 31, 1999 to over $577 million as of June 30, 2001. (Tr. at 367-68, PTE 9, Ex.L). In the same period,

17

the Debtors' operations were generating declining EBITDA, falling from an EBITDA of $18.1 million as of December 31, 1999, to an EBITDA of $3.3 million as of December 31, 2000, to a negative EBITDA of $22.2 million for the six month period ending June 30, 2001.[17] (Tr. 369-70, PTE 9, Ex. A). Furthermore, in the first six months of 2001, both the vessel capacity utilization rates and the revenue per passenger per night were not meeting budgeted expectations. (Tr. 371, 376, PTE 9, Exs. C and D).

More specifically, however, the Plaintiffs argue that the July 2001 Projections were unreliable, thereby undermining Calvert's entire solvency analysis. The Plaintiffs claim that, despite the Debtors' negative performance in early 2001 and other documents indicating continuing financial pressures, (such as an internal memo dated July 18, 2001 discussing an "increasingly weak performance for the remainder of 2001 (vs. strong comparative quarters for 2000)" (PTE 24), and a report from an outside analyst predicting that the company would have a negative EBITDA for 2002 (referenced in DTE 75)), the July 2001 Projections inaccurately portray a recovering business. The Plaintiffs further insist that Calvert should not have relied upon the July 2001 Projections without due diligence, nor should Calvert have adopted the July 2001 Projections *in toto* without examining the reliability of individual elements.

The Banks agree that the Debtors experienced financial difficulties in the first half of 2001, but argue that these difficulties do not prove that the Debtors were insolvent on the Transfer Date. The Banks point to other evidence demonstrating that the Debtors had started to redress some of the difficulties as of the Transfer Date. For example, documents created in June

---

[17]"EBITDA" is an acronym for "Earnings Before Interest, Taxes, Depreciation and Amortization."

and July 2001 show that bookings in the Hawaii market were increasing at a rate suggesting the Debtors would exceed their previous forecasts for the third and fourth quarters of 2001. (DTE 108, 113). Statements in the June 30, 2001 Form 10-Q show that the company had implemented a cost-reduction strategy to decrease costs in the second half of 2001 and that management anticipated that the company would have access to capital resources sufficient to meet its current short-term and long-term capital needs. (DTE 151). Further, in the summer of 2001, the Debtors resolved a dispute with Ingalls regarding the construction of the Project America Ships. (DTE 25). The settlement was critical to the Debtors because it resolved open issues regarding the delivery dates and final cost of the Project America Ships. (DTE 184, Calian Dep. at 80-81).

Calvert testified that he relied upon the July 2001 Projections after reviewing Talcott's deposition, in which he stated that the July 2001 Projections were viable and consistent with management's views at that time of the Debtors' future performance. (DTE 189, Talcott Dep. 5/19/05 at 62-68). Calvert also testified that he found the July 2001 Projections to be reliable because they were very detailed (i.e., growth, capacity and other figures were prepared separately for each ship), were consistent with the companies' plans for expansion and strategy that focused on the Hawaiian market, and were consistent with the cruise industry's positive outlook at that time. (Tr. at 37-41). He stated that any post hoc adjustment made to the Projections would be "nothing but arbitrary." (Tr. at 42).

Arguably, the Debtors' July 2001 Projections may be viewed as optimistic. Normally, the reasonableness of such projections "must be tested by an objective standard anchored in the comany's actual performance." *Moody*, 971 F.2d at 1073. In this case, however, the Debtors were in the midst of a major expansion and Calvert opined that, although historical numbers are

19

typically useful, here they were not sufficient to bridge the gap to the future for purposes of determining value. (Tr. at 38). "[A] court must consider the reasonableness of the company's projections, not with hindsight, but with respect to whether they were prudent when made." *MFS/Sun Life Trust - High Yield Series v. Van Dusen Airport Services Co.*, 910 F.Supp. 913, 944 (S.D.N.Y. 1995).

Both parties agree that the Debtors experienced serious financial issues in early 2001. The Plaintiffs argue that the evidence reflects the Debtors' downward spiral beginning in early 2001 (if not before) and ending with the bankruptcy filings in October 2001. The Banks, however, argue that the evidence demonstrates that the Debtors were implementing measures to improve the companies' finances so that, as of the Transfer Date, the Debtors were a viable, solvent going concern. The Banks claim that the unforeseeable events of 9/11, and their effect upon the travel industry as a whole, forced the Debtors into bankruptcy. The Banks' position is consistent with the evidence.

The events of 9/11 had a devastating effect on the tourism industry and, in particular, the Debtors' business. In his April 7, 2005 deposition, Calian iscussed the profound effect of 9/11 on AMCV's business. Prior to 9/11, the Debtors' vessels were fully booked through the end of 2001. (DTE No. 184, p. 91). Immediately after 9/11, the Debtors faced operational difficulties in transporting staff and customers home from the cruises, since over 90 percent traveled by air, especially from Hawaii. (*Id.* at 91-93). Then, within a week, the Debtors experienced an unprecedented number of cancellations (which, because of the circumstances, were accepted without economic penalties), as well as no new bookings. (*Id.* at 92-95). Calian stated that 9/11 reversed all of the actions the Debtors had taken in the summer of 2001 to improve their

financial situation, including the settlement with Ingalls Shipyard, cost reductions, a more

realistic view of revenue assumptions going forward, and cash conservation steps. (*Id.* at 94).

Within a few weeks of 9/11, Calian realized that the cancellations and absence of bookings were

"real." (*Id.*).

Other members of the Debtors' management confirmed Calian's description of the effect

of September 11, 2001 on the Debtors' business. In his November 27, 2001 deposition, shortly

after the bankruptcy filing, Jordan B. Allen, executive vice president, general counsel and

secretary to AMCV, stated:

> Prior to September 11th, we felt that we had turned the corner on our business, both on ...
> the expense side and the revenue side. In fact, the second six months of the year,
> particularly in Hawaii, but across both brands, was much more positive. And indications
> for 2002 were also favorable. September 11th was a catastrophic event in our business
> and in our industry. It created ... a situation that was just too significant to recover from.
> Our business, particularly in Hawaii, was off 50%. Our business on the Delta Queen side
> of the business actually was off less than that, close to about 25 to 30 percent...

(DTE 176 at 104). (*See also* DTE 183, Talcott Dep. 4/6/05, at 157-58).[18]

The facts established here demonstrate that, while the Debtors had serious financial issues

in early 2001, they had taken steps to address their financial challenges and, as of the Transfer

Date, had reason to be optimistic about the future. The unforeseen events of September 11, 2001

dealt a fatal blow to their business. The evidence presented in this case supports the conclusion

that the projections were reasonable when prepared.

---

[18]In a previous hearing in this case with respect to stay relief and adequate protection, one of my
predecessors in this case, the Honorable Erwin I. Katz, Bankruptcy Judge, stated:

> The testimony that I've heard is that this was a profitable business. Absent September 11 and
> what happened to the industry after September 11, this would never have been in a bankruptcy
> situation - - I can't say never, but at least the likelihood would have been that it would not have.
> And what affected the debtor here was the sudden cessation of tourism and the sudden cessation
> of operations which happened after September 11.

(DTE 78, Tr. 12/18/01 at 4).

Second, the Plaintiffs attack Calvert's calculation of the discount rate. Calvert determined the discount rate by using a Weighted Average Cost of Capital calculation (or "WACC"). (DTE 136, DTE 137, DTE 162). Calvert analyzed three elements to arrive at his WACC Calculation: the capital structure, the cost of debt, and the cost of equity. (Tr. at 54). He arrived at his figure of 22% for the capital structure (or "Debt to Total Capital" in his report) by observing how comparable companies in the industry are capitalized. (Tr. at 78-81). Calvert explained that his capital structure was a conservative figure, because an argument could be made for using more debt in this case. (Tr. at 81). However, if he had used a higher debt figure, the discount rate would have been lower, thereby making the enterprise value higher and, in such an analysis, AMCV and DQSC would still be solvent. (Tr. at 81-83).

Next, Calvert determined the cost of equity by using the capital asset pricing model (or "CAPM), which is used most often for estimating the cost of equity in a DCF analysis. (Tr. at 57).[19] The CAPM calculation requires a determination of the beta, risk-free rate of return and equity risk premium. (DTE 136). The "beta" measures how the particular investment will react to the stock market. (Tr. 60). Because AMCV was a public company, Calvert could have

---

[19]CAPM is a formula that was developed to calculate the cost of equity capital. Peter V. Pantaleo and Barry W. Ridings, *Reorganization Value*, 51 BUS.LAW. 419, 433, n. 52 (1996). "While there are other models to determine equity, CAPM is probably the most widely used." *Id.* The CAPM formula is:
  Cost of Equity = R(f) + (Beta x [R(m) - R(f)])
Where: R(f)  =  risk free rate
  Beta  =  beta of the target's equity security
  R(m)  =  expected return on a market portfolio consisting of a large number of diversified stocks
*Id. See also* DTE 163. "This formula, in essence, provides that a firm's cost of equity is equal to the sum of the risk-free rate of return plus a risk premium (i.e., a return above the risk free rate). The risk premium for the firm is calculated by multiplying the risk premium that the equity market generally must pay to attract investors by the firm's "beta," which...reflects the risk associated with an equity investment in the firm relative to the risk of an investment in the equity market as a whole." Pantaleo, 51 BUS.LAW at 433-34.

observed AMCV's beta in the capital markets. (Tr. at 61). However, because it was unclear how broadly AMCV's stock was traded, Calvert decided to take a more rigorous approach and performed a peer group analysis comprised of companies that might have a similar reaction to systematic (or market) risk, and arrived at a beta of 0.55. (Tr. at 61-62, at 83-89).

The Plaintiffs argued that the companies used in Calvert's peer group analysis were not comparable to AMCV and criticized Calvert's reliance on comparables generated through an internet research database operated by Capital IQ. (Tr. 210-16; DTE 148). The Plaintiffs also argued that Calvert's use of monthly beta observations, rather than weekly, could have skewed his valuation analysis. Plaintiff's expert, Mandarino, then performed seven alternative DCF analyses using Calvert's figures, but adjusting an item on each analysis to demonstrate that, with each adjustment, the DCF would result in a negative valuation for AMCV and DQSC. (PTE 109A). Calvert explained why he disagreed with the various adjustments made by Mandarino.[20] While each expert presents valid arguments, I am persuaded, in part, by Calvert's extensive experience in performing valuations, and whose methods more closely followed generally accepted procedures. Calvert testified about his twenty years of experience in this field and stated that he has performed over 200 valuations (Tr. at 25, 62-63, 632).[21]

In sum, I find that Calvert's DCF calculation and solvency analysis are more reliable than the random adjustments made thereto by Mandarino, and present sufficient evidence to rebut the

---

[20]For example, Calvert explained why he used a small cap premium in his cost of equity analysis instead of the Ibbotson Size Premium (Tr. at 625-28); why using an unsystematic risk premium in the discount rate was inappropriate (Tr. at 629); and why he disagreed with using weekly observed beta because it introduced statistical "noise" into the calculation (Tr. at 634).

[21]Mandarino is a certified public accountant and was qualified appropriately as an expert in this case, but with far less experience in performing solvency analyses. (Tr. at 460-61). Aside from AMCV, Mandarino had performed only one other peer group beta analysis. (Tr. at 582).

§547(f) presumption of insolvency. To prevail, the Plaintiffs must now prove, by a preponderance of the evidence, that the Debtors were insolvent on the Transfer Date. *Roblin Ind.*, 78 F.3d at 34.

        b.     The Plaintiff's Evidence of Insolvency.

The Plaintiffs introduced Mandarino's expert testimony. Mandarino prepared two reports in connection with this adversary - - a Report on Solvency Analysis dated February 18, 2005 (PTE 9)(the "Solvency Analysis") and a Rebuttal Report of Perry Mandarino dated January 31, 2006 (PTE 10)(the "Rebuttal Report"). In his Solvency Analysis, Mandarino used the "Adjusted Balance Sheet Approach" and determined that the value of the assets of AMCV and DQSC was less than the companies' liabilities as of June 30, 2001, thereby declaring both AMCV and DQSC to be insolvent.[22] (PTE 9, at 3-4; Tr. at 381-82). In the Rebuttal Report, Mandarino challenged the solvency determination prepared by an expert retained by one of the defendants that settled with the Plaintiffs prior to trial. The Rebuttal Report does not contain a business valuation or insolvency analysis. (Tr. at 558).

In his Adjusted Balance Sheet Approach, Mandarino calculated the "fair saleable value" of AMCV's and DQSC's assets as of June 30, 2001. (Tr. at 382). Although the transfers at issue were not made until August 14, 2001, Mandarino testified that the June 30th date was appropriate because the financial information he reviewed showed that the companies continued to lose money through July and August 2001. (Tr. at 394).

---

[22]Mandarino noted that the Income Approach was a "valuable technique used to value the properties of a company on an enterprise level." (PTE 9, at 4). However, he did not perform such a valuation because he did not have detailed projected financial information. (*Id.*). Mandarino was not aware of the existence of the July 2001 Projections at the time he prepared his Solvency Analysis. (Tr. at 469).

In valuing the companies' ships, Mandarino considered whether the ships were operating as of June 30, 2001, or whether they were sitting in a shipyard under construction. (Tr. at 383-84). He assigned a value of zero to the Project America Ships that were under construction, because he believed no buyer would pay more than the debt on those ships due to the risks associated with the on-going dispute with the shipbuilder and the delays in completing construction. (Tr. at 384-86). Because the Project America Ships were not operating as a going concern as of the Transfer Date, Mandarino believed that the value of those ships would not change regardless of whether he employed a going concern or liquidation valuation method. (Tr. at 386).

When valuing the ships in operation as of June 30, 2001, Mandarino was able to look only to sales or bids that occurred post-9/11 and post-bankruptcy. Mandarino testified that it was difficult to value the Delta Queen, Mississippi Queen and American Queen Riverboats because they were unique and no competitor existed with similar assets (i.e., paddlewheel boats with no gambling) to provide a comparable market value. (Tr. at 388-89). He determined that the best benchmark of value for the Riverboats was the post-petition sale held in May 2002 (nine months after the Transfer) in accordance with Bankruptcy Code §363, which resulted in a sale price of $80.9 million for the three Riverboats. (Tr. at 388-92). Mandarino also testified that he valued the Columbia Queen Riverboat based on the MARAD credit bid made post-bankruptcy (more than nine months after the Transfer) when the vessel was no longer in operation. (Tr. at 518). Similarly, he valued the Cape May Light and the Cape Cod Light vessels based upon the MARAD post-bankruptcy credit bid (seven months after the Transfer). (Tr. at 509, 519).

The vessels used in the Hawaiian market were also valued in this manner. Mandarino

25

valued the Independence at approximately $4 million based upon a public auction that occurred on February 26, 2003 (eighteen months after the Transfer). (Tr. at 526, PTE 9 at S-8). He valued the Patriot at $59 million based upon an offered made by Capricorn Cruise Line Pty. Ltd. on February 22, 2002, (six months after the Transfer), when the Patriot was in dry dock and had no bookings. (Tr. at 529-30, PTE 9 at S-11).[23]

Mandarino's Solvency Report shows that he adjusted the value of the assets on AMCV's June 30, 2001 balance sheet from $852,290,000 to $266,963,000, which mainly reflects a decrease of $330,864,000 to the vessels under construction and a decrease of $302,721,000 to other vessels. (PTE 9, Sch. S-1). After subtracting the liabilities (that were adjusted from $700,386,000 to $664,885,000), he determined that AMCV was insolvent by the amount of $397,922,000. (PTE 9, Sch. S-3). He similarly adjusted the value of DQSC's assets from $302,082,000 to $137,078,000. (*Id.*). After subtracting liabilities in the amount of $226,804,000 he determined DQSC was insolvent by the amount of $89,726,000. (*Id.*).

Upon review of his testimony and the Solvency Report, it is clear that Mandarino valued the assets of AMCV and DQSC on a liquidation basis. He adjusted the assets' value by determining a sale price for each asset on a piece by piece basis, rather than by a sale of the Debtors as an operating entity. (Tr. at 533). Moreover, he valued the main assets of the companies - - the cruise ships - - based upon transactions that occurred *after* the events of September 11, 2001 and *after* the October 2001 filing of the respective bankruptcy petitions. (*Id.*) He opined that the intervening events of September 11, 2001 had no impact on valuing

---

[23]The Debtor, however, sold the Patriot to HAL at a public auction in January 2002 for a credit bid of approximately $80 million.

these assets because the companies had serious operational and financial problems in the summer of 2001.  (Tr. at 392-93).

Mandarino's valuation method is not consistent with the evidence of this case. The evidence here shows that the Debtors were operating as a going concern on the Transfer Date; therefore, Mandarino's valuation of the assets on a liquidation basis does not provide a true picture of the Debtors' worth on the Transfer Date.

### CONCLUSION

The Defendants have provided sufficient evidence to rebut the presumption of insolvency set forth in Bankruptcy Code Section 547(f).  The Plaintiffs have failed to carry their burden of proving AMCV's and DQSC's insolvency.  Judgment will be entered for the Defendants.  An appropriate order follows.

BY THE COURT:

KEVIN J. CAREY
UNITED STATES BANKRUPTCY JUDGE

Dated: April 27, 2007

27