## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| AMERICAN CLASSIC VOYAGES CO., *et al.*,<br><br>Debtors. | Bankr. Case No. 01-10954 (KJC)<br>(Jointly Administered)<br><br>Adv. Pro. No. 03-56998 (KJC) |
| AMERICAN CLASSIC VOYAGES CO., *et al.*,<br>DEBTORS, by and through PAUL GUNTHER,<br>PLAN ADMINISTRATOR,<br><br>Appellants,<br><br>- against -<br><br>JP MORGAN CHASE BANK, NATIONAL CITY<br>BANK OF MICHIGAN/ILLINOIS, and HIBERNIA<br>NATIONAL BANK,<br><br>Appellees. | Civil Action No. 07-352 (JJF) |

---

### OPENING BRIEF OF APPELLANTS, AMERICAN CLASSIC VOYAGES CO., ET AL.

---

**ANDERSON KILL & OLICK, P.C.**

Mark D. Silverschotz
Jeffrey E. Glen
Luma S. Al-Shibib
1251 Avenue of the Americas
New York, NY 10020
(212) 278-1000

**ROSENTHAL MONHAIT & GODDESS, P.A.**

Norman M. Monhait (#1040)
919 Market Street, Suite 1401
Citizens Bank Center
P.O. Box 1070
Wilmington, DE 19899
(302) 656-4433

Dated: December 14, 2007

Attorneys for Appellants American Classic Voyages Co., et al.

## TABLE OF CONTENTS

Page

NATURE AND STAGE OF THE PROCEEDINGS............................................................1

SUMMARY OF ARGUMENT...........................................................................................3

BASIS OF APPELLATE JURISDICTION.........................................................................4

STATEMENT OF ISSUES PRESENTED.........................................................................5

STATEMENT OF FACTS ................................................................................................6

    The Basic Business ...............................................................................................6

    Expansion Brings on the Financial Crisis..............................................................6

    The Chase Loan ....................................................................................................8

    The Projections......................................................................................................9

    The Expert Testimony..........................................................................................10

    The Bankruptcy Court's Opinion and Order.........................................................11

ARGUMENT ..................................................................................................................14

I.     STANDARD FOR APPELLATE REVIEW ............................................................14

II.    THE BANKRUPTCY COURT ERRED IN ADOPTING
      CALVERT'S FLAWED AND INACCURATE DCF ANALYSIS..............................14

    A.     The Applicable Legal Standard .................................................................14

    B.     The Flaws Underlying Calvert's Testimony ..............................................16

    C.     Calvert Erred in His Unwarranted Reliance on
         Management's Flawed Projections ..........................................................17

    D.     Management Lacked the Ability to Prepare Reliable
         Projections ...............................................................................................19

    E.     Calvert Used Incorrect Inputs and Assumptions Leading
         to a Flawed DCF Analysis .......................................................................20

         1.     Utilization Rates ............................................................................20

         2.     Ship Delivery Date.........................................................................21

## TABLE OF CONTENTS (cont'd)

Page

3.    Capital Expenditure Figure ............................................................22

4.    Peer Group Companies..................................................................23

5.    Small Stock Premium Factor ..........................................................25

F.    Mandarino's Sensitivity Analysis Demonstrates the
      Inherent Flaws Contained in Calvert's DCF Analysis
      and the Bankruptcy Court's Error in Adopting Calvert's
      Analysis....................................................................................................26

      1.    Small Stock Premium Factor Corrected .........................................27

      2.    Unsystematic Risk Premium Corrected ..........................................27

      3.    DCF Discount Rate Corrected.......................................................28

      4.    Peer Group " Beta" Corrected ......................................................28

      5.    Beta Observation Adjustments .....................................................29

G.    The Bankruptcy Court Erred In Exempting Calvert From
      the Normal Requirement of Performing Due Diligence .............................30

III.  THE BANKRUPTCY COURT ERRED IN HOLDING THAT
      AMCV WAS SOLVENT; IN FACT, AMCV'S PUBLIC MARKET
      SHARE PRICE AND THE CONFIRMING TESTIMONY OF
      PLAINTIFFS' EXPERT DEMONSTRATE CONCLUSIVELY
      THAT AMCV WAS INSOLVENT.........................................................................33

CONCLUSION.............................................................................................................39

## TABLE OF AUTHORITIES

**CASES**                                                    Page

In re Allegheny Intern., Inc.,
   954 F.2d 167 (3rd Cir. 1992)................................................................ 14

Argus Mgmt. Group v. J-Von N.A. (In re CVEO Corp.),
   327 B.R. 724 (Bankr. D. Del. 2005) ............................................. passim

Basic Inc. v. Levinson,
   485 U.S. 224 (1988).......................................................................... 36

Bethel v. McAllister Bros., Inc.,
   81 F.3d 376 (3d Cir. 1996)................................................................... 4

Bros. Gourmet Coffees, Inc. v. Armenia Coffee Corp. (In re Bros.
   Gourmet Coffees, Inc.),
   271 B.R. 456 (Bankr. D. Del. 2002) .................................................... 15

In re Cellular Information Sys., Inc.,
   171 B.R. 926 (Bankr. S.D.N.Y. 1994) ........................................... 31, 36

MFS/Sun Trust-High Yield Series v. Van Dusen Airport
   Servs. Co.,
   910 F. Supp. 913 (S.D.N.Y. 1995) ..................................................... 32

In re Fidelity Bond and Mortgage Co.,
   371 B.R. 708 (E.D.Pa.2007) .............................................................. 32

Fidelity Bond and Mortgage Co. v. Brand (In re Fidelity Bond
   and Mortgage Co.),
   340 B.R. 266 (Bankr. E.D. Pa. 2006), aff'd, 371 B.R. 708
   (E.D. Pa. 2007) ................................................................................. 25

In re Heilig-Meyers Co. v. Wachovia Bank, N.A. (In re
   Heilig-Meyers Co.),
   319 B.R. 447 (Bankr. E.D. Va. 2004) ........................................... 31, 36

Kool, Mann, Coffee & Co. v. Coffey,
   300 F.3d 340 (3d Cir. 2002)............................................................... 34

Lids Corp. v. Marathon Inv. Partners., L.P., (In re Lids Corp.),
   281 B.R. 535 (Bankr. D. Del. 2002) ............................................. passim

## TABLE OF AUTHORITIES (cont'd)

Page

Moody v. Security Pacific Business Credit, Inc.,
   971 F.2d 1056 (3d Cir. 1992)........................................................................ 15, 30

Murphy v. Meritor Savs. Bank (In re O'Day Corp.),
   126 B.R. 370 (Bankr. D. Mass. 1991) ........................................................... 31, 36

In re River Valley Fitness One, L.P.,
   Bk. No. 01-12829-JMD, 2003 Bankr. LEXIS 82
   (Bankr. D. N.H. Jan. 31, 2003)...................................................................... 31, 36

Shubert v. Lucent Techs., Inc. (In re Winstar Commc'ns, Inc.),
   348 B.R. 234 (Bankr. D. Del. 2005) ............................................................... 34, 37

Statutory Committee of Unsecured Creditors v. Motorola, Inc.
   (In re Iridium Operating LLC),
   373 B.R. 283 (Bankr. S.D.N.Y. 2007) ....................................................... 35, 36, 37

The Hertz Corporation v. ANC Rental Corp. (In re ANC
   Rental Corp.),
   280 B.R. 808 (D. Del. 2002)................................................................................ 14

The Liquidation Trust of Hechinger Inv. Co. of Delaware, Inc. v.
   Fleet Retail Finance Group (In re Hechinger Investment Co.),
   327 B.R. 537 (D. Del. 2005)................................................................................ 37

Travellers Int'l AG v. Trans World Airlines, Inc. (In re Trans World
   Airlines, Inc.),
   134 F.3d 188 (3d Cir. 1998).......................................................................... 14, 34

United States v. United States Gypsum Co.,
   333 U.S. 364, 68 S. Ct. 525, 92 L. Ed. 746 (1948) .............................................. 14

VFB LLC v. Campbell Soup Co.,
   482 F.3d 624 (3d Cir. 2007)......................................................................... passim

## STATUTES AND RULES

11 U.S.C. §101(32)........................................................................................ 33

11 U.S.C. § 547 ............................................................................................. 1

11 U.S.C. § 547(b)................................................................................. 2, 15, 39

## TABLE OF AUTHORITIES (cont'd)

<u>Page</u>

11 U.S.C. § 547(f) ................................................................................................2, 5, 15

28 U.S.C. §158(a)..................................................................................................................4

Federal Rule of Bankruptcy Procedure 8002(a) ...............................................................5

## NATURE AND STAGE OF THE PROCEEDINGS

American Classic Voyages Co. ("AMCV"), et al. (the "Appellants"), through their undersigned counsel, respectfully submit this opening brief in support of their appeal of an order and judgment (the "Order") entered by Bankruptcy Judge Kevin J. Carey ("Judge Carey") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") on April 27, 2007, dismissing Appellants' complaint in an adversary proceeding (the "Bank Adversary Action") against JP Morgan Chase Bank, Capital One NA (f/k/a Hibernia National Bank), and National City Bank (f/k/a National City Bank of the Midwest f/k/a National City Bank of Michigan/Illinois) (the "Banks" or "Appellees").

On October 16, 2003, the Appellants commenced the Bank Adversary Action against the Appellees, seeking to avoid as a preferential transfer under Section 547 of the Bankruptcy Code, 11 U.S.C. §101 et seq. (the "Bankruptcy Code"), and to recover for the Appellants, the payment of $29.5 million, plus interest (the "Transfer"), made to the Banks on August 14, 2001, as repayment of funds loaned under a revolving line of credit (the "Chase Loan").

In May 2005, along with defendants in other adversary proceedings commenced by certain or all of the debtors, the Banks sought consolidation for trial of the various adversary cases solely on the common issue of insolvency. In January 2006, the Bankruptcy Court granted the motion to consolidate and scheduled a two-

week trial for July 2006. (Record at 18a).[1]  Prior to the trial date, the other adversary cases settled, leaving the Bank Adversary Action as the only remaining case.

In July 2006, the Bankruptcy Court conducted a four-day trial on the issue of the insolvency of parent company AMCV and its subsidiary, the Delta Queen Steamboat Co. ("DQSC"), which was the named borrower under the Chase Loan. On April 27, 2007, the Bankruptcy Court issued its Order and the underlying opinion on which it is based (the "Opinion"). The Bankruptcy Court ruled that Appellees had successfully rebutted the statutory presumption of insolvency under Section 547(f) of the Bankruptcy Code and that Appellants thereafter had not proven .insolvency as of the date of the Transfer, as required by Section 547(b)(3) of the Bankruptcy Code.

Specifically, the Bankruptcy Court concluded that the Banks' expert witness, Brian Calvert – solely by use of a going-concern discounted cash flow analysis – had demonstrated solvency on the date of the Transfer. The Bankruptcy Court further concluded that the Appellants' expert, Perry Mandarino, had failed to rebut the Banks' witness, notwithstanding Mr. Mandarino's demonstration of seven distinct scenarios showing why the assumptions upon which the Banks' expert relied were both speculative and otherwise unreliable. Accordingly, the Bankruptcy Court entered judgment for the Appellees on the issue of solvency and dismissed the complaint in the Bank Adversary Action. (Record at 2; Record at 3). On May 7, 2007, the Appellants timely filed a notice appealing the Order. (Record at 1).

---

[1]     Citations to "Record at __" refer to the tab number behind which the documents that comprise the Record on Appeal can be found. In some instances, specific page numbers are referenced after the tab number and are separated by a colon.

## SUMMARY OF ARGUMENT

Subsequent to trial (and well after the submission of post-trial briefs), but one month prior to the Bankruptcy Court's Order, the United States Court of Appeals for the Third Circuit issued its opinion in VFB LLC v. Campbell Soup Co., 482 F.3d 624 (3d Cir. 2007) ("VFB"). There, the appellate court criticized testimonial experts who relied on discounted cash flow methods where, as here, a public market existed for the debtor's stock. Id. at 633.

As demonstrated at trial, during the 18-month period prior to the disputed transfer, AMCV's publicly-traded common shares lost 94 percent of their value, dropping from $35.25 to $1.93 per share. (Record at 92; Record at 93). The Third Circuit's opinion in VFB compels the conclusion that the actual value of AMCV's equity was accurately reflected by the market price of its shares, which had declined to a de minimus level (see Point III, infra), and that AMCV and DQSC were insolvent on the date of the Transfer. Accordingly, VFB mandates reversal of the Bankruptcy Court's Order.

Aside from the controlling authority of VFB, and notwithstanding the collapsing market price of AMCV's shares, the Bankruptcy Court uncritically adopted the solvency opinion of the Banks' expert who had himself credulously relied on management's speculative and otherwise unreliable projections. Because the evidence showed that management's earlier projections had been grossly overstated (Record at 13:401, 414-415; Record at 39; Record at 91), and because the projections upon which the Banks' expert based his discounted cash flow analysis used speculative and unreliable assumptions and inputs, the Bankruptcy Court's Order is contrary to the opinions of Chief Bankruptcy Judge Walrath in Lids Corp. v. Marathon Inv. Partners.,

3

L.P., (In re Lids Corp.), 281 B.R. 535, 544 (Bankr. D. Del. 2002) ("Lids") (rejecting the use of such data where, as here, management "consistently failed to meet its projections") and Argus Mgmt. Group v. J-Von N.A. (In re CVEO Corp.), 327 B.R. 724, 729 (Bankr. D. Del. 2005) ("CVEO") ("The party challenging an avoidance action bears the burden of rebutting this [insolvency] presumption by offering non-speculative evidence that is sufficient to permit a court to conclude that the debtor was indeed solvent at the time of the transfer.")

Accordingly, even though after VFB use of a going-concern discounted cash flow analysis clearly is improper when valuing a **public** company such as AMCV, the Order also should be reversed because Calvert's analysis was based on unreliable and speculative projections. Therefore, the Order and Opinion are contrary to the law in this district as established in Lids and CVEO.

The Bankruptcy Court's Order and Opinion should be reversed and this matter remanded for further trial.

## BASIS OF APPELLATE JURISDICTION

This Court has appellate jurisdiction to hear appeals from final judgments, orders and decrees entered by bankruptcy judges. 28 U.S.C. §158(a). The Order issued by the Bankruptcy Court, which dismissed the complaint in the above-captioned adversary proceeding, constituted a final appealable judgment and order. See Bethel v. McAllister Bros., Inc., 81 F.3d 376, 381 (3d Cir. 1996) (holding that order was final and appealable because it "ends the litigation on the merits and leaves nothing more for the court to do but execute the judgment."). The Appellants filed their Notice of Appeal of the Order, dated April 27, 2007, on May 7, 2007 – within the statutorily prescribed ten-

day period set forth in Rule 8002(a) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") thereby making the instant appeal timely. (Record at 1).

## STATEMENT OF ISSUES PRESENTED

This appeal presents the following issues for review:

1.      Whether the Bankruptcy Court erred when it used an improper standard to evaluate whether the Appellees had rebutted the statutory presumption of insolvency contained in Section 547(f) of the Bankruptcy Code?

2.      Whether the Bankruptcy Court erred when it found that the unsubstantiated projections prepared by management of the debtors were sufficient to support Appellees' expert's solvency analysis?

3.      Whether the Bankruptcy Court erred when it found that the Appellees rebutted the statutory presumption of insolvency where sufficient non-speculative evidence was neither adduced through trial testimony nor presented in the exhibits in a manner that met the standard required to rebut the presumption?

4.      Whether the Bankruptcy Court erred when it based its decision on the testimony and report of Appellees' expert, R. Brian Calvert ("Calvert"), whose testimony and opinion were wholly impugned at trial?

5.      Whether the Bankruptcy Court erred when it made findings of fact that are erroneous or unsupported in the record?

6.      Whether the Bankruptcy Court erred when it based its finding that Appellants failed to reestablish insolvency on the Bankruptcy Court's erroneous observation that Appellants' expert, Perry Mandarino ("Mandarino"), did not conduct a "going concern" analysis of the debtors' financial condition?

5

7.     Whether the Bankruptcy Court erred when it failed to find from the unrefuted and irrefutable evidence that the fair market price that would have been obtained for the assets of AMCV, even sold as an operating entity, would have been insufficient to pay AMCV's obligations, thus rendering AMCV insolvent on the date of the transfer at issue?

## STATEMENT OF FACTS

### The Basic Business

During the 1990s, AMCV, a Delaware corporation that went public in 1992, owned and operated a small cruise line business which ran river cruises in the continental United States and inter-island cruises in Hawaii. (Record at 18:B-2). Through its subsidiary DQSC, it operated three paddlewheel steamboats, the American Queen, the Mississippi Queen, and the Delta Queen (the "Mississippi Boats"), providing overnight passenger cruises along the Mississippi River and other U.S. inland waterways. (Record at 18:B-4). Through another subsidiary, it operated a single cruise ship in Hawaii. (Record at 18:B-5).

### Expansion Brings on the Financial Crisis

Beginning in 1999, AMCV and its subsidiaries[2] embarked on a grandiose six-ship expansion plan, which included, constructing two huge new cruise ships, buying one existing ship for the Hawaiian operations, adding a new riverboat to run in the Pacific Northwest, and building two new coastal cruisers for the Atlantic trade. (Record at 9:15-20; Record at 13:366–367).

---

[2]     AMCV and its operating subsidiaries are denominated "the Company."

The Company sought to expand its fleet from 1,000 berths to 6,000 berths and transform itself into a "global" cruise line, whose operations would center on providing Hawaiian cruises. (Record at 13:373). This expansion, which substantially increased the Company's debt, commenced in the midst of a recession, during a period when there was increased capacity within the cruise industry and thus increased competition. (Record at 9:15-20; Record at 13:378-379). Consequently, by the start of 2001, the Company was mired in financial crisis.

Specifically, debt increased from approximately $84.6 million as of December 31, 1999, to over $577 million as of June 30, 2001. (Record at 9:16; Record at 13:367-368; Record at 35). Simultaneously, operations were generating declining EBITDA, which went from $22.4 million for the year ended December 31, 1998 to negative numbers in the year 2001, in which the Company registered a **loss** of $22.2 million for the six-month period ended June 30, 2001. (Record at 13:368-370; Record at 24).

Critical components of the earnings crisis included decreased utilization rates and a self-defeating program to discount sales. (Record at 13:377; Record at 18:C-1-17, 18; Record at 26; Record at 27). In 2000 and 2001, hoping to increase vessel "fill rates," the Company slashed cruise prices, and at one point an AMCV tour in Hawaii that usually cost $1,800 was available through an internet discount site for $575. (Record at 18:C-1-18; Record at 78). Predictably, this strategy not only failed to increase vessel capacity, but it led to diminished passenger per night revenues. For year to date as of June 30, 2001, the fill rate was 90.56%, against a budgeted 97.28%. (Record at 9:17-19.) The revenue per passenger night was disastrously off as well; not

a single ship met budget. The worst performance was on the ms Patriot, in the Hawaiian service, where actual total revenue per passenger night was \$289.96, nearly twenty percent below the budgeted amount of \$345.59. (Id.).

Not only was the Company not meeting its budget expectations, it also was performing well below its historic levels. In 2000, total revenue per passenger night for DQSC had been \$341.92, but declined to \$314.44 for that same period in 2001. (Id.). AMCV's management noted that the Company's **operating loss** for the first six months of 2001 had **increased** by approximately \$25 million over the first six months of 2000, as the growth in operating costs and "SG&A"[3] outpaced the growth in revenues. (Id.; Record at 70:4, 13-14).

Despite management's attempt to temper public unease, investors correctly read the Company's performance and quickly abandoned their investments in AMCV. Consequently, AMCV's common stock fell from a high of \$35.25 as of December 31, 1999 to \$1.93 as of July 31, 2001. (Record at 92; Record at 93).

## The Chase Loan

The terms of the Chase Loan were originally executed in February 1999, when a \$70 million revolving line of credit was made available to borrower DQSC. (Record at 173). Thereafter, the loan was amended and reduced to provide a \$30 million line of credit. (Record at 174). The Chase Loan was secured by liens over two of the Mississippi Boats, and other assets such as the Company's customer lists. (Record at 173; Record at 174). AMCV, the parent company, provided an unsecured parent guaranty but did not secure the loan with any of its assets. (Id.).

---

[3]    "SG&A" is an accounting shorthand which refers to the "sales, general, and administrative" costs of running a business.

By the spring of 2001, the Company's only available credit was its right to draw the $30 million revolver under the Chase Loan. (Record at 14:590-592). Specifically, Randall Talcott ("Talcott"), Vice President of Finance and Treasurer for AMCV, testified at deposition that, at the time the $29.5 million had been borrowed, and particularly in June and July 2001, the Company did **not** have access to any other bank lines of credit for general working capital and further did **not** have any access to the private equity markets in the summer of 2001. (Record at 9:17; Record at 13:311-312).

In May 2001, DQSC drew down on the revolver when it borrowed $29.5 million under the Chase Loan. (Record at 14:590-592). The loan proceeds were placed in an AMCV account held in the name of AMCV and thereby were isolated from the reach of Appellees' lien. (Record at 14:590-592; Record at 76).

By the end of the first half of 2001, DQSC's condition had deteriorated to a point where it was in default on the Chase Loan's financial covenants. (Record at 9:14; Record at 18:B-11,12). AMCV's 10-Q for the second quarter 2001 was scheduled for filing on August 14, 2001. So as not to have to report the default in its public filing, AMCV, on August 14, 2001, repaid the loan with interest and reduced its credit availability under the Chase Loan to $10 million, all while leaving its security in place. (Record at 70; Record at 96; Record at 97; Record at 98). This enabled the parties to loosen the loan's restrictive covenants and extend its maturity date. (Record at 18:B-11, 12). That same day, AMCV filed a 10-Q which did **not** mention the covenant default. (Record at 70).

## The Projections

Despite the financial crisis in the spring and summer of 2001, AMCV's directors and officers caused a set of financial projections to be prepared, some

specifically prepared for use in negotiations to settle a financial dispute with a vessel construction company which was building two new vessels (the "Project America Ships"). (Record at 72; Record at 124). Based on nothing more than their hopes for increased fill rates and passenger revenues, and some optimistic plans for cost cutting despite the huge increase in SG&A in the previous year, management marketed the Company as stable, in recovery, and having "turned the corner." (Record at 14:577; Record at 18:C-2-20; Record at 78:EGI L.L.C.278). Internally, however, members of management expressed doubt as to the business' future viability. (Record at 73). Indeed, by May 2001, the Company had retained bankruptcy counsel. (Record at 18:C-1-21; Record at 75; Record at 81; Record at 83). The stock market apparently remained highly skeptical; AMCV common stock lost another 33% of its market value between June 30, 2001 (when the stock was worth $2.98 per share) and July 31, 2001, on which date the share price closed at $1.93. (Record at 92; Record at 93).

## The Expert Testimony

At the insolvency trial, the Appellees presented the expert testimony and analysis of Mr. Calvert in support of their contention that AMCV and DQSC were solvent entities as of the August 14, 2001 Transfer date. Calvert performed a discounted cash flow ("DCF") analysis which the Bankruptcy Court ultimately adopted. Calvert's DCF analysis was flawed and wholly inaccurate because it was based upon unreliable and speculative projections prepared by AMCV's management, which Calvert adopted in toto without conducting any due diligence to determine their reasonableness.

The Appellants presented the expert testimony and analysis of Mr. Mandarino, who testified that AMCV and DQSC were insolvent as of the Transfer date and presented, among other things, a DCF sensitivity analysis correcting what he

contended were the inaccuracies, erroneous inputs, and unfounded assumptions upon which Calvert's DCF analysis was based. (Record at 13:445-455).

## The Bankruptcy Court's Opinion and Order

On April 27, 2007, the Bankruptcy Court issued its Order and underlying Opinion, holding that the Appellees had presented sufficient evidence to rebut the presumption of insolvency and that the Appellants had failed to carry their burden of demonstrating insolvency by a preponderance of the evidence. (Record at 3:27). The Bankruptcy Court accordingly entered judgment for the Appellees and dismissed the complaint. (Record at 2).

In support of its holding, the Bankruptcy Court found that the projections that Calvert relied upon, which were prepared by the Company's management on July 31, 2001 (the "July Projections"), were reasonable when made. Accordingly, the Bankruptcy Court did not fault Calvert's failure to assess the reliability of the July Projections before adopting them in toto. (Record at 3:18; Record at 21). Acknowledging that the July Projections could be viewed as "optimistic," the Bankruptcy Court held that, in the case of AMCV, the normal rule that required the reasonableness of the July Projections to be tested "by an objective standard anchored in the company's actual performance" did not apply. (Record at 3:19). The Bankruptcy Court reasoned that this exception was proper because the Company was expanding, and thus its historical performance would not be helpful in assessing the reliability of the projections. (Record at 3:19-20).

Having exempted Calvert from the requirement to test the reliability of the July Projections, the Bankruptcy Court did not address:

11

- Calvert's use of incorrect assumptions regarding the delivery of the two Project America Ships under construction or the significance of such incorrect assumptions upon Calvert's DCF analysis;

- the sufficiency or adequacy of Calvert's $7 million capital expenditure figure, which his analysis assumed would increase perpetually at 2% per annum;

- the soundness of Calvert's peer group analysis in light of his reliance on a list of "comparable" companies which were generated automatically on an internet website and which included a number of gambling companies (even though AMCV and its subsidiaries **never** operated any vessels with gambling and **never** operated within the gaming industry); or

- Calvert's use in his DCF analysis of an incorrect "small stock premium" factor[4] – despite the fact that, had he used the correct factor, his analysis would have yielded an insolvent enterprise.

Not only did the Bankruptcy Court find the July Projections "reasonable,"

but it also adopted the Appellees' view that AMCV and its subsidiaries represented an

enterprise in recovery. As support for this position, the Bankruptcy Court cited to

testimony from various AMCV directors and officers. (Record at 3:14). Like Calvert,

however, the Bankruptcy Court ignored other testimony from those **same** individuals

which demonstrated that the Company had **not** turned the corner, including Talcott's

testimony that, in the second quarter of 2001, the Company **lacked access** to **any** other

bank lines of credit or the private equity markets. (Record at 9:17; Record at 13:311-

312).

Further, the Bankruptcy Court dismissed Mandarino's sensitivity analysis,

which used as its basis Calvert's flawed DCF analysis, but which applied to Calvert's

analysis corrective adjustments in order to yield a more reliable and accurate

assessment of AMCV's and DQSC's solvency. (Record at 109). Instead of

acknowledging the corrective adjustments as reasonable, the Bankruptcy Court

---

4       See discussion at Point II-E5, infra.

Case 1:07-cv-00352-JJF    Document 14    Filed 12/14/2007    Page 19 of 58

categorized Mandarino's DCF analysis as nothing more than "random adjustments." (Record at 3:23). Finally, the Bankruptcy Court dismissed Mandarino's adjusted balance sheet approach as set forth in the first of his two expert reports and his DCF analysis – which used as its basis the assumptions of expert witness Robert Reilly[5] – set forth in Mandarino's second expert report. Apparently, the Bankruptcy Court dismissed both these solvency valuations on the erroneous belief that Mandarino only had conducted a liquidation analysis and not a going concern valuation as well. (Record at 3:26). Additionally, despite all evidence to the contrary, the Bankruptcy Court incorrectly held that Mandarino had not conducted a discounted cash flow analysis. (Record at 3:24). In making these findings eight months after trial, the Bankruptcy Court completely ignored evidence and Mandarino's own testimony showing that, in fact, he **had** conducted a going concern valuation **and** prepared a DCF analysis. (Record at 13:433-442, 443-455; Record at 37; Record at 47; Record at 109). In any event, these findings led the Bankruptcy Court to reject Mandarino's analysis, leaving Calvert's inaccurate conclusions and incorrect methodology.

Nowhere in the opinion did the Bankruptcy Court even mention either of the two most important facts: (i) the observable consequence to value of the collapse of 94% of AMCV's stock price; and (ii) the Company's lack of access to the capital and debt markets.

---

5       Robert Reilly was retained as the expert witness on valuation and solvency by the defendants in the other adversary proceedings that had been consolidated with the Bank Adversary Action to go to trial on the issue of insolvency. Although Mr. Reilly submitted expert reports and was deposed, his participation in the case ended when a settlement was reached - prior to trial - in the adversary actions in which he had been retained to serve as valuation expert.

## ARGUMENT

### I.    STANDARD FOR APPELLATE REVIEW

On appeal, the Bankruptcy Court's findings of fact are reviewed under the

clearly erroneous standard. Travellers Int'l AG v. Trans World Airlines, Inc. (In re Trans

World Airlines, Inc.), 134 F.3d 188, 192 (3d Cir. 1998). "A finding is 'clearly erroneous'

when although there is evidence to support it, the reviewing court on the entire evidence

is left with the definite and firm conviction that a mistake has been committed." In re

Allegheny Intern., Inc., 954 F.2d 167, 173 (3d Cir. 1992) (citing United States v. United

States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948)). While

factual findings are reviewed only for clear error, an appellate court's review of the trial

court's legal conclusions is plenary. In re Trans World Airlines, Inc., 134 F.3d at 192.

Whether a company is insolvent under the Bankruptcy Code is considered a mixed

question of law and fact. Id. Mixed questions of law and fact are subject to a "mixed

standard of review under which the appellate court accepts findings of historical or

narrative facts unless clearly erroneous, but exercise[s] plenary review of the trial court's

choice and interpretation of legal precepts and its application of those precepts to the

historical facts." The Hertz Corporation v. ANC Rental Corp. (In re ANC Rental Corp.),

280 B.R. 808, 814 (D. Del. 2002) (internal quotations omitted; brackets in original).

### II.    THE BANKRUPTCY COURT ERRED IN ADOPTING CALVERT'S
### FLAWED AND INACCURATE DCF ANALYSIS

#### A.    The Applicable Legal Standard

Chief Bankruptcy Judge Walrath sets out the legal standard by which to

test expert testimony as to the supposed value of an entity that makes a transfer within

90 days prior to filing its bankruptcy petition. See Lids, 281 B.R. at 546. Such an entity

is presumed to be insolvent under Section 547(f) of the Bankruptcy Code, and testimony of the party seeking to support the challenged transfer is inadequate if the "valuations are flawed" and if the countering testimony presented by a plaintiff "raises serious doubts about the validity of ... assumptions" underlying the claim to solvency. Id. Arguments for solvency that "are based on a subjective evaluation ... rather than the objective test required by section 547(b)" not only do not carry the day for the challenged transfer, they do not overcome the presumption of insolvency. Id. at 547.

Moreover, Chief Bankruptcy Judge Walrath has emphasized that a preference defendant cannot (as here) simply spin tales of solvency based on wishful thinking and starry-eyed prognostication. In granting summary judgment to the plaintiff-trustee in CVEO, she expressly stated that "[t]he party challenging an avoidance action bears the burden of rebutting [the insolvency] presumption by offering **non-speculative** evidence that is sufficient to permit a court to conclude that the debtor was indeed solvent at the time of the transfer." 327 B.R. at 729 (emphasis added) (citing Bros. Gourmet Coffees, Inc. v. Armenia Coffee Corp. (In re Bros. Gourmet Coffees, Inc.), 271 B.R. 456, 458 (Bankr. D. Del. 2002)).

The applicable case law draws a bright line. The testimony must be "anchored in the company's actual performance," and cannot be based on unreasonable projections. Moody v. Security Pacific Business Credit, Inc., 971 F.2d 1056, 1073 (3d Cir. 1992) ("Moody"); see discussion at Point II-G, infra. Further, where, as here, a case concerns a public company, the stock market's expertise in determining the fair market value of a company is expressed by the market price for the company's shares. VFB LLC v. Campbell Soup Co., 482 F.3d 624, 633 (3d Cir. 2007) ("VFB").

15

The relevant question posed by this case is: did the Banks' expert base his analysis and conclusions on flawed assumptions? For if he did, the result is the same whether phrased as a failure to overcome the presumption of insolvency or a failure to establish an adequate case of solvency.

Appellants now provide their critical analysis of Calvert's testimony, establishing that the Bankruptcy Court's wholesale acceptance of Calvert's flawed opinion cannot stand. Tedious though this review might seem, its conclusion is irresistible; there is simply no reliable or non-speculative basis for the Calvert DCF analysis, and that is all there was to support the Banks' erroneous claim that AMCV and DQSC, on August 14, 2001, were solvent.

### B.    The Flaws Underlying Calvert's Testimony

Calvert's opinion regarding the solvency and viability of AMCV and DQSC as of the Transfer date was flawed. Accordingly, the Bankruptcy Court erred in adopting Calvert's analysis. Of particular significance are the following crucial errors in Calvert's work:

- Calvert erroneously and incorrectly accepted, at face value, management's unreliable and speculative projections, despite the existence of ample evidence calling into doubt their accuracy;

- Calvert failed to conduct any due diligence to test and assess the viability of various assumptions and inputs used by the Company's management in formulating its unreliable and speculative projections;

- Calvert's DCF analysis was flawed because it used incorrect assumptions regarding the delivery dates of two vessels that were under construction;

- Calvert's DCF analysis was flawed because it erroneously and baselessly assumed that the Company **perpetually** could run its fleet of vessels on a mere $7 million per annum (with a 2% adjusted annual increase);

- Calvert did not use true "comparable" companies in conducting the peer group "beta assessment" that was part of his DCF analysis; and

- Calvert's DCF analysis was flawed because he did not correctly calculate the "small stock premium" input – a factor that is significant to correctly assessing an entity's discounted cash flow.

## C.    Calvert Erred in His Unwarranted Reliance on Management's Flawed Projections

In conducting his DCF analysis, Calvert relied almost exclusively upon the July Projections prepared by management for use in the Company's settlement discussions with Ingalls Shipbuilding (n/k/a Northrop Grumman Ship Systems, Inc.) ("Ingalls"), a ship construction company which had contracted to build the two new Project America Ships. Delays in the construction and delivery schedule and additional costs associated with the construction of the Project America Ships led to disagreements between the Company and Ingalls. The July Projections were prepared at the direction of Randall Talcott specifically for use in discussions that the Company would have with Ingalls in order to settle the dispute. (Record at 124). As instruments to be used to obtain a favorable settlement for the Company, the July Projections adopted a rosy and optimistic outlook of the Company's financial future and did not provide an accurate representation of the Company's economic prospects as of July 2001.

In adopting the July Projections, Calvert completely disregarded evidence that demonstrated their inaccuracy. This evidence was legion: management's immediately previous projections had proven completely wrong (see Point II-D); management used fancifully optimistic passenger fill and per-day revenue rates (see Point II-E1); and management predicted revenue from new ships coming on line when, at the very time the predictions were being made, their delivery dates had already

slipped by more than a year (see Point II-E2). Instead, Calvert adopted the July

Projections at face value and adopted them as the basis for his DCF analysis without

ever examining the reliability and accuracy of their inputs and assumptions. For

instance, Calvert:

- never attempted to contact management to discuss the July Projections (Record at 11:122-131);

- never reviewed the notes of a non-testifying expert witness, Robert F. Reilly, from his due diligence telephone conversation with management regarding the July Projections (Id.);

- did not examine individually each element of the July Projections to assess each element's viability and, generally, failed to perform any diligence into the viability of the July Projections (Record at 11:122-129; Record at 12:281-282, 290-293, 298-301, 312-313);

- did not question whether the inputs used in the July Projections were accurate or had merit; for example, Calvert failed to examine whether the $7 million per annum capital expenditure figure (with an adjusted annual increase of 2%) seemed sufficient to operate the expanded fleet of ships into perpetuity (Record at 11:121-122, 127-129);

- never considered the possibility that AMCV's EBITDA for the year 2002 would be negative rather than the $47 million positive figure forecast by the July Projections and never reviewed nor requested access to documents which would have evidenced such a possibility, such as an August 2001 report prepared by a Raymond James analyst (Record at 12:290-291; Record at 126);

- never asked for or received from the Banks any contemporaneous documentation produced regarding the July Projections (Record at 12:292–293);

- never reviewed a July 18, 2001 email addressed to various AMCV officers which highlighted a "growing weakness of the numbers through 2001 against a plan for a strong recovery vs (but just back to 2000 levels) in 2002" (Record at 12:295-301; Record at 73); and

- never reviewed the projections prepared by management in February 2001 (the "KPMG Projections" or the "Going Concern Projections") that KPMG utilized in conducting an audit of the company (Record at 12:312-313; Record at 102).

To justify his failure to assess the accuracy and reliability of the July Projections independently, Calvert testified that the viability of these projections was demonstrated and supported by: (i) Randall Talcott's deposition testimony characterizing the July Projections as viable; and (ii) Calvert's erroneous belief that the Company had access to broad capital markets in the summer of 2001. (Record at 11:39, 129-131, 148). In the very same deposition, however, Talcott testified that the Company did **not** have access to any other bank lines of credit or to the private equity markets in the summer of 2001. (Record at 12:311-312). Calvert completely ignored these aspects of Talcott's deposition testimony and instead cherry-picked those portions which supported his after-the-fact rationalization for failing to test the July Projections.

## D.    Management Lacked the Ability to Prepare Reliable Projections

Had Calvert bothered to conduct even a minimal amount of diligence, in good conscience he could not have given sworn testimony uncritically adopting the July Projections. Specifically, an examination of the KPMG Projections, which were prepared by management a mere five months before the July Projections, demonstrated management's inability to prepare reliable projections. (Record at 13:401, 414-415; Record at 39; Record at 91). For example, the KPMG Projections forecast first quarter 2001 EBITDA of negative $3.2 million (Record at 39; Record at 91), but actual EBITDA for the first quarter of 2001 was negative $15.2 million. (Id.). The KPMG Projections of EBITDA for the first quarter of 2001 were off by approximately $12 million. (Id.).

Moreover, while the KPMG Projections forecast a **positive** EBITDA of $12.4 million for the second quarter of 2001, actual EBITDA for the second quarter of

2001 was **negative** $22.2 million – yielding a discrepancy of approximately $34 million. (Id.).

Furthermore, a great discrepancy exists between the KPMG Projections, on the one hand, and the July Projections, on the other. (Record at 13:415-417; Record at 38). For example, while the KPMG Projections forecast EBITDA of $47 million for the year ended December 31, 2001, the July Projections forecast EBITDA of **negative** $25 million, a difference of approximately $72 million. (Id.). The huge discrepancy in the two projections makes no sense in light of the fact that they were prepared just a few months apart.

Indeed, the KPMG Projections are so disparate from both the July Projections and actual realized figures that no reasonable individual could have based a DCF analysis upon **any** of management's projections, at least absent independent scrutiny and corrective adjustments to the erroneous inputs used. In hindsight, Calvert appears to have come to this realization. In fact, at trial, he refused to vouch for or stand behind the accuracy of **any** single input or assumption that made up the July Projections, but rather, would **only** stand behind the projections as a whole. (Record at 11:129-131).

## E. Calvert Used Incorrect Inputs and Assumptions Leading to a Flawed DCF Analysis

When formulating his DCF analysis, Calvert failed to make adjustments to the incorrect inputs and assumptions included in the July Projections.

1. Utilization Rates

For example, the July Projections contained inaccurate and unsupported utilization rates for the Project America Ships (they assumed **100**% utilization). This

assumption was unsupported in light of the standard cruise industry utilization rate of 88%, and it appears preposterous when one considers the fact that the Company had been experiencing increasing difficulty in filling its cruise ships and such problems persisted even after cruise prices were cut dramatically. (Record at 13:403–404; Record at 37). Calvert, however, inexplicably failed to make adjustments to the incorrect utilization rates.

2.    Ship Delivery Date

Second, the July Projections included forecasts that assumed that the Project America Ships would be delivered to the Company in 2005. (Record at 11:189). Thus, the anticipated projected performance for year 2006 contained in the July Projections assumed that the Project America Ships would have been in service and operation for one year. Calvert used the anticipated projected performance for year 2006 as the base year for perpetual growth, but he failed to adjust the projected performance figures to allow for additional delays in the construction and delivery of the Project America Ships. As Calvert himself acknowledged, the viability of the July Projections and, by implication, his DCF analysis, were premised on the assumption that the vessels under construction would be delivered in 2005 and would not be delayed another year. (Record at 11:190–191). An additional year of delay would affect the viability of the projections because cash flows and anticipated revenues for 2006 would be drastically overstated. (Id.).

Further, given the history of the delays and complications which plagued the construction of these vessels, it was not reasonable to rely on their entering service even in 2006. The loss of two years of revenue from these enormously expensive

21

ships, while having to continue interest payments to assure their completion, makes any
use of the projections simply guesswork.

3. Capital Expenditure Figure

Further, Calvert's DCF analysis was based on the unfounded assumption
that the Company would require only $7 million increased at a 2% rate per annum to
effectively run its fleet of vessels in perpetuity. (Record at 11:192-194). Calvert picked
the $7 million capital expenditure figure from the 2006 forecast listed in the July
Projections – that forecast, however, contained a particularly low capital expenditure
figure because it assumed that the Company's vessels either just recently had come
into service after the completion of their construction (see Point II-E2, supra) or recently
had undergone dry dock repairs and maintenance, thus requiring little – if any –
improvements.[6]  Indeed, Calvert testified that the $7 million capital expenditure figure
(plus the 2% growth rate per annum) was sufficient because the Company necessarily

---

[6]     If the Project America boats were late by just one more year, the actual capital
expenditure required to keep the antiquated Hawaiian fleet operating would have been
far greater than $7 million, which would have undercut the entire capital expenditure
analysis.

Indeed, in 2001, the existing Hawaiian fleet comprised of the ss Independence (which
originally entered into service in 1951) and the ms Patriot (which originally entered into
service in 1982) had been plagued with numerous operational or mechanical problems.
(Record at 18:B-5 – B-6; Record at 68:AMCV2214).  In fact, both vessels required
unscheduled dry-docking or repair that year. (Record at 68:AMCV2214).  In particular,
the Independence underwent an "unscheduled dry-dock" in March 2001 to repair its bow
thruster, while the Patriot, in February 2001, was forced to cancel a cruise in progress
and return to its home port for the replacement of a thrust bearing in the vessel's
generator drive train. (Id.).  Had Calvert made any inquiry, he could not have assumed
that in 2006 either or both of these ancient steamers could have been kept in service
without vast repair costs.  If the Project America vessels were not in operation, either the
Hawaiian service would have to be abandoned for 2006 or the boats would have to be
jerry-rigged for yet another year to try to generate revenue.

would not need to buy new boats and instead could just perform maintenance on the existing fleet of vessels in perpetuity. (Record at 11:193-194)[7].

Since, however, the July Projections anticipated that the vessels would need only the most minimal amount of maintenance in forecast year 2006, the capital expenditure figure of $7 million for that year represents a freakishly low anomaly. Calvert, therefore, erred in basing his DCF analysis on the $7 million capital expenditure figure of year 2006, increased by 2% per annum. (Record at 11:192-193). Nothing in the record demonstrates that this would have been sufficient for the Company to effectively maintain its fleet of vessels indefinitely.

4.     Peer Group Companies

As noted, Calvert purported to use a DCF analysis to determine the Company's solvency. This approach has been recognized in such cases as Lids, 281 B.R. 535. A DCF analysis is comprised of three major components: (i) the discrete cash flows during the forecast period; (ii) the terminal value; and (iii) the discount rate. The third component, the discount rate applied to the cash flow analysis, is referred to as the weighted average cost of capital ("WACC"). Essentially, WACC is the rate of return that is required by debt and equity providers to compensate for the time value of money and for "systematic risk." (Record at 11:46-47; Record at 12:399). In order to determine the WACC, the analyst has to establish the appropriate debt-to-equity ratio, which is a measure of how the company obtains its capital (through issuing stocks or bonds). Assuming all other variables remain constant, the higher the WACC, the lower the business enterprise value. (Record at 11:82).

---

[7]     This counter-intuitive view is, surely, outside the scope of Calvert's expertise and nowhere is supported in the record.

As Calvert explained, in order to properly compute the WACC, one factor an analyst has to examine is the weighted average debt ratio of companies that are truly comparable to the company being examined. Calvert, however, simply failed to select truly comparable companies. Specifically, using the capital asset pricing model, Calvert derived his figure for AMCV's weighted average debt ratio (the debt to total capital ratio that appears in Exhibit 7A of Calvert's Report) by taking the weighted average of what he erroneously believed to be five "comparable" companies. (Record at 11:183–185). In conducting his comparable company analysis, however, Calvert did not select specific criteria or factors to identify companies comparable to AMCV. Instead, Calvert relied on a list of so-called "comparables" automatically generated on an internet research database operated by Capital IQ.[8]  (Record at 12:214-215).

---

[8]  Specifically, when asked about the method in which he selected comparable companies from the Capital IQ internet website, Calvert testified as follows:

> [Question by the Bankruptcy Court:] … When you searched for competitors, did you give anybody a list of factors that you thought were important which that person or company would use to respond with a list of competitors?

> [Answer by Mr. Calvert:]  Yes.  I said, "Find competitors of AMCV and other companies that may have some of the demand dynamics."  And what happened, what I was told, when this inquiry was put in, is that competitors came up from -- for AMCV.  Those competitors were the two steam boat companies and then two of the river boat gambling companies, and then another one showed a competitor of a competitor, and we put that in so we could get more of a robust sample.

> One of the competitors that came up when the inquiry was planned was Walt Disney World and we chose not to put that in because we put [sic] it was too far away.

> [Question by the Bankruptcy Court:]:  But the -- were the inquiries made by simply providing the name of the company whose assets you wanted to value, or did you give parameters or other factors to be considered?

> [Answer by Mr. Calvert:]  No.  It was put in by the company that we wanted to -- that we wanted to look at.

(Record at 12:214-15).

Included among Calvert's list of "comparables" were three gambling companies. (Record at 11:79). Unlike those gambling companies, the vessels belonging to AMCV and its subsidiaries had **no** casino operations. (Record at 12:219). In fact, Calvert did not properly examine "comparable" companies. Rather, Calvert simply "relied on the competitors that were given to [him] by Capital IQ." (Record at 12:229–230). Calvert's methodology in "selecting" companies "comparable" to AMCV deviates from the standard practice of choosing as comparables companies within the same industry as that of the entity that is being valued. For example, in Fidelity Bond and Mortgage Co. v. Brand (In re Fidelity Bond and Mortgage Co.), 340 B.R. 266, 299 (Bankr. E.D. Pa. 2006), aff'd, 371 B.R. 708 (E.D. Pa. 2007), a case in which the debtor sought to avoid as constructively fraudulent certain distributions made in connection with a leveraged buyout, Judge Carey correctly adopted the position of the defendant's expert that a proper peer group analysis could be conducted **only** through a comparison of the debtor corporation with other companies **within its industry** – in that particular case this required a comparison to other mortgage banking companies. Id. Here, a proper peer group analysis of AMCV would **not** involve gambling companies, but instead would consist only of other cruise companies. (Record at 13:436-437, 450-451; Record at 37; Record at 45).

### 5.    Small Stock Premium Factor

Finally, Calvert incorrectly calculated AMCV's "small stock premium." A small stock premium is an adjustment to the cost of equity, and consequently the WACC, that accounts for the unsystematic risk inherent in companies with lower market capitalizations. (Record at 12:303-304; Record at 106:122-123). Market capitalization, or the number of a company's stock shares outstanding multiplied by the market price of

those shares, is crucial to the determination of a "small stock premium." (Record at
12:231). Calvert properly relied upon a reference book written by Ibbotson Associates
as the source for the small stock premium used in his solvency analysis, **but he used
the wrong premium factor** listed in Ibbotson. (Record at 11:89–90, 155-156).
Specifically, companies like AMCV – those with a market capitalization of less than $48
million – represent the smallest five percent of publicly listed companies, and one
should use the small stock premium of "decile 10b" as referenced by Ibbotson, namely
8.42%. (Record at 106:123). Because, as Calvert conceded, AMCV's market
capitalization by the transfer date was substantially less than $48 million (Record at
12:306), Calvert should have utilized the decile 10b market capitalization rate, but he
did not. (Record at 12:301-308). Instead, Calvert erred and used a small stock
premium of 2.7% leading to a flawed DCF analysis (Record at 12:301-308).

As is next shown, had Calvert used the correct premium factor, even his
analysis would have demonstrated what the stock market price for AMCV's shares
already showed: AMCV and DQSC were insolvent at the time of the disputed Transfer.

## F.    Mandarino's Sensitivity Analysis Demonstrates the Inherent Flaws Contained in Calvert's DCF Analysis and the Bankruptcy Court's Error in Adopting Calvert's Analysis

Perry Mandarino, the Appellants' expert witness, concluded that both
AMCV and DQSC were insolvent as of the August 14, 2001 Transfer date. Mandarino's
conclusion of insolvency was a result of his own analysis under the income approach as
set forth in one of his two reports, the Report on Solvency Analysis, dated February 18,
2005 (the "February Report") (Record at 22-36) and the Rebuttal Report of Perry
Mandarino, dated January 31, 2006 (the "January Report") (Record at 37-67), as well as
the sensitivity analysis he conducted based upon Calvert's flawed DCF analysis.

(Record at 13:349-350). Thus, in addition to the DCF analysis set forth in Mandarino's January Report, Mandarino also adopted Calvert's flawed DCF analysis as the basis for his critique. (Record at 13:433-442, 443-455; Record at 37; Record at 47; Record at 109).

Mandarino ran seven scenarios in which he adjusted a different incorrect input or underlying assumption in Calvert's DCF analysis. Each scenario showed that adjusting just **one** factor in Calvert's DCF analysis demonstrated insolvency. (Record at 109).

### 1.    Small Stock Premium Factor Corrected

For example, in scenario 1, Mandarino adjusted Calvert's DCF analysis to include the correct size premium per Ibbotson. Simply by plugging in the correct size premium (of 8.24%) from Ibbotson and retaining all other inputs in Calvert's analysis, AMCV was rendered insolvent by approximately $362 million as of July 31, 2001. (Record at 13: 445-446; Record at 109).

### 2.    Unsystematic Risk Premium Corrected

In scenario 2, Mandarino adjusted Calvert's DCF analysis to include a 2% unsystematic risk premium. Such an addition was used by Robert Reilly, a non-testifying expert witness retained by the defendants in the debtors' other adversary proceedings. (Record at 108:35). Retaining all other inputs in Calvert's analysis, this scenario applied a 2% unsystematic risk premium to account for the risks specific to AMCV and also to counter the unreliability of the July Projections. The addition of the 2% unsystematic risk premium to Calvert's analysis rendered the Company insolvent by approximately $47 million as of July 31, 2001. (Record at 13: 446-448; Record at 109).

### 3. DCF Discount Rate Corrected

In scenario 3, Mandarino adjusted Calvert's DCF analysis by discounting free cash flow each year of the discrete period by fifteen percent (15%). Such a modest discount could occur through lower fill rates, lower per passenger revenues, and/or a failure to achieve reductions in SG&A – all of which are problems that had plagued the Company throughout the first half of 2001. This scenario retained all other inputs in Calvert's analysis (including Calvert's weighted average cost of capital of 10.17%) and merely discounted cash flow by 15% to demonstrate what would happen if there was a modest decline in predicted EBITDA attained over the five year projection period, due to one or a combination of the factors described above. This one change rendered AMCV insolvent by $84 million. (Record at 13: 448-450; Record at 109).

### 4. Peer Group " Beta" Corrected

In scenario 4, Mandarino adjusted Calvert's DCF analysis to include Mandarino's peer group average "beta." Beta measures how the rates of return for a particular stock move in comparison with the rates of return for the overall stock market. A beta of one indicates that fluctuations in the rates of return of a particular stock mirror fluctuations in the rate of return for the overall stock market.

The appropriate beta is obtained by conducting a peer group analysis. (Record at 11:61-62); see Point II-E4. As noted, Calvert used a peer group of two cruise companies and three gambling companies. In particular, Calvert's peer group of five companies was comprised of Carnival Corp. ("Carnival") and Royal Caribbean Cruises Ltd. ("Royal Caribbean"), on the one hand, and three gambling companies, Ameristar Casinos Inc., Argosy Gaming Co., and Aztar Corp., on the other. (Record at 11:87-88; Record at 140). Mandarino criticized this choice and the haphazard web-

28

surfing that had led to it, and Mandarino created a peer group which did not contain any gambling companies and was comprised of AMCV, Carnival and Royal Caribbean. (Record at 13:436-437; Record at 37; Record at 45).

In scenario 4, Mandarino used the correct peer group to perform an "average levered beta" adjustment. This single adjustment rendered AMCV insolvent by \$95 million as of July 31, 2001. (Record at 13: 450-451; Record at 109).

### 5.    Beta Observation Adjustments

Mandarino's remaining three scenarios made adjustments to Calvert's observed betas using other variables. Each of these remaining scenarios rendered AMCV insolvent by at least \$13 million as of July 31, 2001. (Record at 13:451–455; Record at 109).

Each of the slight adjustments Mandarino made to Calvert's analysis resulted in an insolvent enterprise as of July 31, 2001. (Record at 13:445–455; Record at 109). Thus, consistent with the market-demonstrated stock price collapse, Mandarino concluded that AMCV and DQSC were insolvent from June 30, 2001 up through the petition date in October 2001. (Record at 13:393-394). Mandarino further believed that the events of September 11, 2001 did not cause the insolvency of AMCV and DQSC because the Company – by the summer of 2001 – had already crossed the insolvency threshold. (Record at 13:392-393). Indeed, for the six months ended June 30, 2001, the Company already had experienced **negative** EBITDA of \$22 million and had acquired \$577 million of new debt. (Id.). Additionally, the problems that plagued the Company, namely a decrease in vessel capacity, fare decreases, construction problems and delays, and unexpected repairs and mechanical problems with the new ships, were all experienced well-prior to September 11, 2001. (Id.).

NYDOCS1-880493.2                                29

Mandarino's adjusted DCF analysis, which essentially represents a corrected version of what Calvert should have produced (but did not), demonstrates that AMCV and DQSC were insolvent as of August 14, 2001. (Record at 13:393-394, 445–455; Record at 109). The Bankruptcy Court's dismissal, in the first instance, of Mandarino's critique of Calvert's analysis and, in the second instance, of Mandarino's own sensitivity analysis, amounts to clear error warranting reversal of the Bankruptcy Court's Order.

## G. The Bankruptcy Court Erred In Exempting Calvert From the Normal Requirement of Performing Due Diligence

In its underlying Opinion, the Bankruptcy Court waived the requirement that Calvert should have assessed the reliability and reasonableness of the July Projections prior to relying upon them as the foundation for his DCF Analysis. (Record at 3:19-20). The Bankruptcy Court should not have exempted Calvert from the normal Third Circuit standard requiring an expert to test the reasonableness of projections before using them as a basis for a solvency analysis. See Moody v. Security Pacific Business Credit, Inc., 971 F.2d at 1073 (requiring reasonableness of projections to be tested).

Since the Third Circuit has recognized that projections – at the very least – tend to be "optimistic," they must pass the reasonableness test, which is governed by an "objective standard anchored in the company's actual performance." Id. at 1073. "Among the relevant data are cash flow, net sales, gross profit margins, and net profits and losses." Id. In addition, "[p]arties must also account for difficulties that are likely to arise, including interest rate fluctuations and general economic downturns, and otherwise incorporate some margin of error." Id.

Many courts have refused to consider analyses that relied upon unreasonable projections. See In re Heilig-Meyers Co. v. Wachovia Bank, N.A. (In re Heilig-Meyers Co.), 319 B.R. 447 (Bankr. E.D. Va. 2004) (declining to consider the results of an expert's DCF analysis which relied upon projections of doubtful reliability); In re River Valley Fitness One, L.P., Bk. No. 01-12829-JMD, 2003 Bankr. LEXIS 82, at *18 (Bankr. D. N.H. Jan. 31, 2003) (declining to consider DCF analysis where the court found that the projections relied upon in such analysis were speculative with respect to, among others, assumptions as to increases in revenue); see also In re Cellular Information Sys., Inc., 171 B.R. 926 (Bankr. S.D.N.Y. 1994) (finding management-prepared projections to be unrealistic because the projections were not consistent with the negative impact of competitive pressures, competitive disadvantages or challenges, or industry trends); Murphy v. Meritor Savs. Bank (In re O'Day Corp.), 126 B.R. 370, 405 (Bankr. D. Mass. 1991) (declining to consider DCF analysis based on unreasonable projections that were inconsistent with the debtor's historical data and recent historical trends).

Similarly, Chief Bankruptcy Judge Walrath rejected a defendant's expert's attempt to rebut the statutory presumption of insolvency where, as here, that expert "improperly relied on [debtor's] projections to calculate value." Lids, 281 B.R. at 544. Judge Walrath believed that such credulous reliance was misplaced where, as here, the debtor "has consistently failed to meet its projections." Id. In another solvency case, Judge Walrath held that one seeking to rebut the presumption must present evidence that is "non-speculative." CVEO, 327 B.R. at 729.

In the instant case, on the other hand, the Bankruptcy Court not only failed to examine whether Calvert's uncritical acceptance of the July Projections was reasonable, but justified exempting Calvert from the regular rule requiring independent vetting of projections. Cf. MFS/Sun Trust-High Yield Series v. Van Dusen Airport Servs. Co., 910 F. Supp. 913, 924-26 (S.D.N.Y. 1995) ("MFS"). MFS, a fraudulent conveyance case involving a leveraged buyout ("LBO"), demonstrates the normal practice of diligence and vetting. There, the financial projections relied upon to assess the company's solvency following the LBO were reviewed and subjected to due diligence by at least two financing institutions and two sets of analysts. MFS, 910 F. Supp. at 924-26.

Calvert justified his blind acceptance of management's projections on the notion that it would have been futile to conduct any independent vetting of the July Projections against the Company's historical performance in light of the expansion plans. (Record at 3:19-20). Yet, in another case, Judge Carey recently **rejected** this excuse and required that the projections of the debtor corporation, a company in the midst of vast expansion plans, be "based on historically accurate data." In re Fidelity Bond and Mortgage Co., 371 B.R. 708, 724 (E.D. Pa. 2007) (district court paraphrase of bankruptcy court opinion).

But even if one assumes that expansion plans arguably could reduce the predictive value of historic performance, this does not explain why Calvert refused to examine those indicators **present at the time the July Projections were made** showing an inconsistency between the assumptions upon which the projections were based and the Company's actual and dire reality. Nor does it explain why Calvert

refused to determine whether the July Projections actually accounted for difficulties likely to arise – particularly in light of the ongoing economic slump in the travel industry and general recession experienced at the end of 2000 and throughout 2001. Calvert's failure to conduct any diligence therefore left him unable to determine not only the reasonableness of the projections as compared with the Company's actual performance at the time, but also left him completely unaware as to whether the July Projections contained an internal cushion or margin of error to account for any one of the numerous incorrect inputs or assumptions of which the July Projections were comprised.

By ratifying Calvert's failure to follow the normal rule requiring an independent assessment of the reasonableness of projections, the Bankruptcy Court avoided Appellants' arguments regarding the unreliability of Calvert's DCF analysis.

To put it bluntly, in Lids and CVEO Chief Judge Walrath was right and here the Bankruptcy Court was wrong. Indeed, the Bankruptcy Court below erred both by not addressing the Appellants' arguments regarding the flaws in Calvert's DCF analysis and in exempting Calvert from his obligation to perform due diligence into the reasonableness of the projections. These errors warrant reversal of the Bankruptcy Court's Order and underlying Opinion.

## III.    THE BANKRUPTCY COURT ERRED IN HOLDING THAT AMCV WAS SOLVENT; IN FACT, AMCV'S PUBLIC MARKET SHARE PRICE AND THE CONFIRMING TESTIMONY OF PLAINTIFFS' EXPERT DEMONSTRATE CONCLUSIVELY THAT AMCV WAS INSOLVENT

An entity is insolvent under Section 101(32) of the Bankruptcy Code if the sum of the entity's debts is greater than all of such entity's property, taken at a fair valuation. 11 U.S.C. §101(32). "Fair valuation is generally interpreted as fair market value, that is the amount a hypothetical willing buyer would pay to a willing seller…."

Shubert v. Lucent Techs., Inc. (In re Winstar Commc'ns, Inc.), 348 B.R. 234, 274

(Bankr. D. Del. 2005) ("Winstar") (citing In re Trans World Airlines, Inc., 134 F.3d 188,

194 (3d Cir. 1998), cert. denied, 523 U.S. 1138 (1998)).

Recently, the Third Circuit made it clear how best to value a publicly

traded company. VFB, 482 F.3d at 633. In VFB, it held that "as private traders seek to

pay no more for an asset (and sell an asset for no less) than it is worth, the market price

[is] a rational valuation of [the debtor company] in light of all the information available to

market participants." 482 F.3d at 629 (describing the affirmed district court analysis).

In VFB, the market capitalization of the company on the day that solvency

was to be measured, as calculated by multiplying the share price by the number of

outstanding shares, was significantly in excess of the company's debt. The company,

seeking to establish insolvency, sought to prove that condition through the testimony of

expert economists using a variety of analyses, including discounted cash flow. The

Third Circuit approved the use instead by the District Court of

> the objective evidence from the public equity and debt markets. To
> the extent that the experts purport to measure actual post-
> [valuation day] performance, as by, for example, discounted cash
> flow analysis, they are measuring the wrong thing. **To the extent**
> **they purport to reconstruct a reasonable valuation of the**
> **company in light of uncertain future performance, they are**
> **using inapt tools.** Kool, Mann, Coffee & Co. v. Coffey, 300 F.3d
> 340, 362 (3d Cir. 2002) (noting that discounted cash flow analyses
> are imprecise and have value only "in certain limited situations").
> Absent some reason to distrust it, the market price is "a more
> reliable measure of the stock's value than the subjective evidence
> of one or two expert witnesses."... "[T]he price of stock in a liquid
> market is presumptively the one to use in judicial proceedings."

Id. at 633 (some internal citations omitted; emphasis added).

In the instant case, the "objective evidence from the public equity and debt

markets" is that on August 14, 2001, the Transfer date, AMCV was insolvent. This is so

because on that date, the face value of AMCV's interest-bearing debt was $477 million, and the face value of its trust preferred securities was $100 million. Prior to September 11, 2001, and specifically on July 31, 2001, AMCV's common stock traded at a low of $1.93 per share. (Record at 93). As Calvert recognized at trial, the market capitalization of AMCV on July 31, 2001, therefore, was $42 million. (Record at 12:306).

What does this mean in the present appeal? Here, the Bankruptcy Court ignored the collapse in AMCV's stock price in favor of Calvert's wholesale and credulous adoption of management's speculative projections which were part and parcel of his flawed DCF analysis. The Bankruptcy Court also ignored (or rejected) Mandarino's compelling testimony establishing seven distinct reasons why the Calvert analysis was wrong and, in effect, confirming that the collapse of AMCV's share price accurately indicated its insolvency.[9] In VFB the appellate court rejected the use by

---

[9]    In both VFB and a recent New York bankruptcy decision, Statutory Committee of Unsecured Creditors v. Motorola, Inc. (In re Iridium Operating LLC), 373 B.R. 283, 347 (Bankr. S.D.N.Y. 2007) ("Iridium"), the presence of a significant market capitalization, as well as the ability of the debtors in those cases to access the debt and equity markets, was treated as evidence of solvency. In those cases, however, the share prices were not approximately $2 per share (down from $35 per share) as was the situation with AMCV shares. Further, it is clear that merely having a public market for common stock does not mean, per se, that a corporation is solvent. Were that so, any public company would be deemed solvent even if its shares traded for mere pennies, a clearly absurd result.

experts of "subjective"[10] DCF analyses and focused instead on the more accurate markets. So should this Court.[11]

This is not to say that value is independent of projections; quite the contrary. Certainly, for example, Chief Judge Walrath's opinion in Lids foreshadowed the Third Circuit's opinion in VFB when it rejected a preference defendant's expert's credulous, uncritical acceptance of the debtor's enterprise value derived from management projections, which that management "consistently failed to meet." Lids, 281 B.R. at 544.[12] Under such circumstances, an expert who relies on dubious projections fails to establish that a debtor is solvent. Lids, 281 B.R. at 544.

As the Court in VFB pointed out, when one buys stock, one is investing on expectations of future income which require the buyer to project future performance. 482 F.3d at 633. To make rational economic judgments, such earning projections must be

> anchored in [a] company's actual performance ... Market capitalization is a classic example of such an anchored projection, as it reflects all the information that is publicly available about a company at the relevant time of valuation.[13]

---

[10]    VFB, 632 F.3d at 633; see also Iridium, 373 B.R. at 347 (quoting VFB).

[11]    VFB's debt "continued to sell at par until January of 2000. 482 F.3d at 636. Conversely, AMCV's public debt was guaranteed by the United States Maritime Administration's ("MARAD") Title XI ship financing guarantee program, yet its stock still traded down 94%. (Record at 18:B-7; Record at 70:AMCV2189).

[12]    See also In re Heilig-Meyers Co., 319 B.R. 447; In re River Valley Fitness One, L.P., 2003 Bankr. LEXIS 82, at *18; In re Cellular Information Sys., Inc., 171 B.R. 926; In re O'Day Corp., 126 B.R. at 405; CVEO, 327 B.R. at 729.

[13]    It is highly significant that the Third Circuit in its VFB decision cited to Basic Inc. v. Levinson, 485 U.S. 224 (1988), for the quoted proposition. Levinson is the seminal case supporting fraud on the market theory, which is predicated on the proposition that manipulation of publicly available knowledge about a publicly-held company is actionable precisely because it is public knowledge that is the basis for share price.

VFB, 482 F.3d at 631. What management thinks the future will bring, let alone "the subjective estimates of one or two expert witnesses," id. at 633, based on such management musings, is no match for what investors at the time of valuation are willing to pay for a company's stock.

> [Precisely] because valuation is, to a great extent, a subjective exercise dependant upon the input of both facts and assumptions, the court will give deference to "prevailing marketplace values" rather than to values created with the benefit of hindsight for the purpose of litigation.

The Liquidation Trust of Hechinger Inv. Co. of Delaware, Inc. v. Fleet Retail Finance Group (In re Hechinger Investment Co.), 327 B.R. 537, 548 (D. Del. 2005) (internal citation omitted). Thus, as one bankruptcy court has already held, "VFB ... makes clear that the public markets constitute a better guide to fair value than the opinions of hired litigation experts whose valuation work is performed after the fact and from an advocate's point of view." Iridium, 373 B.R. at 291. In valuing a company, "contemporaneous market evidence" is the most reliable measure of value because it is "untainted by hindsight or post-hoc litigation interests." Id. at 346.

Of course, if the investing public is misled by management into overvaluing a company's stock, then the "contemporaneous market evidence," while perhaps still probative, may not be conclusive. See, e.g., Winstar, 348 B.R. at 276. But while it is certainly possible in the instant case that AMCV's management suppressed bad news – after all, they paid down the amounts due under the Chase Loan precisely to avoid having to reveal in AMCV's second quarter 2001 SEC filings the loan's default – the market was not fooled. AMCV's "average investors" accurately read the company for the hollow shell that it was, and voted it insolvent with their dollars.

VFB compels the conclusion that AMCV's August 2001 share price stands as an utter rebuke to Calvert's analysis. The Third Circuit clearly feels that share price "is presumptively the one to use." See VFB, 482 F.3d at 633. Mandarino's testimony anticipated the Third Circuit's VFB opinion and verified what the share price accurately reflected: AMCV was insolvent. Each of the seven scenarios testified to by Mandarino showed that Calvert's DCF analysis was wrong. See Point II-F, supra.

This Court should apply the Third Circuit's controlling reasoning in VFB, as well as that of Chief Bankruptcy Judge Walrath in Lids and CVEO, reverse the Bankruptcy Court's Order, and find that AMCV and DQSC were insolvent on the date of the Transfer at issue.

## CONCLUSION

For the foregoing reasons, the Appellants respectfully request that this Court enter an order: (i) granting judgment to the Appellants and reinstating the complaint in the above-captioned adversary proceeding; (ii) holding that the Appellants have satisfied their burden of proof as to insolvency as set forth in Section 547(b)(3) of the Bankruptcy Code; (iii) reversing the Bankruptcy Court's Order, dated April 27, 2007; and (iv) granting such other and further relief as the Court deems just and proper.

Dated:  December 14, 2007

**ROSENTHAL MONHAIT & GODDESS, P.A.**

_____

Norman M. Monhait (#1040)
919 Market Street, Suite 1401
Citizens Bank Center
P.O. Box 1070
Wilmington, Delaware  19899-1070
(302) 656-4433

- and -

**ANDERSON KILL & OLICK, P.C.**
Mark D. Silverschotz
Jeffrey E. Glen
Luma S. Al-Shibib
1251 Avenue of the Americas
New York, NY 10020
(212) 278-1000

_Attorneys for American_
_Classic Voyages, Co., et al._

## CONCLUSION

For the foregoing reasons, the Appellants respectfully request that this

Court enter an order: (i) granting judgment to the Appellants and reinstating the

complaint in the above-captioned adversary proceeding; (ii) holding that the Appellants

have satisfied their burden of proof as to insolvency as set forth in Section 547(b)(3) of

the Bankruptcy Code; (iii) reversing the Bankruptcy Court's Order, dated April 27, 2007;

and (iv) granting such other and further relief as the Court deems just and proper.

Respectfully submitted,

Dated: December 14, 2007

ROSENTHAL MONHAIT & GODDESS, P.A.

Norman M. Monhait, Esq. (No. 1040)
919 Market Street, Suite 1401
Wilmington, DE 19899
Telephone: (302) 656-4433

- and -

**ANDERSON KILL & OLICK, P.C.**
Mark D. Silverschotz, Esq.
Jeffrey E. Glen, Esq.
Luma S. Al-Shibib, Esq.
1251 Avenue of the Americas
New York, NY 10020
Telephone: (212) 278-1000

*Attorneys for American*
*Classic Voyages, Co., et al.*

# EXHIBIT A

LEXSEE 2003 BANKR LEXIS 82

**In re: River Valley Fitness One, L.P., Debtor; Laconia Savings Bank, Movant v. River Valley Fitness One, L.P., Respondents**

**Bk. No. 01-12829-JMD, Chapter 11**

**UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF NEW HAMPSHIRE**

*2003 BNH 4; 2003 Bankr. LEXIS 82*

**January 31, 2003, Decided**

**NOTICE:**       [*1] THIS IS AN UNREPORTED OPINION. REFER TO AO 1050-1 REGARDING CITATION.

**SUBSEQUENT HISTORY:** Objection sustained by, Claim allowed by *In re River Valley Fitness One, L.P., 2004 Bankr. LEXIS 688 (Bankr. D.N.H., 2004)*

**DISPOSITION:**       Court found that fair value of the Debtor's real property, and the Bank's collateral, for purposes of confirmation was $ 2,218,878.

**COUNSEL:** James W. Donchess, Esq., Steven M. Notinger, Esq., DONCHESS & NOTINGER, for Debtor.

Robert M. Koch, Esq., Law Offices of Robert M. Koch, for Laconia Savings Bank.

**JUDGES:** J. Michael Deasy, Bankruptcy Judge.

**OPINION BY:** J. Michael Deasy

**OPINION**

*MEMORANDUM OPINION*

**I. INTRODUCTION**

The Court has before it Laconia Savings Bank's (the "Bank") Motion to Determine Valuation of Security Pursuant to *Bankruptcy Rule 3012* (the "Motion") (Doc. No. 95). The Bank financed the construction of the River Valley Club (the "Club") and the purchase of the real

estate. The construction loan was never converted into a permanent loan, leaving the Bank a claim that is secured by the Club's real property but not its personal property. At issue before the Court is the value of the real property. After hearing from both parties on October 7, 8, and 21, 2002, the Court took the matter under submission.

This Court has jurisdiction of the subject matter and the parties pursuant to *28 U.S.C. §§ 1334* [*2] and *157(a)* and the "Standing Order of Referral of Title 11 Proceedings to the United States Bankruptcy Court for the District of New Hampshire," dated January 18, 1994 (DiClerico, C.J.). This is a core proceeding in accordance with *28 U.S.C. § 157(b)*.

**II. BACKGROUND**

**A. The Facility**

River Valley Fitness One, L.P. (the "Debtor") purchased a 3.6 acre site in Centerra Business park in March of 1997 for $ 530,000 and completed construction of the Club in 1998. The Debtor obtained a $ 3.6 million construction loan from the Bank in early 1997. The cost of constructing the Club was significantly greater than originally projected. The Club has a capacity of 3,300 members, but active membership appears to have leveled out at about 2,500. The land and buildings which constitute the Club are assessed by the City of Lebanon at $ 4,395,700. Because the equalization ratio for the City of Lebanon is eighty-eight percent, the assessment is equivalent to a fair market value of $ 4,995,114. The Club offers indoor and outdoor pools, a lap pool, squash and basketball courts, a rock climbing wall, aerobic studio, childcare facility, weight training machines,

Case 1:07-cv-00352-JJF    Document 14    Filed 12/14/2007    Page 49 of 58

Page 2

2003 BNH 4; 2003 Bankr. LEXIS 82, *2

cardio vascular [*3] equipment, women-only training areas, whirlpool, sauna, beauty salon, massage and hydrotherapy treatments, and locker and shower areas.

## B. The Valuation Evidence

The Debtor and the Bank both offered expert appraisal testimony on the value of the real property. Both appraisers agreed that the income capitalization approach was the preferred method of valuing a facility such as the Club. Both appraisers utilized the direct capitalization method. Direct capitalization determines the value of an income producing property by first determining the stabilized net operating income ("NOI") and then dividing by a capitalization rate. This approach is based upon the assumption that at an assumed requirement for a rate of return for an investment, an investor would pay a certain value in order to obtain the benefits of an expected future income stream. [1]

> 1    For example, an investor who would be attracted to a property generating $ 100,000 in net income per year would be willing to pay $ 1,000,000 at a ten percent capitalization rate (the "CAP rate").

[*4] However, the use of the direct capitalization approach is not simple or straight forward. Deriving NOI is at best problematic. An appraiser typically starts with either actual or assumed income and expense information and then makes adjustments based upon those matters which in his or her judgment are inappropriate, inconsistent with current or proposed operations or would otherwise make the NOI misleading.

The appraiser also must determine an appropriate capitalization rate ("CAP rate"). The determination of a CAP rate is influenced by four factors: 1) the "riskless" rate of return available from interest on long-term government bonds; 2) a compensation factor for loss of liquidity; 3) compensation for "investment management"; and 4) compensation for risk. While the first of these factors can be determined from published market rates, the other three are estimations based upon market conditions and the property in question. A small change in the CAP rate can result in a large change in the property value. [2] While competent appraisers frequently agree on the range of appropriate CAP rates for a particular property, the often disagree on which part of that range is the proper rate. [*5]

> 2    If the required CAP rate in footnote 1 were increased to twelve percent, the value of the property generating the same $ 100,000 income stream would decrease by $ 166,667 to $ 833,333.

Accordingly, disputes over direct capitalization valuations frequently involve a dispute between expert appraisal witnesses over the assumptions and rationale behind the adjustments utilized in determining NOI and the selection of a CAP rate. Seemingly minor changes in assumptions or selected capitalization rates can result in material differences between the expert's final opinions of value. This adversary proceeding is no exception. The Bank's appraiser, Russell Thibeault, valued the real and personal property of the Club at $ 3,850,000. See Exhibit 115 at page 59. The Debtor's appraiser, Richard Caro, set the value at $ 2,024,510. [3] See Exhibit 81 at page 2.

> 3    Both of these values represent the value of all of the Debtor's assets as a going concern, not simply the real property which is the Bank's collateral.

## [*6] 1. The Bank's Evidence

The Bank's appraiser utilized unaudited financial reports for calendar year 2001 which were provided to him by the Club. He then made various adjustments to the financial performance of the Club for the purpose of his valuation. Because the Club had ceased operation of its restaurant during 2001, he removed from the Club's reported financial performance all income and expenses associated with the restaurant. Because the restaurant had been closed, the Great Room area of the Club was no longer utilized for the production of income. The Bank's appraiser proposed that this area be converted into office space at a cost of $ 235,000 which he estimated would produce $ 47,200 per year in additional rental income. The Bank's appraiser also believes that the property tax assessment for the Club is excessive. Therefore, he removed real estate property taxes from the determination of NOI and accounted for property taxes by increasing his Cap rate by 2.64%. This increase appears to be based upon the assumption that the Club's property assessment for real estate tax purposes will change to result in a tax expense equal to the effective tax rate applied to the final [*7] appraised value as determined through the Bank's appraiser's analysis. The Bank's appraiser also removed the general partner and subordinate special fees totaling $ 74,680 and replaced them with an estimated off-site management fee of five percent of income or $ 37,255.

Case 1:07-cv-00352-JJF    Document 14    Filed 12/14/2007    Page 50 of 58

Page 3

2003 BNH 4; 2003 Bankr. LEXIS 82, *7

Finally, the Bank's appraiser estimated the annual cost of a reserve for the replacement and improvement of equipment at two percent of the Club's revenue or $ 66,631. As a result of these adjustments, he concluded that the Club's stabilized performance generated income before interest and depreciation and amortization of $ 600,457.

The Bank's appraiser developed his CAP rate by examining alternative rates of return and weighing the comparative risk associated with the Club's income stream as compared to alternative investments. The higher the risk, the greater return required to offset that risk. In his report, the Bank's appraiser explained in detail the assumptions and analysis behind his derived CAP rate. He developed his CAP rate through a weighted average of debt and equity rates of return assuming debt financing of seventy percent and equity of thirty percent. He selected a debt financing rate of nine percent, [*8] higher than the prevailing rate of eight percent, because

of the property's financial problems. Due to the Club's history and risk, he selected an equity return rate of twenty percent. The Bank's appraiser had determined that Bally's Total Fitness Holdings, a publicly traded chain of health clubs with less perceived risk, was returning 14.7% for equity.

Finally, based upon his belief that the Club was over assessed for real estate tax purposes, the Bank's appraiser stated that the proper way to account for property taxes in such an instance is to add the effective tax rate to the weighted capitalization rate. He determined that in 2001 the equalization assessment ratio in Lebanon was eighty-eight percent and its tax rate was $ 29.98. Multiplying these two factors together accounts for the effective tax rate. Based upon these assumptions and data, the Bank's appraiser developed his weighted CAP rate as follows:

|  | Portion | Annual Constant | Weighted Average |
|---|---|---|---|
| Mortgage | 0.70 * | 0.1080 = | 0.0756 |
| (Prin.&Int.) |  |  |  |
| Equity | 0.30 * | 0.2000 = | 0.0600 |
| Weighted Rate |  |  | 0.1356 |
| Effective Tax |  |  |  |
| Rate | 88% * | $ 29.98 | 0.0264 |
| Weighted CAP |  |  | 16.20% |
| Rate |  |  |  |

[*9] Using the direct capitalization approach, the Bank's appraiser divided his stabilized current income of $ 600,457 by his weighted CAP rate of 16.20% to arrive at a value for the Club of $ 3,707,000. He also developed a value of $ 4,112,000 using the discounted cash flow approach. Combining these two values and giving more

weight to the direct capitalization approach the Bank's appraiser's final value was $ 3,850,000. Because this value included the real estate, the assumed great room improvements and the equipment, the final valuation for the real estate was obtained by deducting the estimated cost of the great room improvements ($ 235,000) and the equipment ($ 450,000) to arrive at a final real estate value

Case 1:07-cv-00352-JJF   Document 14   Filed 12/14/2007   Page 51 of 58

Page 4

2003 BNH 4; 2003 Bankr. LEXIS 82, *9

of $ 3,165,000 as of July 5, 2002.

## 2. The Debtor's Evidence

The Debtor's appraiser, Richard Caro, used a combination of audited and unaudited financial records to derive his value as of June 30, 2002. The original report dated December 19, 2001 determined a value for the Club as of August 31, 2001. That report was updated on October 4, 2002 to determine a revised valuation as of June 30, 2002. The update was based upon operating results for the twelve months ending June 30, 2002. The [*10] core of the Debtor's appraiser's original expert report is disclosed in three exhibits (Exhibits I, II and III) consisting of five pages. The update itself was only five pages and consists solely of revisions to those exhibits

and a copy of a handwritten spread sheet showing the Debtor's appraiser's adjustments to the operating results for the twelve months ending June 30, 2002. While the original and updated reports reveal the numbers used by the Debtor's appraiser in determining a value for the Club, it does not always disclose the rationale for those adjustments.

In his updated report, the Debtor's appraiser indicated that he believed that the most recently completed twelve month period was the most representative time period to use to determine stabilized net income. Based upon the Debtor's internal financial statements he computed the base NOI as follows:

| Income | $ 3,300,972 |
|---|---|
| Less: Expenses | $ 2,746,340 |
| Plus: Add Back Adjustments | $ 41,418 |
| Base Net Operating Income | $ 596,050 |

The report states that all non-cash expenses (depreciation and amortization) and costs of financing (interest) were excluded in determining base net operating income. [*11] Although the updated report is not clear, it appears that these items were the "add back adjustments". The Debtor's appraiser then reduced the base operating income by five percent of gross annual revenue ($ 151,148) as a reserve for replacement of equipment. It was his testimony that 5% of the Club's gross annual revenues should be dedicated to the renovation of space, replacement of equipment, purchase of new equipment and repairs. The Debtor's appraiser also reduced base operating income by $ 40,000 to reflect the additional cost of compensation for a managing general partner. He believes that the Debtor's income is understated because the current general partner serves as part of the management team without compensation. This adjustment renders the Debtor's income comparable to other facilities and is a deduction which a buyer would

make in determining a purchase price. After adjustments, the Debtor's appraiser determined that the "stabilized income" or NOI for the Debtor was $ 404,902.

In stark contrast to the Bank's appraiser's report, the Debtor's appraiser's report is strikingly devoid of the methodology and assumptions behind his direct CAP rate. The Debtor's appraiser testified [*12] that he used 44 different variables in determining his CAP rate of twenty percent; however, there was no explanation to what those 44 variables actually were or why they were used. In his report the Debtor's appraiser states that "the selling price for clubs which own the real estate has been between 5-7 times the stabilized income value" or capitalization rates of between 14.70% and 20.00%. The Debtor's appraiser also references another method for determining the capitalization rate from an investor's perspective. He references the following model from a book he authored in 1976 and then updated in 1994:

| Base Rate AAA Bonds | 5.50% |
|---|---|
| +Lack of Liquidity of the Business | 4.00% |

Case 1:07-cv-00352-JJF    Document 14    Filed 12/14/2007    Page 52 of 58

Page 5

2003 BNH 4; 2003 Bankr. LEXIS 82, *12

| | | |
|---|---|---|
| +Management Intensive Business | | 4.00% |
| +Fast Changing Industry | | 3.50% |
| +Potential Exposure for Regular Investment | | |
| Money in the Club | | 2.00% |
| +Lack of Collateral from this Investment to | | |
| Use for Other Loans | | 1.00% |
| | Total | 20.00% |

The Debtor's appraiser states that the above calculation "if entirely applicable to the [Debtor], would imply a multiple of '5' or a capitalization rate of '.200' for stabilized income value -- which was the actual calculation used. [*13] " The original report states that a CAP rate at the high end of the range was used by the appraiser due to the lack of growth potential in the Debtor's marketplace, ease of entry in the marketplace for competitors, limited potential for price increases, the Chapter 11 bankruptcy proceeding and unfavorable aspects of the layout and functionality of the Debtor's building. Taking the Debtor's appraiser's NOI of $ 404,902 and dividing it by his overall CAP rate of twenty percent results in a value of $ 2,024,510.00 as of June 30, 2002 [4].

> 4   It must be noted that this value is the going concern value of the Club, not the value of the real property. The Debtor's appraiser never offered an opinion on the value of the real property alone.

## III. DISCUSSION

### A. The Legal Standard

The question of valuing property in the context of a Chapter 11 case is a fact-sensitive one; valuation is done on a case-by-case basis. *See Financial Sec. Assurance, Inc. v. T-H New Orleans Ltd. P'ship (In re T-H New Orleans Ltd. P'ship), 116 F.3d 790, 799 (5th Cir. 1997);* [*14] *In re Melgar Enter., Inc., Inc., 151 B.R. 34, 39 (Bankr. E.D.N.Y. 1993)* (finding "Valuation is to be determined on a case-by-case basis."). However, where a debtor proposes to retain property under a plan of reorganization, the Court must value the property in light of the proposed post-bankruptcy use of the property. *Winthrop Old Farm Nurseries, Inc. v. New Bedford Inst.*

*for Sav. (In re Winthrop Old Farm Nurseries, Inc.), 50 F.3d 72, 75 (1st Cir. 1995).* As a general rule, that value will be the replacement, or fair market value, of the property valued in a manner consistent with the debtor's use of the property. *Associates Commercial Corp. v. Rash, 520 U.S. 953, 963, 138 L. Ed. 2d 148, 117 S. Ct. 1879 (1997)* (citing *Winthrop, 50 F.3d at 75*). Finally, it is generally agreed that the property should be valued as it stands at the time of the proceeding. *See, e.g., In re Tamarack Trail Co., 23 B.R. 3, 5-6 (Bankr. S.D. Ohio 1982).*

### B. Stabilized Net Operating Income (NOI)

The Court is not bound by the opinion of any expert witness and may accept or reject expert testimony in the exercise of sound judgment. [*15] *Helvering v. Natl. Grocery Co., 304 U.S. 282, 295, 82 L. Ed. 58 S. Ct. 932 (1938).* Both the Bank's appraiser and the Debtor's appraiser provided credible testimony; the difficulty for the Court lies more with comparability rather than credibility. As mentioned earlier both experts used financials provided by the Debtor; however, the Bank's appraiser used unaudited financials for 2001 and the Debtor's appraiser used a combination of audited financials for the last six months of 2001 and unaudited financials for the first six months of 2002. Compounding the comparison problem is that the Debtor's appraiser's report does not always explain the assumptions and analysis behind his adjustments. For example, Exhibit 81 includes what appear to be copies from an account ledger. Recorded on these copies are handwritten calculations. The left hand column lists the last six months of 2001 and the first six months of 2002, and the following columns are labeled "Revenue," "Expenses," "NOI," "Add Backs," and "EBITDA Revised Totals." While the mathematics are easy to follow it is not possible for the Court to ascertain with certainty what the raw numbers are composed of. What [*16] is being calculated in

Case 1:07-cv-00352-JJF    Document 14    Filed 12/14/2007    Page 53 of 58

Page 6

2003 BNH 4; 2003 Bankr. LEXIS 82, *16

"Revenue"? What are the "Add Backs"? Have the partnership fees been deducted out? Despite the lack of clarity or difficulty in determining the basis for the Debtor's appraiser's opinion, the reports and testimony are the only evidence before the Court. Therefore, the Court will utilize what evidence has been offered and admitted.

After a careful analysis of the reports and expert testimony, the Court has reconciled the numbers which form the basis for the opinion of each expert and reorganized them for purposes of analysis. Exhibit A to this opinion shows the results of that analysis in tabular form together with the Court's determination of the differences between the appraisers.

**1. Income and Expenses**

In compiling Exhibit A, the Court adjusted the income and expense assumptions used by the appraisers to remove the four items on which they disagreed. The Bank's appraiser used unaudited calendar year 2001 figures provided by the Debtor. The Debtor's appraiser completed his updated report utilizing audited financials for the last six months of 2001 and unaudited figures for the first six months of 2002. The Debtor's operating results during the year ending [*17] June 30, 2002 were much improved over the similar period a year earlier. The Debtor's appraiser initially valued the Club at $ 1,770,870 as of August 31, 2001. Using the same methodology and assumption with figures for the year ending June 30, 2002 his valuation increased 14.3% to $ 2,024,510. Because the evidence reflects that the Club's financial performance is improving, the Court shall rely on the most recent income and expense numbers, which are the ones used by the Debtor's appraiser.

The Bank's appraiser also completed a discounted cash flow analysis which resulted in a valuation of $ 4,112,000. However, that analysis was based upon a number of assumptions which were vigorously challenged in both direct examination of the opposing expert and on cross examination. The major dispute centered around a projection of revenue increases of five percent per year over the next five years. The cornerstone of this projection was a projected increase in memberships. The Debtor's appraiser disputed that the market would support any significant increase in memberships based upon the demographics of the Lebanon, New Hampshire area and the fact that the Club fees are at the top of the local [*18] market. The Debtor's

appraiser believed that there was little room for significant membership increases and that revenue could increase with the rate of inflation in operating costs, if marketing efforts continue and the Club's equipment and facilities was maintained at a level consistent with its fees. The Bank's appraiser recognizes that because the discounted cash flow analysis depends on projections of future earnings it is less certain than an analysis based upon current earnings. *See* Exhibit 115 at page 55. The Court finds that the testimony at trial raised substantial questions concerning the ability of the Club to increase membership or fee income beyond the rate of inflation. Accordingly, the discounted cash flow analysis used by the Bank's appraiser is too speculative and shall not be utilized by the Court in determining the value of the Club.

**2. Great Room Lease**

The Bank's appraiser believes that the value of the Club should take into consideration the incremental value obtained by renovating the great room into office space and leasing it to third parties. In his appraisal report he adds projected net rental income of $ 47,200 to his projected NOI and subtracts [*19] the capital cost of the improvements ($ 235,000) from the final value. In his opinion the additional rental income adds $ 291,358 to the value of the Club at an estimated capital cost of $ 235,000 for an incremental increase of $ 56,358 in value.

The Court does not agree with the Bank's appraiser that such an analysis is appropriate under the facts of this case for two reasons. First, this Court is charged with valuing the Club in light of the Debtor's proposed post-bankruptcy use of the property. *Winthrop Old Farms Nurseries, 50 F.3d at 75.* No evidence was presented which would indicate that the Debtor has any intent to renovate and rent the great room as office space. Second, the Bank's appraiser testified that the highest and best use of the property was to continue the current operation of the Club. Therefore, the fair market value of the Club must be based on that use. Even if a prudent buyer might plan to perform such renovations, no evidence was offered to support an argument that such a buyer would share any such incremental increase in value with the Debtor. In the Court's experience, buyers do not typically share upside potential on such alterations to a [*20] property when they bear all of the risk.

**3. Real Property Taxes**

The Bank's appraiser increases his projected NOI for the Club by adding back the $ 128,182 real property tax bill for the 2001 year. He then lowers the value of Club by adding a property tax factor to his CAP rate. The problem with this approach is that it assumes that an owner of the Club will secure an agreement from the City of Lebanon and receive an abatement on the Club's assessment for tax purposes. No evidence was presented to establish that it is likely that the owner of the Club will receive any such abatement. Accordingly, for the reasons stated above on the great room lease income, the Court shall not account for real property taxes in the manner used by the Bank's appraiser. The Debtor has not received an abatement and any hypothetical buyer who takes the risk of not receiving any such abatement would be unlikely to share that benefit with the Debtor. The Court shall add back the amount of the 2001 tax bill in determining NOI.

**4. Offsite Management**

Both appraisers made adjustments to account for compensation of management. The Bank's appraiser deducted $ 82,360 in general partner and special [*21] fees and replaced them with $ 37,255 in "offsite management" fees resulting in an increase in NOI of $ 45,105. It appears that the Bank's appraiser believes that the current fees are excessive, although his report contains little explanation. *See* Exhibit 115 at page 49. The Debtor's appraiser increased expenses by $ 40,000 to reflect his opinion that the current compensation for a general partner ($ 25,000) is below market which he states should "range from $ 80,000-$ 90,000 plus bonus and a range of benefits." *See* Exhibit 81 at page 3. His appraisal report offers little analysis or support for this adjustment.

The question before the Court is whether to adjust the $ 82,360 expended by the Debtor for management fees during calendar year 2001 upwards to $ 122,360 used by the Debtor's appraiser or downward to the $ 37,255 used by the Bank's appraiser. The adjustment by the Bank's appraiser would increase the value of the Club, using his CAP rate, by $ 278,426. [5] The adjustment by the Debtor's appraiser would lower the value, using his CAP rate, by $ 200,000. [6] The difference in final valuation of $ 478,426 is material. Yet neither appraisal report contains any significant [*22] detail regarding the rationale or market justification for the adjustment. Accordingly, in the absence of evidence compelling an adjustment in this item, up or down, or any evidence that the Debtor intends to alter management compensation, the Court shall make no adjustment to this item.

5 $ 45,105 divided by 16.20%

6 $ 40,000 divided by 20.0%

**5. Replacement Reserve**

Both parties agree that the Debtor needs to fund a reserve to provide for the renovation and conversion/ expansion of space, replacement of equipment, purchase of new equipment, carpeting/ painting and major repairs beyond routine maintenance. They disagree on whether the replacement reserve should be funded at two percent or five percent of revenues. The Debtor's appraiser states that 5-6.5% is the industry norm and that a facility, such as the Club, whose fees are at the top of its market area needs to provide its customers with the perception of quality to match the fees charged. The Bank's appraiser's report does not discuss the [*23] reasons for his two percent funding assumption. The Court finds the Debtor's appraiser has more experience in the health club industry and more credibility on this issue. In addition, testimony was presented at trial which indicates a number of deficiencies in the facility which would indicate the need for greater expense in this area to satisfy a customer base paying top dollar. Accordingly, the Court shall use a five percent replacement reserve.

**C. Determination of the CAP Rate**

As discussed above, the Bank's appraiser went to great lengths to explain the methodology behind his CAP rate and the Court finds the Bank's appraiser's methodology reasonable and his testimony credible. Unfortunately, the Court cannot say the same for the Debtor's appraiser's CAP rate. The Court recognizes the Debtor's appraiser's extensive background in the management of fitness centers and the economics of running such centers. However, due to a veil of secrecy imposed by the Debtor's appraiser the Court is unable to evaluate the assumptions behind his CAP rate or even his methodology. It is interesting to note that this is not the first time the Debtor's appraiser has refused to reveal the information [*24] behind his assumptions. In an unreported superior court case from Connecticut the court commented that,

> "... Mr. Caro's opinion heavily relied on performance comparisons between New

Page 8

2003 BNH 4; 2003 Bankr. LEXIS 82, *24

Dimensions and other clubs, but because of self-imposed confidentiality restrictions, little information was provided to evaluate or determine whether these clubs had characteristics which could be fairly or appropriately compared to New Dimensions' characteristics."

*Anton Nemth et al v. Robert Carroll, 1998 Conn. Super. LEXIS 897, 16* (March 30, 1998). That same Connecticut court found Caro's testimony as "being conjectural and insufficiently supported" and that Caro, "did not provide any specific data for Connecticut or even for the New England area generally; nor did he adequately explain or establish that the industry data relied on was applicable to ... the New England area." *Id.* The Connecticut court finally stated that "the plaintiff must establish a foundation to enable the trier to make a fair and reasonable estimate of the damages, and *this foundation must rest upon more than surmise and conjecture.*" 1998 Conn. Super. LEXIS at 17 quoting *Ball v. Pardy Const. Co., 108 Conn. 549, 143 A. 855 (1928)* [*25] (emphasis added).

The Debtor's appraiser's report and testimony contains almost no analysis and little applicable data to aid the Court in determining an appropriate CAP rate for the Club. In his first report, he states that "generally, the selling price for clubs which own the real estate has been between 5-7 times the stabilized income value. This relates to capitalization rates between .200-.147." Exhibit 1 at page 14. In his updated report he states "the .200 rate (or a 5-multiplier) is used as a market indicator of value given the club's real estate ownership situation, previous history, trends, current standing in the local market, limited opportunity for growth, financial problems and recent industry club sales." Exhibit 81 at page 2. However, the Debtor's appraiser refused to disclose any data supporting his conclusions based upon claims of confidentiality. While the Court has no reason to doubt the sincerity of his testimony, the Court cannot compare the basis for his opinion against the information provided by the Bank's appraiser. Accordingly, the Bank appraiser's testimony on CAP rates was subject to cross examination and review by the Court and, therefore, is entitled [*26] to more weight.

The Bank's appraiser's CAP rate was computed as a weighted average of a twenty percent return on equity and a nine percent cost for debt financing. Assuming a

loan to value ratio of seventy percent, the Bank's appraiser concluded that 13.56% was an appropriate CAP rate. The Court believes that determining the CAP rate based upon a weighted average of debt and equity financing is more reflective of reality than a single rate for all purposes. However, the testimony at trial does not support a finding that the Club could be financed at the loan to value ratio or the rate assumed by the Bank's appraiser.

Testimony at trial revealed repeated failures in the Debtor's attempts to refinance the Club. The evidence supports a finding that debt financing for the Club would be available, if at all, at a premium rate and a higher loan to value ratio. If the Court were to assume a fifty percent loan to value ratio, a twelve percent interest rate and a twenty percent return on equity, the weighted CAP rate would be sixteen percent. Although the Debtor's appraiser did not supply any detailed support for his CAP rate assumptions, he does have extensive experience in the health club [*27] industry and his opinion on the range of CAP rates (14.7% to 20.0%) for facilities such as the Club also provide support for a CAP rate higher than that assumed by the Bank's appraiser. Accordingly, the Court shall employ a CAP rate at the midpoint of the range offered by the Debtor's appraiser or 16.67% (or a multiple of 6).

**D. Determination of Value**

For the reasons discussed above, the Court finds that the direct capitalization method is an appropriate method to use in valuing the Club. As detailed above and in Exhibit A to this opinion, the Court finds that the NOI for the Club is $ 444,902 and that after the application of a 16.67% CAP rate results in a value of $ 2,668,878 for the Club as a going concern. However, that value needs to be reduced by the value of the personal property in order to determine the value of the Bank's real property collateral. The Debtor's appraiser did not make any attempt to determine the value of the real property separate and distinct from the entire business operation. The only evidence of a value for the personal property is the $ 450,000 used by the Bank's appraiser. Accordingly, the Court subtracts this value from the total value of the [*28] Club to arrive at a value of $ 2,218,878 for the real property.

**III. CONCLUSION**

For the reasons set forth above, the Court finds that

Page 9

2003 BNH 4; 2003 Bankr. LEXIS 82, *28

the fair value of the Debtor's real property, and the Bank's collateral, for purposes of confirmation is $ 2,218,878.

This opinion constitutes the Court's findings of fact and conclusions of law in accordance with *Federal Rule of Bankruptcy Procedure 7052*. The Court will issue a separate order consistent with this opinion.

DATED this 31st day of January, 2003, at Manchester, New Hampshire.

/s/ J. Michael Deasy

Bankruptcy Judge

**EXHIBIT A**

**IN RE: RIVER VALLEY FITNESS ONE, L.P.**

**Bk. No. 01-12829**

**COMPARISON OF VALUATIONS**

|  | Bank's Appraiser | Debtor's Appraise |
|---|---|---|
| Income from Club Operations | $ 3,284,364 | $ 3,300,972 |
| Operational Expenses | $ (2,627,221) | $ (2,576,740) |
| Net Income | $ 657,143 | $ 724,232 |
| Adjustments: |  |  |
| Great Room Lease Income | $ 47,200 | $ 0 |
| Property Taxes | $ 0 | $ (128,182) |
| Offsite Management | $ (37,255) | $ (40,000) |
| Replacement Reserve | $ (66,631) | $ (151,148) |
| Net Operating Income | $ 600,457 | $ 404,902 |
| Capitalization Rate | 16.20% | 20.00% |
| Valuation of Club (Direct Capitalization) | $ 3,706,525 | $ 2,024,510 |
| Valuation of Club (Discounted Cash Flow) | $ 4,112,000 | $ 0 |
| Final Valuation of Club | $ 3,850,000 | $ 2,024,510 |
| Less: Equipment | $ 450,000 | $ 450,000 |
| Less: Great Room Construction | $ 235,000 |  |
| Real Estate Valuation | $ 3,165,000 | $ 1,574,510 |

2003 BNH 4; 2003 Bankr. LEXIS 82, *28

[*29]

|  | Court's Findings and Rulings |
|---|---|
| Income from Club Operations | $ 3,300,972 |
|  |  |
| Operational Expenses | $ (2,576,740) |
|  |  |
| Net Income | $ 724,232 |
|  |  |
| Adjustments: |  |
| Great Room Lease Income | $ 0 |
| Property Taxes | $ (128,182) |
| Offsite Management | $ 0 |
| Replacement Reserve | $ (151,148) |
|  |  |
| Net Operating Income | $ 444,902 |
|  |  |
| Capitalization Rate | 16.67% |
|  |  |
| Valuation of Club (Direct Capitalization) | $ 2,668,878 |
| Valuation of Club (Discounted Cash | $ 0 |
| Flow) |  |
|  |  |
| Final Valuation of Club | $ 2,668,878 |
|  |  |
| Less: Equipment | $ 450,000 |
| Less: Great Room Construction |  |
| Real Estate Valuation | $ 2,218,878 |

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 14th day of December, 2007, a copy of the

**Opening Brief Of Appellants, American Classic Voyages Co., et al.** was served, by

electronic transmission, upon:

> Michael D. DeBaecke, Esquire
> Blank Rome LLP
> 1201 N. Market Street, Suite 800
> Wilmington, Delaware 19801

> Laurie S. Silverstein, Esquire
> Gabriel R. MacConaill, Esquire
> Potter Anderson & Corroon LLP
> Hercules Plaza, 6th Floor
> 1313 N. Market Street
> Wilmington, Delaware 19801

and a copy was sent, by first class mail, postage prepaid to:

> Anthony G. Stamato, Esquire
> Kaye Scholer LLP
> 3 First National Plaza
> Chicago, Illinois 60602

> Robert J. Sidman, Esquire
> Tiffany Strelow Cobb, Esquire
> Voyrs Sater Seymour & Pease LLP
> 52 East Gay Street, P.O. Box 1008
> Columbus, OH 43215-1008

> Jeffrey E. Glen, Esquire
> Mark D. Silverschotz, Esquire
> Luma S. Al-Shibib, Esquire
> Anderson Kill & Olick, P.C.
> 1251 Avenue of the Americas
> New York, NY 10020

Norman M. Monhait (#1040)