# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>AMERICAN CLASSIC VOYAGES CO., *et al.*,<br><br>Debtors. | Chapter 11<br>(Jointly Administered)<br>Case Nos. 01-10954,<br>01-10955 - 01-10977 (KJC)<br><br>Adv. Pro. No. 03-56998 (KJC) |
| AMERICAN CLASSIC VOYAGES CO., *et al.*,<br><br>Appellants,<br><br>- against –<br><br>JP MORGAN CHASE BANK, NATIONAL CITY BANK OF MICHIGAN/ILLINOIS, and HIBERNIA NATIONAL BANK,<br><br>Appellees. | Civil Action No. 07-352 (JJF) |

---

## RESPONSE BRIEF OF APPELLEES JP MORGAN CHASE BANK, NATIONAL CITY BANK, AND CAPITAL ONE, N.A.

---

Laurie Selber Silverstein (No. 2396)
Gabriel R. MacConaill (No. 4734)
POTTER ANDERSON & CORROON LLP
1313 North Market Street, 7th Floor
Wilmington, DE 19801
Telephone: (302) 984-6067
-and-
Anthony G. Stamato (*pro hac vice*)
Robert M. Spalding (*pro hac vice*)
KAYE SCHOLER LLC
3 First National Plaza, Suite 4100
70 W. Madison Street
Chicago, Illinois 60603
Telephone (312) 583-2300

*Attorneys for J.P. Morgan Chase Bank*

Michael D. DeBaecke (No. 3186)
BLANK ROME LLP
1201 North Market Street, Suite 800
Wilmington, DE 19801
Telephone: (302) 425-6400
-and-
Robert J. Sidman (*pro hac vice*)
Tiffany Strelow Cobb (*pro hac vice*)
VORYS, SATER, SEYMOUR and PEASE LLP
52 East Gay Street
Columbus, OH 43215
Telephone: (614) 464-6422

*Attorneys for National City Bank (f/k/a National City Bank of the Midwest, f/k/a National City Bank of Michigan/Illinois) and Capital One, NA (f/k/a Hibernia National Bank)*

# TABLE OF CONTENTS

TABLE OF CITATIONS ............................................................ iii

STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDINGS.................. 1

SUMMARY OF ARGUMENT .................................................... 2

COUNTERSTATEMENT OF FACTS ............................................. 7

ARGUMENT ............................................................... 11

I.      STANDARD OF APPELLATE REVIEW .................................. 11

II.     APPELLANTS' BURDEN OF PROOF BY THE PREPONDERANCE
        OF THE EVIDENCE ............................................... 12

III.    THE APPELLEES PRESENTED MUCH MORE THAN "SOME
        EVIDENCE" OF SOLVENCY AS OF THE TRANSFER DATE ......... 14

        A.      Opinion Testimony of Brian Calvert ............................. 14

                1.      The Discounted Cash Flow Analysis ................... 15

                2.      The July 2001 Projections ................................. 15

                3.      Calvert's Conservative Judgments ..................... 17

        B.      Additional Evidence of Solvency ................................ 18

        C.      That Evidence Rebuts the Statutory Presumption of
                Insolvency .................................................... 19

IV.     APPELLANTS' ATTRIBUTIONS OF ERROR LACK MERIT ............ 20

        A.      The Bankruptcy Court Correctly Rejected Appellants'
                Challenges To The July 2001 Projections And Found that
                They were Reasonable When Prepared .......................... 20

        B.      The Bankruptcy Court Correctly Found That Calvert's
                DCF Analysis Was Proper ...................................... 25

                1.      Calvert Selected Appropriate Peer Group
                        Companies ........................................... 26

                2.      Calvert Selected An Appropriate Small Stock
                        Premium .............................................. 27

3.    Mandarino's "Sensitivity Analyses" Prove Nothing ........30

V.    APPELLANTS' ARGUMENT FOR A MARKET CAPITALIZATION
APPROACH TO VALUATION ALSO FAILS........................................32

A.    Appellants Failed To Make A Market Capitalization
Argument At Trial Or Designate It As An Issue On Appeal.........32

B.    Appellants Seek To Take the Holding Of VFB Too Far ...............33

C.    Market-Based Data Shows That AMCV Was Solvent As
Of The Transfer Date ...................................................................37

CONCLUSION................................................................................................................39

# TABLE OF CITATIONS

## CASES

A.C. Auckerman Co. v. R.L. Chaides Constr. Co., 960 F.2d 1020 (Fed. Cir. 1992) ....... 13

Amerada Hess Corp. v. Comm'r, 517 F.2d 75 (3d Cir. 1975).......................................... 11

Anderson v. City of Bessemer City, N.C., 470 U.S. 564, 105 S. Ct. 1504, 84
    L.Ed.2d 518 (1985)................................................................................................ 4, 11

Bolt v. Merrimack Pharms., Inc., 503 F.3d 913 (9th Cir. 2007)...................................... 33

Chartwell Litig. Tr. v. Addus Healthcare, Inc. (In re Med Diversified, Inc.), 334
    B.R. 89 (Bankr. E.D.N.Y 2005)........................................................... 15, 17, 32

Fidelity Bond and Mortgage Co. v. Brand (In re Fidelity Bond and Mortgage
    Co.), 340 B.R. 266 (Bankr. E.D. Pa. 2006) ................................................ 27

Harris v. City of Philadelphia, 35 F.3d 840 (3d Cir. 1994) ......................................... 5, 33

Homeplace of America, Inc. v. Salton, Inc. (In re Waccamaw's Homeplace), 325
    B.R. 524 (Bankr. D. Del. 2005) ................................................................... 2, 13

In re Exide Techs., 303 B.R. 48 (Bankr. D. Del. 2003)..................................................... 15

In re Hechinger Inv. Co., 147 Fed. Appx. 248, 251 (3d Cir. 2005).................................. 11

In re R.M.L., Inc., 93 F.3d 139 (3d Cir. 1996) ................................................................. 12

Interface Group-Nev., Inc. v. Trans World Airlines, Inc. (In re Trans World
    Airlines, Inc.), 145 F.3d 124 (3d Cir. 1998) ............................................... 5, 33

Intuitive Surgical, Inc. v. Computer Motion, Inc., Case No. Civ.A.01-203 SLR,
    2002 WL 31833867 (D. Del. December 10, 2002) ................................... 2, 13

Kool, Man, Coffee & Co. v. Coffey, 300 F.3d 340 (3d Cir. 2002) ............................... 5, 34

Landon v. Hunt, 977 F.2d 829 (3d Cir. 1992) ............................................................... 4, 11

Lids Corp. v. Marathon Inv. Partners, L.P. (In re Lids Corp.), 281 B.R. 535
    (Bankr. D. Del. 2002) .................................................................................... 23

MFS/Sun Life-Trust-High Yield Series v. Van Dusen Airport Servs. Co., 910 F.
    Supp. 913 (S.D.N.Y. 1995)............................................................................ 21

Official Committee of Asbestos Claimants v. G-I Holdings, Inc. (In re G-I
    Holdings, Inc.), 385 F.3d 313 (3d Cir. 2004) .............................................. 13

Shire US Inc. v. Barr Labs., Inc., 329 F.3d 348 (3d Cir. 2003)................................... 3, 12

Statutory Committee of Unsecured Creditors v. Motorola, Inc. (In re Iridium
    Operating LLC), 373 B.R. 283 (Bankr. S.D.N.Y. 2007)................................... 5

Union Meeting Partners v. Lincoln Nat'l Life Ins. Co. (In re Union Meeting
    Partners), 163 B.R. 229 (E.D. Pa. 1994)................................................. 14, 20

VFB LLC v. Campbell Soup Co. , Case No. Civ.A.02-137 KAJ, 2005 WL
   2234606, at *10 (D. Del. September 13, 2005) ................................................. 33, 35, 36

VFB LLC v. Campbell Soup Co., 482 F.3d 624 (3d Cir. 2007) ............................... passim

## STATUTES

11 U.S.C. § 101(32) ................................................................................................ 38

11 U.S.C. § 547(b) .................................................................................................. 12

11 U.S.C. § 547(b)(3) ............................................................................................. 13

11 U.S.C. § 547(g) .................................................................................................. 14

Bankr. Code § 547(f) ............................................................................................ 2,13

## RULES

Fed. R. Bankr. P. 8006, 8010(a)(1) ....................................................................... 5, 33

Fed. R. Bankr. P. 8013 (2008) ............................................................................... 4, 11

Fed. R. Bankr. P. 9017 ............................................................................................. 13

Fed. R. Evid. 301 ..................................................................................................... 13

## OTHER AUTHORITIES

5 Lawrence P. King, *et al.*, Collier on Bankruptcy § 547.03[5], at 547-39 (15th ed.
   2005) ................................................................................................................ 2, 13

## STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDINGS

American Classic Voyages Co. ("AMCV") filed a voluntary petition for relief under Chapter 11 on October 19, 2001. Several AMCV subsidiaries, including the Delta Queen Steamboat Co. ("DQSC," and with AMCV the "Debtors" or "Appellants"), filed similar petitions days later.

On October 16, 2003, Debtors filed this adversary proceeding against JP Morgan Chase Bank, National City Bank, and Hibernia National Bank, n/k/a Capital One, NA (collectively "Appellees") to recover an allegedly preferential repayment of a $29.5 million loan on August 14, 2001 (the "Transfer Date"). The United States Bankruptcy Court for the District of Delaware ("Bankruptcy Court") consolidated this and other similar adversary proceedings to determine whether the Debtors were insolvent on the relevant transfer dates, a common element in each of the adversary proceedings, and a necessary prerequisite to any recovery.

After nearly three years of discovery on the insolvency issue, and the settlement of the other adversary proceedings, the Bankruptcy Court commenced a four day trial in this adversary proceeding limited to the question of whether the Debtors were insolvent on the Transfer Date.

On April 27, 2007, the Bankruptcy Court issued its Opinion, finding that the Appellees presented "some evidence" that the Debtors were solvent as of the Transfer Date, thereby rebutting the statutory presumption of insolvency, and further finding that the Debtors failed to prove that the Debtors were insolvent as of the Transfer Date by the preponderance of the evidence.

## SUMMARY OF ARGUMENT

1.    The Bankruptcy Court properly concluded that the Appellees presented some evidence of the solvency of AMCV and DQSC sufficient to rebut the presumption of insolvency and that the Appellants failed to satisfy their burden of proving insolvency by the preponderance of the evidence.

2.    Section 547(f) of the Bankruptcy Code provides that there is a presumption of insolvency in favor of the Appellants, but that presumption "does not shift the burden of proof on the issue of insolvency away from the [Appellants]." H.R. Rep. No. 95-595, at 178-79. This presumption may be rebutted by the presentation of "some evidence at trial showing that [debtor was] solvent at the time the challenged transfers were made." Homeplace of America, Inc. v. Salton, Inc. (In re Waccamaw's Homeplace), 325 B.R. 524, 529 (Bankr. D. Del. 2005). The presumption only "compels the production of [a] minimum quantum of evidence from the party against whom it operates, nothing more." Intuitive Surgical, Inc. v. Computer Motion, Inc., Case No. Civ.A.01-203 SLR, 2002 WL 31833867, at *4 n.3 (D. Del. December 10, 2002) (quotation omitted).

3.    At trial, Appellants bore the burden to prove by a preponderance of evidence that AMCV and DQSC were insolvent. See, e.g., 5 Lawrence P. King, et al., Collier on Bankruptcy § 547.03[5], at 547-39 (15th ed. 2005); H.R. Rep. No. 95-595, at 375 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6331.

4.    The Bankruptcy Court correctly concluded that both AMCV and DQSC were operating as going concerns on the Transfer Date. (See R. at 3:14 (Opinion)).[1]  In arriving at its

---

[1] Appellees' citations of "R. at" are to the Record on Appeal.

conclusion, the court considered substantial evidence that prior to the terrorist attacks on September 11th, Debtors were operating as viable going concerns.  In addition, the Bankruptcy Court considered, among other things, the opinion testimony of the parties' respective experts; AMCV's SEC filings; testimony of former offers of the Debtors; and evidence of an untapped $10 million credit facility.  (R. at 13:509 (Tr.,  July 24, 2006).)  That finding was not clearly erroneous.

5.       The Bankruptcy Court then correctly found that Appellees presented "some evidence" of the solvency of AMCV and DQSC sufficient to rebut the presumption of insolvency.  (R. at 3:23-24.)  The evidence considered by the Bankruptcy Court included the statements of AMCV's former management, the Debtors' sworn SEC filings and financial schedules, overwhelming evidence that but for the tragic events of September 11th, the Debtors would never have been in a bankruptcy situation, and the opinion testimony of Appellees' expert witness that AMCV and DQSC were solvent as of the Transfer Date.  These findings of fact were not clearly erroneous.  "Valuing an asset is a difficult task that depends upon detailed factual determinations, which may be overturned only if they are 'completely devoid of a credible evidentiary basis or bear[] no rational relationship to the supporting data.'"  VFB LLC v. Campbell Soup Co., 482 F.3d 624, 633 (3d Cir. 2007); see also Shire US Inc. v. Barr Labs., Inc., 329 F.3d 348, 352 (3d Cir. 2003).

6.       Appellants' brief is solely focused on its misguided assertions concerning the relative credibility of the parties' respective experts, R. Brian Calvert ("Calvert"), and Perry Mandarino ("Mandarino").  Appellants leave unchallenged the additional—and substantial— evidence of solvency presented by Appellees at trial, and considered by the Bankruptcy Court in reaching its decision.  While Calvert's opinion testimony was appropriately accepted by the

Bankruptcy Court, even if one were to assume, *arguendo*, that the Appellees had not presented credible opinion testimony, the additional evidence of solvency that was adduced by Appellees alone constitutes "some evidence" sufficient to rebut the presumption of insolvency. Bankruptcy courts' "[f]indings of fact . . . shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses." Fed. R. Bankr. P. 8013 (2008); Landon v. Hunt, 977 F.2d 829, 830 (3d Cir. 1992); Anderson v. City of Bessemer City, N.C., 470 U.S. 564, 573-74, 105 S. Ct. 1504, 84 L.Ed.2d 518 (1985).

7.     After concluding that Appellees had rebutted the presumption of insolvency, the Bankruptcy Court then correctly determined that the Appellants failed to satisfy their burden of proving insolvency by the preponderance of the evidence. Among other things, it was significant to the Bankruptcy Court that Appellees' expert, Calvert, had "extensive experience in performing valuations," highlighting testimony about "his twenty years of experience in this field" and the fact "that he has performed over 200 valuations." (R. at 3:23 (Opinion).) By contrast, the Bankruptcy Court observed that Appellants' expert had "far less experience [than Calvert] in performing solvency analyses," noting that "[a]side from AMCV, Mandarino had performed only one other peer group beta analysis." (Id. at n.21.) The Bankruptcy Court also rejected the assertion of Appellants' expert that September 11th did not have an impact on the Debtors' financial condition. In addition, Appellants' expert applied the wrong premise of value by applying a liquidation valuation standard instead of a going concern standard. Finally, the Bankruptcy Court found unpersuasive Mandarino's artificial adjustments to Calvert's DCF analysis which were advanced solely to support Appellants' litigation posture. The Bankruptcy Court's conclusion is consistent with recent case law: "The creation of a revised set of projections for purposes of performing a discounted cash flow analysis supporting the conclusion

4

that Iridium was insolvent looks like second-guessing by financial experts who are doing precisely what they were hired to do—doing everything that needs to be done to justify giving an insolvency opinion. . . ." Statutory Committee of Unsecured Creditors v. Motorola, Inc. (In re Iridium Operating LLC), 373 B.R. 283, 301 (Bankr. S.D.N.Y. 2007).

8.    Contrary to Appellants' suggestions, VFB LLC v. Campbell Soup Co., 482 F.3d 624 (3d Cir. 2007), does not stand for the proposition that the so-called market capitalization methodology is the only accepted approach when considering valuation issues in solvency disputes. The Third Circuit expressly recognized in VFB, as it previously did in the decision Kool, Man, Coffee & Co. v. Coffey, 300 F.3d 340 (3d Cir. 2002), that the discounted cash flow approach was an appropriate and accepted methodology in solvency disputes.

9.    Appellants never espoused a market capitalization methodology at trial (or in their pre- or post-trial filings) and further failed to designate it in their Designation of Issues and Record on Appeal.  Appellants have thus waived the issue on appeal.  (Appellants' Br. 5-6); Interface Group-Nev., Inc. v. Trans World Airlines, Inc. (In re Trans World Airlines, Inc.), 145 F.3d 124, 131-33 (3d Cir. 1998); see Fed. R. Bankr. P. 8006, 8010(a)(1); Harris v. City of Philadelphia, 35 F.3d 840, 845 (3d Cir. 1994).

10.    By Appellants' own reading of VFB, AMCV would necessarily be found to be solvent as of the transfer date because they have conceded AMCV's equity did have a positive value.  (See Appellants' Br. p. 3 ("VFB compels the conclusion that the actual value of AMCV's equity was accurately reflected by the market price of its shares," which, although the market price of AMCV's stock had been declining, nonetheless still results in a positive equity value).) [2]

---

[2] It is also curious that the Appellants include DQSC in their discussion of VFB and market capitalization.  Unlike AMCV, DQSC was not publicly traded.  It is unclear whether Appellants merely forgot this significant fact, but Appellants' inclusion of DQSC in its discussion of AMCV's share value is misplaced.

11.    In short, the Bankruptcy Court's interpretation of the evidence was more than plausible based on the record. The Bankruptcy Court's findings were hardly devoid of a credible evidentiary basis and certainly bore a rational relationship to the supporting data. Under the clearly erroneous standard, the Bankruptcy Court decision may not be reversed, even if this Court believes that it might have weighed the evidence differently. Accordingly, the Bankruptcy Court's decision must be affirmed.

## COUNTERSTATEMENT OF FACTS

On September 11, 2001, the United States of America experienced the worst terrorist attacks in its history. (R. at 3:9 (Opinion).) These tragic events and their dramatic negative effect on the financial condition of the Debtors, who owned and operated U.S. flagged passenger cruise vessels, are a critical and unavoidable issue in this appeal, despite Appellants' attempt to ignore them in their opening brief.

This appeal involves only the most recent of Appellants' quixotic efforts to recover, on a preference theory, the repayment of a valid secured loan obligation that was made approximately one month *before* the tragic events of September 11, 2001, followed by a bankruptcy filing approximately one month *after* September 11th. (R. at 199 (Chapter 11 Petition of AMCV).) It was the September 11 events that led to the Debtors' bankruptcy. (R. at 198 (AMCV Press Release, Oct. 19, 2001); R. at 168:108-09 (Calian Dep., Apr. 7, 2005).) In their opening brief, Appellants make virtually no mention of September 11th or its direct and, in fact, catastrophic impact on these Debtors.

The insurmountable financial problems created by the events of September 11, 2001 were not conclusions reached solely by AMCV's management[3]; as the Bankruptcy Judge overseeing the Debtors' bankruptcy cases concluded years ago:

> **Absent September 11** and what happened to the industry on September 11th, **[Debtors' financial situation] would never have been a bankruptcy situation** - - I can't say never, but at least the likelihood would have been that it would not have. And what affected the debtor here was the sudden cessation of tourism and the sudden cessation of operations which happened after September 11.

---

[3] See, e.g., (R. at 197:6 (AMCV Discussion Material, Oct. 16, 2001); R. at 198:2 (AMCV Press Release, Oct. 19, 2001); R. at 163:102-06 (Allen Dep., Nov. 27, 2001); R. at 167:93-94, 151, 157-67, 181-82 (Talcott Dep., Apr. 6, 2005); R. at 168:25-27, 38-39, 91-97, 100-06, 108-12, 213-16 (Calian Dep., Apr. 7, 2005); R. at 169:64-66, 71-72, 90-98 (Allen Dep., Apr. 7, 2005).)

(R. at 129:4 (Tr., Dec. 18, 2001) (emphasis added).)

The unequivocal and uncontroverted testimony from the Debtors' management strongly supports the Bankruptcy Judge's conclusion. Jordan B. Allen ("Allen"), AMCV's Executive Vice President, General Counsel and Secretary, testified shortly after the Debtors filed for bankruptcy, highlighting that September 11th had a catastrophic impact on its business (as well as the travel industry as a whole) and concluded that ensuing events such as the cancellation of travel insurance and the corresponding credit crunch left AMCV and its related companies in a chapter 11 situation. (See R. at 163:104-06 (Allen Dep., Nov. 27, 2001).) Allen also unequivocally testified that prior to September 11th, he believed that AMCV had turned the corner on its business. (Id.)[4] Allen's observations were echoed by other AMCV senior management, Randall L. Talcott ("Talcott"), AMCV's former Vice President-Finance, Treasurer and Chief Accounting Officer, and Philip C. Calian ("Calian"), AMCV's former Chief Executive Officer, who likewise believed that, if not for the events of September 11, 2001, AMCV likely would have survived. (R. at 167:151 (Talcott Dep., Apr. 6, 2005); R. at 168:103-05 (Calian Dep., Apr. 7, 2005).) Ironically, in the weeks and months prior to September 11, AMCV's prospects were looking brighter as the U.S. economy slowly worked its way out of the post-

---

[4] Specifically, Allen testified as follows:

> **Prior to September 11[th], we felt that we had turned the corner** on our business, both on … the expense side and the revenue side. In fact, the second six months of the year, particularly in Hawaii, but across both brands, was much more positive. And indications for 2002 were also favorable. **September 11[th] was a catastrophic event in our business and in our industry.** It created … a situation that was just too significant to recover from. Our business, particularly in Hawaii, was off 50%. Our business on the Delta Queen side of the business actually was off less than that, close to, about 25 or 30 percent. . . .
>
> [T]he travel insurers made the underwriting decision that because of the condition of the industry, our business and the credit squeeze that we were facing following September 11th, that it was a risk that they were not willing to write. And it was sort of a … self- fulfilling prophesy. **The day that they stopped writing, people stopping booking, and they left us in a Chapter 11 situation.**

(R. at 163:104-06 (Allen Dep., Nov. 27, 2001) (emphasis added).)

"dot.com" recession. Prior to September 11th, DQSC had an untapped $10 million revolving credit facility in place and available to it. (See R. at 18:B-13 ((Stmt. Uncont'd Fact ¶ 49).) On July 31, 2001, AMCV successfully refinanced $50 million of one-year MARAD guaranteed notes. (R. at 11:39, 95-96 (Tr., July 20, 2006); R. at 153:7 (AMCV Form 10-Q FQE 6/30/01).) Just prior to the Transfer Date, AMCV had resolved its dispute with its shipbuilder, Ingalls, which was critical to the Debtors in that it resolved open issues regarding the delivery dates and final cost of the Project America Ships. (R. at 3:18-19 (citing R. at 245, 251, 153, 188, 168:80-81).) Debtors' business records and other documents from June and July 2001 evidenced "that bookings in the Hawaii market were increasing at a rate suggesting that the Debtors would exceed their previous forecasts for the third and fourth quarters of 2001." (Id.)

As a result of the events of September 11, 2001, AMCV experienced (among other things) a dramatic and almost immediate reduction in gross bookings (50% in Hawaii and 50% at Delta Queen), a dramatic and almost immediate increase in cancellations (35% in Hawaii and 30% at Delta Queen), a significant liquidity squeeze, vessel operating cash outflow rate exceeding inflow rate by $3 million per week, and access to additional capital became non-existent. (R. at 197:5 (AMCV Discussion Material, Oct. 16, 2001); R. at 198:1-2 (AMCV Press Release, Oct. 19, 2001); R. at 167:173-74 (Talcott Dep., Apr. 6, 2005); R. at 168:105-06 (Calian Dep., Apr. 7, 2005).) At their bankruptcy confirmation hearing, Debtors reiterated that September 11th caused their financial demise, noting that prior to September 11th, they were anticipating that their business would be profitable well into the future. (R. at 225:42-43 (Tr., Feb. 6, 2003).)

At no time prior to the events of September 11, 2001 did AMCV senior management believe that AMCV lacked sufficient liquidity to stay in business; in fact, as of September 11,

2001, AMCV was an operating, fully functional company, which, through its subsidiaries, operated four cruise lines under the following brand names: (i) The Delta Queen Steamboat Co.; (ii) American Hawaii Cruises; (iii) United States Lines; and (iv) Delta Queen Coastal Voyages, and was completing plans to bring additional ships on line in the coming months. (R. at 182:3, 17 (AMCV Form 10-K for FYE); R. at 18:B-2 (Stmt. of Uncont'd Facts).) It was not until October 1, 2001, that AMCV management, confronted with the dramatic increase in cancellations and drop in bookings, realized that the company was facing a liquidity crisis that would jeopardize its ability to continue to operate as a going concern business; at that time, management realized that the devastating effects of the events of September 11, 2001 could not be overcome. (R. at 167:165-66 (Talcott Dep., Apr. 6, 2005); R. at 168:89-91 (Calian Dep., Apr. 7, 2005); R. at 169:66-67 (Allen Dep., Apr. 7, 2005).)

The Bankruptcy Court found these facts (along with a careful assessment of other facts in the record, including a detailed and reasoned consideration of Appellees' opinion witness's cash flow analysis) compelling in reaching the conclusion that: (i) Appellees had met their burden to present "some evidence" that AMCV and DQSC were solvent, operating businesses prior to September 11 and (ii) Appellants failed to satisfy their burden of proving by a preponderance of the evidence that AMCV and DCSC were insolvent. (R. at 3:12 (Opinion).) The merits of Appellants' case on appeal rest almost exclusively on convincing this Court that the Bankruptcy Judge committed "clear error" in making these findings.

10

## ARGUMENT

### I.    STANDARD OF APPELLATE REVIEW

Bankruptcy courts' "[f]indings of fact . . . shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses." Fed. R. Bankr. P. 8013 (2008); Landon v. Hunt, 977 F.2d 829, 830 (3d Cir. 1992). So long as the Bankruptcy Court's interpretation of the evidence is plausible based on the record, its decision may not be reversed, even if the appellate court believes that it would have weighed the evidence differently:

> If the [bankruptcy court's] account of the evidence is plausible in light of the record viewed in its entirety, the [reviewing court] may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.

Anderson v. City of Bessemer City, N.C., 470 U.S. 564, 573-74, 105 S. Ct. 1504, 84 L.Ed.2d 518 (1985).

An appellate court "exercises plenary review over a [trial] court's selection of a valuation standard," that is, going concern value or liquidation value. In re Hechinger Inv. Co., 147 Fed. Appx. 248, 251 (3d Cir. 2005) (citing Amerada Hess Corp. v. Comm'r, 517 F.2d 75, 82 (3d Cir. 1975)). "Once a standard is applied, a valuation is a question of fact that [the appellate court] reviews only for clear error." Id. To the extent that the bankruptcy court's determination to use going concern or liquidation value depended on facts, its findings of facts are likewise reviewed for clear error.

In the present context, when a reviewing court is considering valuation evidence that was presented to the trial court in a dispute over solvency, the Third Circuit has recognized that "[v]aluing an asset is a difficult task that depends upon detailed factual determinations, which

11

may be overturned only if they are 'completely devoid of a credible evidentiary basis or bear[]

no rational relationship to the supporting data.'" VFB LLC v. Campbell Soup Co., 482 F.3d 624,

633 (3d Cir. 2007); see also Shire US Inc. v. Barr Labs., Inc., 329 F.3d 348, 352 (3d Cir. 2003)

("a finding of fact may be reversed on appeal only if it is completely devoid of a credible

evidentiary basis or bears no rational relationship to the supporting data").  At the time the

transfer in question was made, which is when solvency must be measured, AMCV and DQSC

were not just established operating companies that had secured a substantial place in its market,

they were also in the process of expanding their fleet, planning on increasing capacity with the

addition of the Project America Ships that were under construction.[5]  Sadly, in light of

September 11, AMCV was never afforded the opportunity to see the full return on its capital

investments.  In a valuation analysis, however, facts that were unknown or not reasonably

foreseeable cannot be factored into the equation.  To the extent Appellants attempt to

characterize AMCV's expansion plan as unrealistic, the reviewing court must be mindful that:

"Where the asset being valued is a speculative investment [such as an investment that requires

the passage of time to realize returns], a trial court's factual determinations will be 'largely

immune from attack on appeal.'"  VFB, 482 F.3d at 633 (quoting In re R.M.L., Inc., 93 F.3d 139,

154 (3d Cir. 1996).

## II.    APPELLANTS' BURDEN OF PROOF BY THE PREPONDERANCE OF THE EVIDENCE

The Appellants asserted a "preference" claim against the Appellees pursuant to 11 U.S.C.

§ 547(b).  One of the elements of a plaintiff's *prima facie* preference claim is proving by

preponderance of the evidence the insolvency of the debtor at the time of the transfer.  11 U.S.C.

---

[5] (R. at 182:3, 6 (AMCV Form 10-K FYE 2000; (R. at 206:1, 2 (Calian Stmt. to Congress); (R. at 168:39-48 (Calian Dep., Apr. 7, 2005).)

§ 547(b)(3).[6] At trial, Appellants bore the burden to prove by a preponderance of evidence that AMCV and DQSC were insolvent when the payment in question was made. See, e.g., 5 Lawrence P. King, et al., Collier on Bankruptcy § 547.03[5], at 547-39 (15th ed. 2005); H.R. Rep. No. 95-595, at 375 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6331.

Section 547(f) of the Bankruptcy Code provides for an initial presumption of insolvency in favor of the Appellants; however, that presumption *does not* shift the burden of proof away from the Appellants. H.R. Rep. No. 95-595, at 178-79; see Fed. R. Evid. 301; Official Committee of Asbestos Claimants v. G-I Holdings, Inc. (In re G-I Holdings, Inc.), 385 F.3d 313, 318 (3d Cir. 2004). Instead, "the presumption merely requir[es] the [Appellees] to present some evidence to overcome the presumption." H.R. Rep. No. 95-595, at 179. Specifically, the presumption is rebutted by the presentation of "some evidence at trial showing that [the debtor was] solvent at the time the challenged transfers were made." In re Waccamaw's Homeplace, 325 B.R. at 529 (Bankr. D. Del. 2005) . The presumption of insolvency under 11 U.SC. § 547(f) "is as defined in Rule 301 of the Federal Rules of Evidence." S. Rep. No. 95-989, at 89 (1977), reprinted in 1978 U.S.C.C.A.N. 5787, 5875; see also Fed. R. Bankr. P. 9017 (stating that Federal Rule of Evidence 301 applies in bankruptcy proceedings). Federal Rule of Evidence 301 only "compels the production of [a] minimum quantum of evidence from the party against whom it operates, nothing more." Intuitive Surgical, Inc. v. Computer Motion, Inc., 2002 WL 31833867, at *4 n.3 (D. Del. 2002) (quoting A.C. Auckerman Co. v. R.L. Chaides Constr. Co., 960 F.2d 1020, 1037 (Fed. Cir. 1992)) (brackets in original, emphasis added).

Once the Appellees presented the "minimum quantity of evidence" of solvency, the

---

[6] In this case, the parties agreed to a trial solely on the issue of insolvency; accordingly, the remaining elements of Appellants' preference claim are not at issue here, including the issue of which entity made the transfer.

Appellants had the burden to affirmatively demonstrate Debtors' insolvency by a preponderance of the evidence. 11 U.S.C. § 547(g); H.R. Rep. No. 95-595, at 179 (once "some evidence" is presented, the "ultimate burden of proof remain[ed] with [Appellants]"); <u>Union Meeting Partners v. Lincoln Nat'l Life Ins. Co. (In re Union Meeting Partners)</u>, 163 B.R. 229, 239 (E.D. Pa. 1994) ("the presumption disappears completely and the burden of proving insolvency reverts to the Debtor" upon the presentation of "some evidence" that the debtor was solvent).[7]

## III.   THE APPELLEES PRESENTED MUCH MORE THAN "SOME EVIDENCE" OF SOLVENCY AS OF THE TRANSFER DATE

The Bankruptcy Court correctly found that Appellees presented more than enough evidence to satisfy the "some evidence" standard to rebut the presumption of insolvency. (R. at 3:23-24.) Indeed, Appellees presented much more than "some evidence" that both DQSC and AMCV were solvent as of the Transfer Date, including the unequivocal statements of AMCV's former management, which were corroborated by the Debtors' sworn SEC filings and financial schedules, as well as the opinion testimony of expert witness Calvert.

### A.    Opinion Testimony of Brian Calvert

At trial, the Bankruptcy Court evaluated the testimony of the Appellees' expert, Calvert, who conducted a solvency analysis of DQSC and AMCV as of the Transfer Date and opined that both DQSC and AMCV were solvent as of the Transfer Date. (R. at 132; R. at 11:26 (Tr., July 20, 2006).)

Calvert is a sophisticated expert with 20 years of experience conducting valuations of international and domestic private companies, public companies, and divisions of public

---

[7] One threshold issue in any solvency analysis is the premise of value to be applied: going concern or liquidation. The Bankruptcy Court properly found that the Debtors should be valued as a going concern. (R. 3:13-14, 26 (Opinion).) While Appellants designate the Bankruptcy Court's conclusion that Mandarino did not apply a going concern premise of value as an issue on appeal, Appellants offer no argument to support that position.

companies. Calvert has personally performed more than 200 valuations both as an advisor, as a partner in an equity fund, and as a vice president for a public corporation. (R. at 3:23 (Opinion); R. at 11:25-26, 62-63 (Tr., July 20, 2006); R. at 14:632 (Tr., July 25, 2006).) Calvert has also lectured on valuation issues as a faculty member at the international consulting firm, LEK, as a guest lecturer at Columbia University, and to various bank groups and others. (R. at 11:23-24 (Tr., July 20, 2006).)

### 1.    The Discounted Cash Flow Analysis

Calvert conducted a DCF analysis[8] to calculate the fair value of the assets of DQSC and AMCV. (R. at 3:15-24; R. at 11:75-107 (Tr., July 20, 2006).)

The three major components of a DCF analysis are: 1) the discrete cash flows during the forecast period, 2) the discount rate, or "WACC"; and 3) the terminal value[9] post-forecast period. (R. at 11:46-47 (Tr., July 20, 2006).) The discount rate is often called the weighted average cost of capital, or WACC. (Id. at 11:46.) The three components of the WACC are the capital structure, the cost of debt and the cost of equity. (R. at 11:54 (Tr., July 20, 2006); R. at 154 (linear WACC equation); R. at 156 (graphic WACC equation).)

### 2.    The July 2001 Projections

The projected cash flows used by Calvert in his DCF analysis came from a set of projections prepared by AMCV's management on or about July 31, 2001 (the "July 2001 Projections"). (R. at 3:15; R. at 11:76 (Tr., July 20, 2006).) Before relying on the July 2001

---

[8] The fair value of assets may be determined by a variety of methodologies, including the DCF, comparable companies, comparable transactions and replacement cost. See, e.g., In re Exide Techs., 303 B.R. 48, 65 (Bankr. D. Del. 2003); Chartwell Litig. Tr. v. Addus Healthcare, Inc. (In re Med Diversified, Inc.), 334 B.R. 89, 98 (Bankr. E.D.N.Y 2005).

[9] To calculate the terminal value (the third component of a DCF analysis), Calvert applied two independent methodologies, each to corroborate his conclusions under the other. Calvert's Gordon Growth calculation was corroborated by the exit multiple approach, which he also applied. (R. at 11:103-105 (Tr., July 20, 2006); R. at 145 (Calvert Calc. AMCV S'holder Value); R. at 150 (Calvert Calc. DQSC S'holder Value).)

Projections, Calvert studied those projections to determine whether they were reasonable as of

the time they were prepared. Calvert concluded that the July 2001 Projections were, in fact,

reasonable and reliable based on the following indications:

- The July 2001 Projections were detailed, with line items broken down on a "ship by ship, capacity by capacity" basis;

- The July 2001 Projections were integrated;

- The July 2001 Projections were consistent with AMCV's business model, and reflected that AMCV was experiencing growth within inland waterways routes as well as in the Hawaiian market;

- AMCV's business model was being undertaken with some measure of success, as broad capital markets were making money available to AMCV;[10]

- DQSC had just renegotiated its line of credit with the banks;

- AMCV was close to resolving the Ingalls dispute;

- Deposition testimony, including that of Talcott, suggested that the July 2001 Projections represented management's best statement of AMCV's performance going forward;

- The cruise industry was saying very good things about the cruise market, and specifically, the Hawaiian market;

- The fact that AMCV was U.S. flagged gave AMCV an economic advantage over non-U.S. flagged ships with a barrier to entry.

(R. at 11:37-42 (Tr., July 20, 2006).)

Based on this evidence that the July 2001 Projections were, in fact, reasonable when

made, Calvert testified that "any adjustment [he] would try to make to [the July 2001

Projections] would be nothing but arbitrary." (R. at 11:42 (Tr., July 20, 2006).) Calvert's refusal

to make adjustments to the July 2001 Projections comports with relevant case law, which

dictates that arbitrary adjustments to management's projections that are designed only to reach a

---

[10] For example, Debtors issued $50 million of short-term notes guaranteed by MARAD on January 31, 2001. (R. at 153:7 (AMCV Form 10-Q FQE 6/30/01).) Debtors also had available an untapped $10 million credit facility. (R. at 13:509 (Tr., July 24, 2006). And, prior to the transfer at issue, the funds identifiable as proceeds from the borrowing on the $30 million line of the Chase Facility remained available but untouched from the time of the initial borrowing until August 14, 2001, the date on which the borrowing was repaid. (R. at 18:B-12, ¶ 44 (Stmt. of Uncont'd Facts).)

predetermined result are disfavored and lack credibility. See, e.g., Chartwell Litig. Tr. v. Addus Healthcare, Inc., (In re Med Diversified, Inc.), 346 B.R. 621 (Bankr. E.D.N.Y. 2006). In fact, an expert's opinions are "suspect" when the expert "ignore[s] or wrongly disregard[s] [a debtor's] projections . . . and instead create[s] his own projections for litigation purposes." Iridium Operating LLC, 373 B.R. at 351. "Where alternative projections 'are no better supported by the evidence than are those in the [debtor's] Business Plan,' the projections in management's business plan should be used in the DCF." Id.

### 3.    Calvert's Conservative Judgments

Calvert then used the July 2001 Projections to create his DCF analysis, using conservative judgments at several points that resulted in lower business enterprise values for DQSC and AMCV than would have resulted otherwise. (R. at 11:107-109 (Tr., July 20, 2006).) Yet, despite those conservative judgments, he still reached a conclusion that both DQSC and AMCV were solvent as of the Transfer Date. Examples of his conservative judgments are as follows:

- Conservative capital structure: Calvert estimated a capital structure of 22 percent debt to total capital; yet, one could make an argument for using more debt. (R. at 11:80-81 (Tr., July 20, 2006).) Had Calvert used more debt in his capital structure, the value of the assets of AMCV and DQSC would have simply increased to further support a conclusion of solvency.

- 7.8% equity risk premium rather than 5%: To determine the equity-risk premium, Calvert referred to Ibbotson, who publishes the historic equity risk premia. (R. at 11:89-90 (Tr., July 20, 2006).) Based on Ibbottson, the equity-risk premium that Calvert used was 7.8 percent. (R. at 11:91 (Tr., July 20, 2006).) Calvert explained that there are academics and practitioners who argue that the equity-risk premium should be forward looking and should thus be approximately 5 percent. (Id.) Although an argument could be made for the use of 5 percent when analyzing the solvency of AMCV and DQSC, Calvert used a more conservative, 7.8 percent equity-risk premium. Had he used a 5 percent equity-risk premium, the cost of equity would have gone down and the business enterprise value of DQSC and AMCV would simply have gone up. (R. at 11:90-91 (Tr., July 20, 2006).)

- Addition of small stock premium: Calvert also added a small stock premium (or

small cap premium) of 2.7 percent, again to be conservative. Calvert noted, however, that there are purists who do not use a small stock premium. (R. at 11:91-94 (Tr., July 20, 2006).) Had Calvert followed the purists' approach and not used a small stock premium, the WACC calculation would have been lower; again, the business enterprise value of DQSC and AMCV would simply have increased. (Id.)

## B.   Additional Evidence of Solvency

In addition to the opinion testimony of Calvert, the trial record is replete with other evidence, including contemporaneous evidence from the capital markets, regarding the solvency of AMCV and DQSC on the Transfer Date. Under the minimal "some evidence" standard, this evidence was more than sufficient to rebut the statutory presumption of insolvency in preference actions, and the Bankruptcy Court's findings to that effect cannot be found to be clearly erroneous or outside the realm of reason.

Other evidence of solvency included the following:

- Debtors issued $50 million of short-term notes guaranteed by MARAD on January 31, 2001, a portion of the proceeds of which was used to pay down $25 million of previously guaranteed MARAD debt. (R. at 153:7 (AMCV Form 10-Q FQE 6/30/01).)

- In March of 2001, Talcott advised the AMCV board of directors that AMCV projected an unrestricted cash balance at December 31, 2001 of $42.4 million (R. at 111:10 (page unnumbered) (Talcott Mem. to Board, Mar. 13, 2001).)

- In May 2001, AMCV issued $35 million in notes guaranteed by MARAD. (R. at 153:7 (AMCV Form 10-Q FQE June 30, 2001).)

- In May of 2001, Calian reported that AMCV had $79 million cash on hand. (R. at 219:1 (AMCV Board Meeting Minutes, May 29, 2001).)

- In June 2001, AMCV "reported a significant improvement in booking momentum and a high occupancy forecast for the summer season on its Hawaii cruise ships." (R. at 245:1 (AMCV Press Release, June 12, 2001).)

- This booking momentum continued throughout the summer of 2001. (R. at 249 (Talcott E-Mail to Jeff Klein, July 16, 2001); R. at 251 (Anathan E-Mail to Talcott and Davison, July 30, 2001).)

- As of June 30, 2001, AMCV continued to advise that it believed it would have adequate access to capital resources to meet then-current short-term and long-term capital commitments and working capital needs. (R. at 153:17 (AMCV Form 10-Q FQE June 30, 2001); see also R. at 182:21 (AMCV Form 10-K for calendar year 2000).)

- And, in fact, AMCV continued to access the capital markets during the summer of 2001. For example, AMCV refinanced $50 million of one-year MARAD-guaranteed notes on July 31, 2001 and successfully amended its facility with Chase. As of August 31, 2001, DQSC had in place a $10 million line of credit under the amended facility that was never utilized. (R. at 153:8 (AMCV Form 10-Q FQE 6/30/01).)

- In the third quarter of 2001, AMCV's management expected that 87.5% of Debtors' outstanding obligations to Ingalls would be paid by draw upon MARAD-backed debt. (R. at 171:127-32 (Talcott Dep., May 19, 2005).)

- The July 31 Projections reflected AMCV's management's views of AMCV's likely future performance. (R. at 171:62-68 (Talcott Dep., May 19, 2005).)

- Revised projections provided to AMCV management on September 10, 2001 indicated that AMCV would have cash balances in excess of $21 million at the end of 2001 and in excess of $29 million at the end of 2002. Talcott testified that these projections were reasonable and accurately reflected his expectations for AMCV's future performance just prior to the terrorist attacks of September 11th. (R. at 194 (Talcott Mem., Sep. 10, 2001); R. at 167:135-40 (Talcott Dep., Apr. 6, 2005).)

- In their Schedules of Assets and Liabilities, the Debtors listed assets of $1,623,636,736.00 and total liabilities of $1,545,443,317.00. (R. at 343 (Schedules of Assets and Liabilities and Statement of Financial Affairs).) In their First Amended Schedules of Assets and Liabilities, the Debtors listed total assets of $1,720,733,103.00 and total liabilities of $1,414,631,024. (R. at 343) (Schedules of Assets and Liabilities and Statement of Financial Affairs).)

- Overwhelming evidence that but for the tragic events on September 11th, the Debtors would never have been in a bankruptcy situation, demonstrating that on the Transfer Date pre-9/11, DQSC and AMCV were solvent. (See, e.g., R. at 129:4 (Tr., Dec. 18, 2001); R. at 163:104-06 (Allen Dep. Nov. 27, 2001).)

Significantly, Appellants fail to address this additional evidence of solvency. One need only glance at the headings of each section of Appellants' brief to see that their focus is solely on Appellees' expert opinion evidence. This additional evidence of solvency, which is unchallenged by Appellants, either on its own or when coupled with the opinion testimony of Calvert, far exceeds the "minimum quantum" of evidence required to rebut the presumption of insolvency under the "some evidence" standard.

### C.    That Evidence Rebuts the Statutory Presumption of Insolvency

Having met the requirement of presenting "some evidence" of solvency, the presumption

of insolvency disappeared and Appellants bore the full burden of proving by a preponderance of evidence that AMCV and DQSC were insolvent as of the Transfer Date. See, e.g., Union Meeting Partners v. Lincoln Nat'l Life Ins. Co. (In re Union Meeting Partners), 163 B.R. 229, 239 (E.D. Pa. 1994) ("the presumption disappears completely and the burden of proving insolvency reverts to the Debtor" upon the presentation of "some evidence" that the debtor was solvent). The Bankruptcy Court specifically found that the Appellants failed to satisfy that burden at trial.

## IV.  APPELLANTS' ATTRIBUTIONS OF ERROR LACK MERIT

Appellants make two primary attacks on Calvert's DCF analysis. First, Appellants argue the July 2001 Projections on which Calvert's DCF analysis is based were flawed and, therefore, his analysis based on those projections is flawed. Second, Appellants argue Calvert made several mistakes in conducting his DCF analysis, as demonstrated by their expert's "sensitivity analyses." Appellants are wrong on both counts.

### A.  The Bankruptcy Court Correctly Rejected Appellants' Challenges To The July 2001 Projections And Found that They were Reasonable When Prepared

The trial court correctly found, as a factual matter, that the July 2001 Projections were reasonable when prepared and, as such, that Calvert's reliance upon those projections in formulating his DCF analysis was entirely appropriate. (R. at 3:18-21.) This Court should not disturb those factual findings as there is no clear error.

The Bankruptcy Court specifically rejected the same factual arguments that Appellants are advancing here, that the July 2001 Projections were not reasonable. (R. at 3:20.) In rejecting Appellants' argument, the Bankruptcy Court emphasized that a "court must consider the reasonableness of the company's projections, not with hindsight, but with respect to whether they are prudent when made." (R. at 3:20 (quoting MFS/Sun Life-Trust-High Yield Series v.

Van Dusen Airport Servs. Co., 910 F. Supp. 913, 944 (S.D.N.Y. 1995)).)  Among other things,

the Bankruptcy Court considered the following evidence to assess whether the projections were

prudent when made:

- Calvert's testimony that he relied on the July 2001 Projections "after reviewing Talcott's deposition, in which he stated that the July 2001 Projections were viable and consistent with management's views at the time of the Debtors' future performance";

- Calvert's testimony that he found the July 2001 Projections to be "reliable because they were very detailed (i.e. growth, capacity and other figures were prepared separately for each ship), were consistent with the companies' plans for expansion and strategy that focused on the Hawaiian market, and were consistent with the cruise industry's positive outlook at the time";

- the fact that the Debtors "were in the midst of a major expansion", such that historical numbers alone "were not sufficient to bridge the gap to the future for purposes of determining value";

- evidence that the Debtors were implementing measures to improve the companies' finances so that, as of the Transfer Date, the Debtors were a viable, solvent going concern; and

- evidence that it was the "unforeseeable events of 9/11, and their effect on the travel industry as a whole, [that] forced the Debtors into bankruptcy."[11]

(R. at 3:20-21 (citing R. at 171:62-68 (Talcott Dep., May 19, 2005) and R. at 3:42 (Tr., July 20,

2006)).)

The Bankruptcy Court further found that the July 2001 Projections were still reasonable,

despite the fact that they were in contrast with the Debtors' weak performance in the first half of

2001.  The Bankruptcy Court based that finding on other evidence presented by the Appellees,

including:

- business records and other documents from June and July 2001 showing "that bookings in the Hawaii market were increasing at a rate suggesting that the Debtors would exceed their previous forecasts for the third and forth quarters of 2001";

---

[11] More specifically, the Bankruptcy Court concluded that "[t]he events of 9/11 had a devastating effect on the tourism industry, and, in particular, the Debtors' business."  (R. at 3:20.)

- statements in Debtors' June 30, 2001 Form 10-Q showing "that the company had implemented a cost-reduction strategy to decrease costs in the second half of 2001 and that management anticipated that the company would have access to capital resources sufficient to meet its current short-term and long term capital needs";

- the fact that in the summer of 2001, the Debtors resolved a dispute with Ingalls regarding the construction of the Project America Ships; and

- testimony from a former officer of Debtors that the Ingalls settlement was critical to the Debtors because it resolved open issues regarding the delivery dates and final cost of the Project America Ships.

(R. at 3:18-19 (citing R. at 245, 251, 153, 188, 168:80-81).)

Based on the evidence available to the Bankruptcy Court, there was no error in its conclusion that the July 2001 Projections were reliable, notwithstanding that those figures were not comparable with AMCV's historical observations. Appellants note (and the Bankruptcy Court considered), the amount of AMCV's debt in the summer of 2001 was nearly seven times what it had been previously just 18 months earlier, increasing from $84 million to $577 million. While that substantial increase in the amount of debt it was carrying was burdensome to AMCV, AMCV was making those capital investments in order to engage in an unprecedented expansion that would have introduced two state of the art luxury ships in Hawaii, and new ships on coastal waterways of the U.S, substantially increasing the number of berths for sale. The debt was necessarily incurred in advance, and it did not anticipate generating revenues as a result of those capital investments until years in the future. For that reason, Calvert testified (R. at 11:36-43 (Tr., July 20, 2006)), and the Bankruptcy Court found (R. at 3:19-20), that comparing the July 2001 Projections to AMCV's historical performance would be meaningless. After weighing this evidence, the Bankruptcy Court concluded:

> The facts established here demonstrate that, while the Debtors had serious financial issues in early 2001, they had taken steps to address their financial challenges and, as of the Transfer Date, had reason to be optimistic about the future. The unforeseen events of September 11, 2001 dealt a fatal blow to their business. **The evidence presented in this case supports the conclusion that the**

**projections were reasonable when prepared**.

(R. at 3:21) (emphasis added). The Bankruptcy Court's findings of fact in this regard were not clearly erroneous.[12]

Appellants also argue that the July 2001 Projections were necessarily unreliable because AMCV had missed a set of projections prepared earlier in early 2001 (the "KPMG Projections"). That argument is a *non sequitur*: it does not follow that simply because AMCV missed projections prepared in January or February of 2001, that projections prepared in July 2001 were unreliable. Further, the circumstances that led to the preparation of the KPMG Projections, which consisted of a few summary pages, were a mystery when they were introduced by Appellants at trial. As the Bankruptcy Court observed during the closing phases of the trial, there was nothing in the trial record with which it could assess the merits or the reasonableness of the KPMG projections: "There have been references to the KPMG or going-concern projections, but, you know, as a matter of weight, there really isn't anything in the record upon which I could rest a determination about the merits, the reasonableness of the [KPMG] projections." (R. at 14:618 (Tr., July 25, 2006).)    Further, as Calvert explained in his testimony, the KPMG Projections were, for his purposes, irrelevant because they were outdated and had been supplanted by the July 2001 Projections. (R. at 12:313-16 (Tr., July 21, 2006).) Moreover, the fact that AMCV may have missed an earlier set of projections meant that subsequently prepared projections were, if anything, more accurate because they were prepared with those

---

[12] Appellants' reliance on <u>Lids Corp. v. Marathon Inv. Partners, L.P. (In re Lids Corp.)</u>, 281 B.R. 535, 541 (Bankr. D. Del. 2002) is misguided for this reason. The <u>Lids</u> court arrived at its conclusion that debtor's projections in that case were "unconvincing" because there was "<u>no evidence</u> to support the assumption that such a dramatic change [in the debtor's performance] would occur." <u>Lids</u>, 281 B.R. at 544 (emphasis added). By contrast, in this case, the Bankruptcy Court weighed substantial evidence that supported the assumption that a change in Debtors' business would (and had begun to) occur sufficient to support the July 2001 Projections to conclude that they were reasonable.

earlier projections in mind.[13]  (R. at 12:297-98 (Tr., July 21, 2006).)

Appellants also attack the inputs used in the July 2001 Projections, such as the passenger fill and per-day revenue rates, anticipated delivery dates for new ships under construction, and capital expenditure figures going forward.  Appellants' attacks are unsubstantiated.  First, Appellants presented *no evidence* at trial demonstrating that those inputs were wrong or what alternate inputs should have been used.  Instead, Appellants simply speculate that the inputs must have been wrong.[14]  That is plainly insufficient from an evidentiary viewpoint.  Second, Calvert testified that making changes along the lines suggested by Appellants would be "nothing but arbitrary" in light of the independent evidence of the viability of the July 2001 Projections, including the testimony of AMCV's management, the rigorous manner in which the July 2001 Projections were created, the then-current state of AMCV's operations and strategic initiatives, AMCV's access to capital markets, and the upbeat outlook of cruise industry analysts.  (R. at 11:42 (Tr., July 20, 2006).)

Moreover, as noted above, Calvert's refusal to substitute his judgment for the judgment of AMCV's management by rewriting the July 2001 Projections is sound and supported by ample case law.  See Iridium Operating LLC, 373 B.R. at 301.  The Iridium court had little difficulty in rejecting the DCF analysis of the plaintiffs' expert witness precisely because that expert rewrote the entity's projections.  The court stated:

---

[13] This fact also undermines Appellants' unsubstantiated assertion that the July 2001 Projections are unreliable merely because they differed substantially from the KPMG Projections.

[14] For example, Appellants argue that Calvert should have adjusted the estimated delivery date of two ships then under construction because delivery of those ships had previously been delayed.  Appellants, of course, offer no evidence demonstrating that anyone at AMCV believed, as of the Transfer Date, that the estimated delivery date of those ships was incorrect or, if so, by how much.  Appellants simply speculate that it was "not reasonable" to rely on the date used.  As Calvert testified by analogy, if anything, the fact that the delivery date of the new ships had been previously delayed made their delivery in accordance with the revised estimate more likely, rather than less likely. (R. at 11:191-92 (Tr., July 20, 2006).)

> The creation of a revised set of projections for purposes of performing a discounted cash flow analysis supporting the conclusion that Iridium was insolvent looks like second-guessing by financial experts who are doing precisely what they were hired to do—doing everything that needs to be done to justify giving an insolvency opinion. . . .
>
> The projections as revised by the Committee's experts assume that the original projections [prepared by management] were seriously flawed because of the assumptions made . . . . This is fully compatible with the Committee's theory of the case, but appears designed to yield the desired results. . . .
>
> The Committee's experts have created their own projections that have been cut drastically to account for an overly optimistic projection of subscribers . . . but there has not been a persuasive showing that the methods used and the adjustments made are appropriate and that the revised projections should be accepted as a valid starting point for performing a discounted cash flow analysis.

Id.

In sum, Appellants erroneously assert that Calvert should have substituted his judgment for the judgment of AMCV's management and should have made arbitrary adjustments to the inputs underlying the July 2001 Projections based on his own speculation about what would constitute appropriate utilization rates, ship delivery dates, and capital expenditure figures. There is simply no basis to conclude that the trial court erred in finding the July 2001 Projections were reasonable and viable. Therefore, Calvert's reliance on them was reasonable and appropriate. Appellants offer no basis to demonstrate that finding was clear error.

### B. The Bankruptcy Court Correctly Found That Calvert's DCF Analysis Was Proper

The second prong of Appellants' attack is to argue that Calvert made several mistakes in performing his DCF analysis. Appellants argue that Calvert erred in conducting his peer group analysis to determine the appropriate beta for use in his DCF analysis and that he applied an incorrect small stock premium. This Court should recognize that Appellants offered no rebuttal DCF analysis to Calvert. As detailed below, their own expert offered only an eleventh hour "sensitivity analysis" that adjusted Calvert's figures. Appellants' expert, whom the Bankruptcy

25

Court found to have "far less experience" than Calvert, conceded that his sensitivity analysis was not a solvency analysis. (R. at 3:23, n.21 (Opinion); R. at 14:558.) With that background, Appellants' second guessing of Calvert is dubious, at best.

### 1.    Calvert Selected Appropriate Peer Group Companies

According to Appellants, Calvert's DCF analysis was flawed because he failed to select "truly comparable companies" in his peer group analysis. This criticism rests on a fundamental misapprehension of what a peer group analysis in the context of a DCF analysis is and does.

Calvert explained in his trial testimony that a peer group analysis is performed in order to derive an appropriate beta, an essential component of the capital asset pricing model ("CAPM") to determine the cost of equity, which in turn is an essential component of any DCF analysis. (R. at 11:61-62 (Tr., July 20, 2006).) Contrary to Appellants' assertion, this peer group analysis does not seek to identify companies that are "comparable" in the ordinary sense. Instead, according to Calvert's testimony, which was supported by the hundreds of peer group analyses he has conducted or reviewed in his career, the peer group analysis that is part of the CAPM calculation seeks to identify peer companies that have a similar reaction to systematic risk.[15] (R. at 11:62, 87-88 (Tr., July 20, 2006).)

Thus, contrary to Appellants' unsubstantiated assertion that Calvert failed to chose comparable companies, the fact that the business description of the companies selected by Calvert as "comparables" for purposes of his peer group analysis do not precisely match with

---

[15] Appellants also criticize Calvert's reliance on the Capital IQ database to identify comparable companies for use in his peer group analysis. Capital IQ is a Division of Standard & Poor's and is widely used by "many of the world's most successful investment banks, hedge funds, private equity firms, consultants, and corporations." The Capital IQ Platform, http://www.capitaliq.com/main/ourproducts.asp (last visited February 6, 2008). Capital IQ "is a web and Excel-based research platform that combines deep information on companies, markets, and people worldwide with robust tools for fundamental analysis, financial modeling, market analysis, screening, targeting, and relationship and workflow management." Id. Appellants' criticism of Calvert's reliance on Capital IQ is tantamount to criticizing a lawyer for using the Westlaw or Lexis databases to conduct legal research.

AMCV's is irrelevant. The relevant question is whether the selected companies react to systematic risk in the same way as AMCV, which question Appellants fail to address.

Finally, Appellants' reliance on <u>Fidelity Bond and Mortgage Co. v. Brand (In re Fidelity Bond and Mortgage Co.)</u>, 340 B.R. 266, 299 (Bankr. E.D. Pa. 2006), is misplaced. That case involved absolutely no discussion about the selection of appropriate comparable companies when performing a peer group analysis for the purpose of determining an appropriate beta for use in the CAPM calculation in the context of a DCF analysis. Rather, the court in <u>In re Fidelity</u> was trying to determine whether a debtor had unreasonably small capital by comparing the debtor's balance sheet with balance sheets from other companies in the industry. That is a far cry from the question of whether companies react similarly to systematic risk, and therefore are comparable for purposes of the CAPM component of the DCF analysis.

## 2.    Calvert Selected An Appropriate Small Stock Premium

Appellants next attack the small stock premium utilized by Calvert.[16] Once again, Appellants' attack misses the mark.

Appellants argue that Calvert should have applied a small stock premium of 8.42%, more than three times higher than the 2.7% small stock premium Calvert applied, on the basis that is the small stock premium mandated by Ibbotson Associates for companies with market capitalizations below $48 million. (Appellants' Br. 26.) Thus, as Appellants would have it, the selection of a small stock premium would involve nothing more than the purely mechanical process of calculating the company's market capitalization and looking up the small stock

---

[16] In making this argument, Appellants inexplicably cite to portions of Calvert's trial testimony that relate to the application of an *equity risk premium* rather than a *small stock premium*. (See Appellants' Opening Br. at 25-26 (citing R. at 11:80-90, 11:155-56 (Tr., July 20, 2006)).) Appellants also misstate the record in this portion of their brief when they cite to the Record at 12:231 for the proposition that a company's market capitalization "is crucial to the determination of a 'small stock premium.'" Record 12:231 merely identifies the formula for calculating market capitalization.

premium published by Ibbotson Associates for that market capitalization. Nothing, however, presented by Appellants at trial remotely suggests why Calvert's judgment was wrong.

Calvert explained that the process of selecting a small stock premium is much more nuanced than that and that there are two separate judgments involved in applying a small stock premium. The first is whether to apply a small stock premium at all. The second is the amount of the small stock premium to apply if one is appropriate. (R. at 11:91-94 (Tr., July 20, 2006).) When deciding whether to add a small cap premium in a valuation, one must be "very, very careful, perhaps even reverent of the CAPM." (R. at 14:625 (Tr., July 25, 2006).) For that reason, Calvert started from the assumption that no small stock premium should be added unless its existence can be justified. (R. at 14:628-29 (Tr., July 25, 2006).) Calvert asks three questions before he adds a small stock premium: 1) is there reason to believe that a small cap premium will be there in the future; 2) is there reason to believe that the company would react any differently to systematic risk if it were larger; and 3) is this a small cap stock? (R. at 14:626 (Tr., July 25, 2006).)

Here, Calvert weighed those questions and concluded that, in an effort to be conservative, he would include a small stock premium, but concluded that the small stock premium should be 2.7%. (R. at 11:91-94 (Tr., July 20, 2006); R. at 14:625-27 (Tr., July 25, 2006).) As previously noted, adding a small stock premium was one of Calvert's *conservative* judgment calls.

Appellants also identify Calvert's trial testimony as evidence supporting their assertion that Calvert applied an incorrect small stock premium. (See Appellants' Br. 26 (citing R. at 11:301-08 (Tr., July 20, 2006)).) While Appellants' counsel certainly tried to get Calvert to admit that he had utilized an incorrect small stock premium in that portion of his testimony, the

actual testimony shows precisely the opposite.[17]  Appellants' counsel then abandoned that line of

questioning with Calvert.  Thus, there is no factual support for Appellants' argument that Calvert

applied an incorrect small stock premium.

The Court properly credited Calvert's explanation for applying the small stock premium

he chose.  Because Appellants offer no other testimony to support their assertion that the small

stock premium Calvert applied was incorrect, this Court should not disturb the Bankruptcy

Court's finding.

---

[17] Calvert testified as follows:

> **Q:** And, therefore, if one applied the small market premium that the Ibbotson Company, in its 2001 yearbook instructs should be applied, you would—this company would be in decile 10B because its market cap would be under 48 million; you have to agree with that; right?
> **A:** Let's back up.  First of all, you said—
> **Q:** Let's try answering my question this time, sir.
> **A:** You said that—
> **Q:** Move to strike, your Honor, and ask that the witness be instructed not to volunteer.
> **THE COURT:** The question was: Is it right?  Can you answer that?
> **THE WITNESS:** It is not right.
> **Q:** It is not right that this company would be in decile 10B?
> **A:** That wasn't your question, sir.  Your question was this number as Ibbotson instructs you to add.  Ibbotson does not instruct you to add that.
> **Q:** I will withdraw that question, then.
> . . .
>
> **Q:** In Exhibit 7A, you reference Ibbotson Associates as the adjustment source for your small stock premium.  You have explained to me that you think there is some Ibbotson that has 2.7, at least as a rounded number, but the Ibbotson that I am pointing you to, that number should be 8.42 percent; right?
> **A:** No.
> **Q:** Why not?
> **A:** The three reasons I explained yesterday when doing this small cap premium.  The first question you need to ask is:  Do you believe there will be a small cap premium in the future?  The second question you need to ask:  Do we have a small cap stock here?  I do not believe we have a small cap stock.  The third question you need to ask is:  Is there anything that would make you believe that this stock would react any differently than its larger peers?  The fourth thing you need to ask, which I am adding from yesterday, as I think about this, is you would want to look at the distribution of all of these various -- before you -- if you got past those three questions, then you would want to say, Wait a minute, how is this 8.42 percent distributed?  You know, what does the value probability distribution look like?  Do you have some that were 16 and do you have some that were negative?  And all of a sudden, it—the—the mean, however they calculate it, comes out to be 8.42, so you would want to examine the distribution.  And that's assuming you can get over one, two, and three, and I don't think this company gets over one, two, and three.  And that's my testimony on the small cap premium.

(R. at 12:307-10 (Tr., July 21, 2006).)

### 3.    Mandarino's "Sensitivity Analyses" Prove Nothing

Appellants also point to the "sensitivity analyses" prepared by their expert, Mandarino, to purportedly show flaws in Calvert's DCF analysis.

On the eve of trial and after expert discovery had closed, Appellants produced (in the guise of demonstrative exhibits) the "sensitivity analyses" prepared by Mandarino. (See R. at 109 (Mandarino Scenarios).)  Those sensitivity analyses prove nothing more than that changing variables in a formula leads to different outcomes.  The changes Mandarino makes to Calvert's DCF analysis are not premised on sound valuation principals or standards typically applied in the field of valuation and are, instead, merely a numbers game employed solely to artificially reduce values on the asset side of AMCV's balance sheet.  Mandarino's changes are what the Iridium court cautioned should be dismissed as mere "second-guessing by [a] financial expert[] who [is] doing precisely what [he was] hired to do—doing everything that need[ed] to be done to justify giving an insolvency opinion. . . ." In re Iridium Operating LLC, 373 B.R. at 301.

The "sensitivity analyses" offered by Mandarino in this case marked only the second time he had performed a peer group beta analysis. (R. at 3:23, n.21 (Opinion).)  This lack of experience showed.  The Bankruptcy Court properly rejected Mandarino's "sensitivity analyses" entirely, finding that Calvert's "methods more closely followed generally accepted procedures" than those of Mandarino and that "Calvert's DCF analysis and solvency analysis are more reliable than the random adjustments made thereto by Mandarino." (R. at 3:23.) This Court should not disturb that finding.

In addition to Mandarino's erroneous changes to the Calvert's peer group beta and the small stock premium, as discussed, above, Mandarino's other changes to Calvert's DCF analysis were similarly flawed.  When Mandarino performed his comparable peer group analysis to

derive a beta for AMCV, he used a weighted average rather than a simple average when conducting his peer group analysis. In the more than 400 comparable peer group analyses for beta that Calvert has either conducted or seen, Calvert has only seen a weighted average applied to a comparable peer group analysis once: by Mandarino in this case. (R. at 11:64-65 (Tr., July 20, 2006); R. at 14:631-32 (Tr., July 25, 2006).) Mandarino, with his limited DCF experience, could hardly be considered competent to defend this approach as an industry accepted standard. Similarly, Mandarino relied on observed weekly beta information. As explained by Calvert, using a weekly as opposed to monthly observations adds statistical "noise" to the time series, and adding noise in statistical analysis causes unreliable results. (R. at 14:634 (Tr., July 25, 2006).)

Mandarino also attempted to "correct" Calvert's DCF analysis by adding an unsystematic risk premium. Calvert explained, however, that because unsystematic risk can be diversified away—a point Mandarino conceded on cross-examination (R. at 14:587 (Tr., July 25, 2006))—there is absolutely no basis to include an unsystematic risk premium here. (R. at 11:178-79 (Tr., July 20, 2006); R. at 14:629 (Tr., July 25, 2006).) Calvert testified that he would only envision using an unsystematic risk premium for negotiation purposes, but in so doing, one might have trouble clearing the market. (R. at 12:275 (Tr., July 21, 2006).) Mandarino did not substantiate any basis for adding an unsystematic risk premium.

Similarly, another of Mandarino's "corrections" involved his arbitrary reduction of the cash flows contained in the July 2001 Projections by 15%. (R. at 13:448-49 (Tr., July 24, 2006).) Mandarino conceded that a 15% reduction in cash flows was "pretty material." (R. at 13:448-49 (Tr., July 24, 2006).) Further, he provides no substantiation for making any adjustment at all or for selecting 15% as the appropriate percentage.

In sum, Mandarino's random adjustments appear to have been made solely to serve

Appellants' litigation purpose, a result disfavored by the courts and lacking credibility. See Med

Diversified, 346 B.R. at 626. The Bankruptcy Court was correct when it concluded that

Calvert's DCF analysis was conservative and proper, and Mandarino's "sensitivity analyses"

were nothing more than random adjustments of no evidentiary value.

## V.     APPELLANTS' ARGUMENT FOR A MARKET CAPITALIZATION APPROACH TO VALUATION ALSO FAILS

Appellants argue that the Third Circuit's decision in VFB LLC v. Campbell Soup Co.

compels this Court to reject Calvert's DCF analysis in favor of the value of AMCV established

by the marketplace. Appellants' reliance on VFB is misplaced for several reasons. First,

Appellants did not present a market-based valuation of AMCV to the Bankruptcy Court and,

therefore, cannot now present that issue on appeal. Second, Appellants did not designate market

capitalization as an issue on appeal. Third, Appellants seek to take the VFB decision too far.

Fourth, even if Appellants were correct that VFB requires that AMCV be valued by the

marketplace rather than any expert analyses, the value placed in AMCV by the marketplace

clearly shows that AMCV was *solvent* as of the Transfer Date, thus compelling that the

Bankruptcy Court's decision be affirmed.

### A.     Appellants Failed To Make A Market Capitalization Argument At Trial Or Designate It As An Issue On Appeal

The market capitalization methodology espoused by the Appellants is not a proper issue

on appeal. First, the market capital methodology was not part of the trial record. The

Bankruptcy Court never had an opportunity to decide, or even consider, whether or to what

extent that methodology should be applied in this case. Nowhere in Appellants' proposed

conclusions of law presented to the Bankruptcy Court after trial is there any mention of AMCV's

market capitalization. (Cf. R. at 9 (Pl.'s Proposed Findings).) Indeed, there is no mention of the

market capitalization methodology in Appellants' pre-trial brief or post-trial submissions. At

32

trial, the only discussion of market capitalization was in the context of the discounted cash flow valuation method—no trial testimony by any witness addressed the market capitalization methodology now asserted for the first time on appeal. In fact, the only "testimony" regarding AMCV's market capitalization was submitted by Appellants' counsel who made a back-of-the-envelope calculation at trial. (R. at 12:305-06 (Tr., July 21, 2006).) Appellants have thus waived any argument espousing the market capitalization methodology. See Harris v. City of Philadelphia, 35 F.3d 840, 845 (3d Cir. 1994).

Second, the market capitalization issue is not proper on appeal because Appellants failed to designate this issue in Appellants' Designation of Issues and Record on Appeal (nor could they have so designated this issue given its absence from the trial record). (Appellant Br. at 5-6); Interface Group-Nev., Inc. v. Trans World Airlines, Inc. (In re Trans World Airlines, Inc.), 145 F.3d 124, 131-33 (3d Cir. 1998); see Fed. R. Bankr. P. 8006, 8010(a)(1).

**B.     Appellants Seek To Take the Holding Of <u>VFB</u> Too Far**

Even were the market capitalization methodology a proper issue on appeal, the market capitalization evidence here supports a finding of solvency. "Market capitalization" calculates the equity value of a publicly traded company by multiplying the number of outstanding shares by the market price of those shares. See, e.g., VFB LLC v. Campbell's Soup Co., Case No. Civ.A.02-137 KAJ, 2005 WL 2234606, at *10 (D. Del. September 13, 2005) ("VFB District Court Decision"). Equity, by definition, is what remains once a company's liabilities are subtracted from its assets. See, e.g., Bolt v. Merrimack Pharms., Inc., 503 F.3d 913, 916 (9th Cir. 2007) ("equity by definition equals the residual interest in assets after subtracting liabilities"). Of course, this is intuitive because an investor purchasing a company's common stock is investing as an equity holder, who stands to receive a return on that investment only if

the company is solvent—*i.e.*, the equity investor takes only after the company's debts are satisfied.

Appellants argue that the Court of Appeals' decision in <u>VFB</u> compels rejection of Calvert's DCF analysis because AMCV can only be properly valued by reference to market-based data. Yet, Appellants concede that exclusive use of market-based information to determine the solvency of publicly traded companies would lead to absurd results.[18] <u>VFB</u> cannot be read, as Appellants suggest, to abolish DCF as an appropriate valuation methodology. Indeed, even the <u>VFB</u> court noted that DCF analyses are appropriate in some circumstances. 482 F.3d at 633 (citing <u>Kool, Mann, Coffee & Co. v. Coffey</u>, 300 F.3d 340 (3d Cir. 2002) for the proposition that DCF analysis are appropriate in some circumstances).[19]

Properly understood, within the context of the facts presented there, the <u>VFB</u> decision does not preclude the use of DCF analyses to value publicly traded companies, but rather holds that courts must view opinions of expert witnesses that are plainly inconsistent with objective market-based data of a company's value with skepticism. Here, Calvert's opinions were consistent with objective market data. He testified that "all the arrows, with respect to the cruise industry [in the summer of 2001], were pointing up": the fact that both the Buckingham Research Group and Cruise Line International Association "thought the demographics for the future of the cruise industry was very strong"; a report by Paine Webber that focused on the supply of berth versus the demand of berth was going to be outstripped; and additional information in his report showing that the Hawaiian market "was supposed to grow at a very,

---

[18] In footnote 9 of their opening brief, Appellants state: "it is clear that merely having a public market for common stock does not mean, *per se*, that a corporation is solvent. Were that so, any public company would be deemed solvent even if its shares traded for mere pennies, a clearly absurd result." This conclusion is counterintuitive and in fact wrong (<u>see</u> Section V.C., <u>infra</u>).

[19] Indeed, <u>Kool, Mann</u> cites a slew of cases supporting the use of DCF analysis. <u>See</u> 300 F.3d at 362.

very rapid pace." (R. at 11:34-35 (Tr., July 20, 2006).) Discussing the reasonableness of the

July 2001 Projections, Calvert further testified:

> I started looking for arrows going the opposite way. If I would have seen in the
> cruise ship industry that it was heading downward in Hawaii, nobody wanted to
> go there because Al-Qaeda was getting ready to go off, some of those types of
> things, that would have caused problems. But what I testified is what we can look
> at here today, five years from now, what we have to work with, all of the arrows
> are pointing in the same direction. And it seemed to make sense, when you think
> about the operations of the company at that time, the investment considerations
> they were making the economic conditions, the viability of the cruise ship
> industry; and also, not forgetting the fact that they have this huge competitive
> advantage comparing the entry with the Hawaiian ships not having to go to a non-
> U.S. port or going to consecutive ports in the U.S. So all those things together,
> five years later, makes sense to me.

(Id. at 11:129-30.) The Bankruptcy Court's findings with respect to Calvert's opinions were thus

appropriate; there is no clear error for this Court to reverse.

In VFB, Campbell Soup Co. spun off a subsidiary, VFI, in exchange for $500 million of

borrowed funds.[20] VFI ultimately failed and filed for bankruptcy. The VFI shareholders sued

Campbell on a fraudulent conveyance theory, arguing that they did not receive reasonably

equivalent value in exchange for the $500 million paid to Campbell in connection with the spin-

off. Thus, the question in VFB was whether VFI was worth more than $500 million, in which

case the plaintiffs may have received reasonably equivalent value, or less than $500 million, in

which case the plaintiffs may not have received reasonably equivalent value.

Looking to data from the marketplace, the Bankruptcy Court found that VFI's equity

market capitalization (calculated by multiplying VFI's share price by the number of shares

outstanding) was approximately $1.1 billion. VFB District Court Decision, 2005 WL 2234606,

---

[20] As is more clear from the trial court opinion than the Court of Appeals opinion, prior to, and in anticipation of, the
spin off, Campbell negotiated a $750 million line of credit with lenders that allowed the rights and obligations under
that line of credit to be assumed by VFI at the time of the spin-off. VFB District Court Decision, 2005 WL
2234606, at *10-*11. Campbell then drew down $500 million from that line of credit, which VFI became obligated
to repay after the spin-off.

at *10. That valuation was corroborated by other contemporaneous evidence of VFI's equity value. Id. at *13. Nevertheless, plaintiffs presented expert testimony from three expert witnesses who opined that the enterprise value of VFI was substantially less than $500 million. Despite that large discrepancy between the opinions of VFI's value offered by plaintiffs' expert witnesses, whose analyses were prepared years after the events in question and solely for purposes of litigation, and the objective value of VFI established by the marketplace, plaintiffs' experts made no attempt to reconcile that disparity. That failure led the Third Circuit to affirm the trial court's conclusion that:

> [Plaintiffs] do not even attempt to show any market valuation of VFI contemporaneous with the Spin-off that is anywhere close to the figures urged by [plaintiffs'] experts. There is simply no credible evidence to justify setting aside VFI's stock price and the other contemporaneous market evidence of VFI's worth.

VFB, 482 F.3d at 629.

Here, the marketplace data shows AMCV had a market capitalization of approximately $42 million. Calvert, through a DCF analysis that the trial court found eminently credible, concluded that AMCV was solvent by approximately $228-$247 million. Appellants' expert, Mandarino, in an analysis the trial court properly rejected, concluded that AMCV was insolvent by approximately $400 million. While Calvert's valuation was higher than the value indicated by marketplace data, Calvert's conclusion of solvency is consistent with the marketplace data in that both show AMCV had positive equity as of the Transfer Date and, therefore, that AMCV was solvent. It is the conclusion of Appellants' expert that controverts the available marketplace data and, therefore, it is his conclusions which should be regarded with severe skepticism under

the mode of analysis employed by the Third Circuit in VFB.[21]

### C. Market-Based Data Shows That AMCV Was Solvent As Of The Transfer Date

Finally, even if Appellants were correct that this Court must look to the equity value of AMCV[22] as determined by the marketplace, that evidence demonstrates that AMCV is solvent rather than insolvent.

Appellants argue that market-based data show that AMCV was insolvent as of the Transfer Date on the basis that its market capitalization was $42 million while its debts and preferred securities were approximately $577 million. In making that assertion, Appellants apparently suggest (without any support from the evidence in the record) that the amount of AMCV's debts (and preferred securities) must be subtracted from AMCV's market capitalization to determine AMCV's solvency. There is nothing in the record that suggests this methodology (the use of which would require expert testimony) is proper. Once again, Appellants have demonstrated a fundamental misunderstanding of the applicable principles, resulting in a substantial mischaracterization of the value of AMCV as established by the marketplace.

Again, as explained in VFB, "market capitalization" calculates the equity value of a publicly traded company. The fact that AMCV's shares were trading at approximately two dollars with approximately 21 million outstanding shares demonstrates that AMCV had a market

---

[21] It is also worth noting that it was the plaintiff in VFB who bore the burden of proof by a preponderance of evidence and that it was the plaintiff who advanced expert testimony contrary to the marketplace evidence. Here, by contrast, the Appellees were only required to present "some evidence" of solvency. The fact that as of the Transfer Date, AMCV had a market capitalization of $42 million, had recently issued additional notes guaranteed by MARAD, and had access to a $10 million line of credit, is certainly "some evidence" of solvency provided by the marketplace, all of which is consistent with and is corroborated by Calvert's DCF analysis.

[22] Appellants' brief refers only to AMCV, not DQSC, in its heading and discussion regarding market capitalization. It closes its argument, however, by contending that the market capitalization methodology somehow proves not only AMCV's insolvency but also DQSC's insolvency. DQSC was not a publicly traded company and thus could not possibly be subject to the market capitalization calculation in any event.

equity value of $42 million. A positive equity value means that AMCV was solvent as the Bankruptcy Code defines insolvency as when "the sum of such entity's debts is greater than all of such entity's property, at fair value." 11 U.S.C. § 101(32).

Accordingly, even if this Court were to accept Appellants' suggestion that, under VFB, AMCV's solvency must be determined by the value established by the stock market (an issue not litigated in the trial court and not properly appealed to this Court), that market value shows that AMCV is solvent by $42 million. Appellants' desperate attempt to argue that AMCV was insolvent by deducting AMCV's debt from its market capitalization, which already accounts for AMCV's debt, is counterintuitive and unsupported in the record and therefore should be rejected by this Court.

Appellants chose to rely on the "expert" opinion of a witness (Mandarino) who had virtually no experience in performing the type of analysis that Appellants needed to carry their burden of proving insolvency. The Appellees chose to rely on the expert opinion of a witness (Calvert), as well as substantial other evidence, to set forth "some evidence" that AMCV and DQSC were each solvent. The trial court understandably and correctly found that Appellees adduced "some evidence" sufficient to rebut the presumption of insolvency and that Appellants had failed to carry their burden of proof that AMCV and DQSC were insolvent, a finding that this Court must affirm.

## CONCLUSION

For the foregoing reasons, and for the reasons set forth in the Bankruptcy Court's

Opinion, this Court must affirm.

Dated: February 8, 2008

Respectfully submitted,

Laurie Selber Silverstein (No. 2396)
Gabriel R. MacConaill (No. 4734)
POTTER ANDERSON & CORROON LLP
1313 North Market Street, 7th Floor
Wilmington, DE 19801
Telephone: (302) 984-6067
-and-
Anthony G. Stamato (*pro hac vice*)
Robert M. Spalding (*pro hac vice*)
KAYE SCHOLER LLC
3 First National Plaza, Suite 4100
70 W. Madison Street
Chicago, Illinois 60603
Telephone (312) 583-2300

*Attorneys for J.P. Morgan Chase Bank*

/s/Michael D. DeBaecke
Michael D. DeBaecke (No. 3186)
BLANK ROME LLP
1201 North Market Street, Suite 800
Wilmington, DE 19801
Telephone: (302) 425-6400
-and-
Robert J. Sidman (*pro hac vice*)
Tiffany Strelow Cobb (*pro hac vice*)
VORYS, SATER, SEYMOUR and
PEASE LLP
52 East Gay Street
Columbus, OH 43215
Telephone: (614) 464-6422

*Attorneys for National City Bank (f/k/a*
*National City Bank of the Midwest, f/k/a*
*National City Bank of Michigan/Illinois)*
*and Capital One, NA (f/k/a Hibernia*
*National Bank)*

Pac#847565

## CERTIFICATE OF SERVICE

I, Gabriel R. MacConaill, certify that I am not less than 18 years of age and that on this 8th day of February 2008, I caused a true and correct copy of the within **Response Brief of Appellees JP Morgan Chase Bank, National City Bank, and Capital One, N.A.** to be served as follows:

**BY HAND DELIVERY**
Norman M. Monhait, Esq.
Rosenthal Monhait
& Goddess, P.A.
919 Market Street, Suite 1401
Wilmington, DE 19801

**BY EMAIL/AND FIRST CLASS MAIL**
Mark D. Silverschotz, Esq.
Jeffrey E. Glen, Esq.
Luma S. Al-Shibib, Esq.
Anderson Kill & Olick, P.C.
1251 Avenue of the Americas
New York, NY 10020

Gabriel R. MacConaill

Pac#847422