IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re<br><br>AMERICAN CLASSIC VOYAGES CO., *et al.*,<br><br>Debtors. | Chapter 11<br><br>Bankr. Case No. 01-10954 (KJC)<br>(Jointly Administered)<br><br>Adv. Pro. No. 03-56998 (KJC) |
| AMERICAN CLASSIC VOYAGES CO., *et al.*,<br>DEBTORS, by and through PAUL GUNTHER,<br>PLAN ADMINISTRATOR,<br><br>Appellants,<br><br>- against -<br><br>JP MORGAN CHASE BANK, NATIONAL CITY<br>BANK OF MICHIGAN/ILLINOIS, and HIBERNIA<br>NATIONAL BANK,<br><br>Appellees. | Civil Action No. 07-352 (JJF) |

---

**REPLY BRIEF OF APPELLANTS, AMERICAN CLASSIC VOYAGES CO., ET AL.**

---

Dated: March 12, 2008

**ANDERSON KILL & OLICK, P.C.**
Jeffrey E. Glen, Esq.
1251 Avenue of the Americas
New York, NY 10020
Telephone: (212) 278-1000

**ROSENTHAL MONHAIT & GODDESS, P.A.**
Norman M. Monhait, Esq. (No. 1040)
919 Market Street, Suite 1401
Wilmington, DE 19899
Telephone: (302) 656-4433

Attorneys for Appellants American Classic Voyages Co., et al.

## TABLE OF CONTENTS

| | |
|---|---:|
| INTRODUCTION | 1 |
| A. UNDER THE CASE LAW IN THIS CIRCUIT AMCV WAS INSOLVENT ON THE TRANSFER DATE | 1 |
|     1. Determining fair value by reference to market capitalization was presented in the trial court and is reviewable on appeal. | 1 |
|     2. AMCV, a publicly traded company, was insolvent on the Transfer Date because its market capitalization was less than its liabilities. | 4 |
| B. THE BANK'S EXPERT TESTIMONY FAILS TO REFUTE THE PRESUMPTION OF INSOLVENCY | 7 |
|     1. Calvert failed to make reasonable inquiry | 7 |
|     2. Calvert relied on non-probative "indications" supporting management's projections | 8 |
|     3. Calvert's analysis was rash, not conservative | 9 |
|     4. There is no reliable "Additional Evidence of Solvency" | 10 |
|     5. Management projections were historically inaccurate | 10 |
|     6. Calvert and RCF calculation was based on false assumptions and faulty data | 11 |
| CONCLUSION | 12 |

# TABLE OF AUTHORITIES

*EBC I, Inc. v. America Online, Inc.* (In re EBC I, Inc.), 380 B.R. 348 (Bankr. D. Del. 2008) .................................................................................................................. 2,6,9

*Harris v. City of Philadelphia*, 35 F.2d 840 (3d Cir. 1994) ................................................. 3

*Interface Group-Nev., Inc. v. Trans World Airlines, Inc. (In re Trans World Airlines, Inc.*, 145 F.3d 124 (3d Cir. 1998) ............................................................. 3

*VFB LLC v. Campbell's Soup Co.*, 482 F.3d 624 (3d. Cir. 2007) ............................. passim

*Lunderstadt v. Colafella*, 885F.2d 66 (3d Cir. 1989) ......................................................... 3

Bankruptcy Code §101 ....................................................................................................... 4

## INTRODUCTION

The Banks, in what they denominate their "Response Brief", raise only one point that was not addressed in AMCV's Opening Brief; they claim that AMCV waived its right to demonstrate, as it did at Point III of the Opening Brief, that AMCV was insolvent under the balance sheet test because its market capitalization was orders of magnitude less than its debt, however measured. This claim is refuted at Part A-1 of this Reply Brief.

While none of the Banks' substantive arguments were unanticipated in the Opening Brief, AMCV here sketches for the Court, at Parts A -2 and B of this Reply Brief, the reasons why (a) it was insolvent based on its market capitalization when it repaid the Banks, and (b) why the Bank's expert testimony on solvency was unfounded, unprofessional, and demonstrably inadequate. From every standpoint, AMCV was insolvent, and this Court should so find.

### A. UNDER THE CASE LAW IN THIS CIRCUIT AMCV WAS INSOLVENT ON THE TRANSFER DATE

#### 1. Determining fair value by reference to market capitalization was presented in the trial court and is reviewable on appeal.

The sole issue that was tried to the Bankruptcy Court, the sole issue on this appeal, is whether the entity making the challenged transfer was insolvent on the date it paid the Banks nearly $30 million. In order to make this determination, the Court had to ascertain the fair market value of the transferor's assets and compare that value to the transferror's liabilities. See Opening Brief at 33 – 34.[1]

---

[1] AMCV's initial brief to this Court, dated December 14, 2007, is referred to herein as "Opening Brief" The banks' Response Brief, dated February 8, 2008, is referred to herein as "Response Brief".

NYDOCS1-887162.1                - 1 -

The Banks, confusing the question of determining fair market value with the question of how to obtain reliable proof of that value, claim that, because AMCV did not at trial specifically point to market capitalization as an indicium of value, it cannot appeal the Court's solvency finding. The Banks also suggest that the failure to enumerate market capitalization as an <u>element</u> of the value determination in the statement of issues on appeal waives the argument. Neither point is correct.

While there are a number of methods to ascertain the solvency of an entity, one frequently employed method, and the one employed by both the experts in this case and by the Bankruptcy Court herein, is the "balance sheet test." Record at 11:43 (testimony of Bank's expert Calvert); Opening Brief at 13 (referencing testimony and reports of AMCV's expert Mandarino); Record at 3:15 (Court's opinion).

Chief Judge Walrath in <u>EBC I, Inc. v. America Online, Inc. (In re EBC I, Inc.)</u>, 380 B.R. 348, 358 (Bankr. D. Del. 2008)("EBC") utilized the market capitalization of the debtor as part of the "balance sheet test". It is unquestionable that the market capitalization of AMCV was in evidence at the trial of this case, and was available for the parties and the Court to emphasize or minimize as each may have chosen. So, for example, the Bank's expert Calvert used market capitalization in constructing his WACC (weighted average cost of capital), Record at 11:80, and Banks' counsel used market capitalization in cross-examining AMCV's expert Mandarino, Record at 14:580.

In sum, while different approaches to the issue of insolvency were addressed, there is simply no validity to the Banks' argument that AMCV waived its contention that it was insolvent under the balance sheet test because of its inadequate

market capitalization. The cases cited by the Banks, Response Brief at 33, do not support its contention.

In Harris v. City of Philadelphia, 35 F.2d 840 (3$^d$ Cir. 1994), a party attempted to raise for the first time on appeal that it had been denied a hearing by the trial court before the court issued a *sua sponte* order. The litigant simply had not moved the trial court for a hearing. The question was not whether an argument had not been presented, but whether a challenge to the validity of the entire trial level procedure had been waived. Significantly, even in that situation, where the litigant failed to give the trial court the opportunity to repair a fundamental procedural irregularity, the Circuit, considered the claimed error on appeal.

In Interface Group-Nev., Inc. v. Trans World Airlines, Inc. (In re Trans World Airlines, Inc., 145 F.3d 124 (3d Cir. 1998), the Bankruptcy Court failed to include interest in an award, and the plaintiff neither included that omission in its statement of issues on appeal to the District Court nor briefed the issue to the District Court. The Circuit Court held that in that situation, the claim for interest was waived. Of course, this holding related not to a theory or an argument, but to a specific and separate claim for relief. Further, the Banks' suggestion that failure to denominate the market capitalization approach as an "issue" in the Designation constitutes a waiver is contrary to the rule announced in Lunderstadt v. Colafella, 885F.2d 66, 78 (3rd Cir. 1989), and quoted with approval in Interface, 145 F.3d at 133: an issue on appeal is not reserved "where it is contained **neither** [in] the statement of issues on appeal **nor** the argument section of the brief." Id. (emphasis added). Since AMCV has briefed the market

capitalization argument exhaustively in its Opening Brief, there can be no claim of waiver.

> 2. **AMCV, a publicly traded company, was insolvent on the Transfer Date because its market capitalization was less than its liabilities.**

It is clear in this Circuit that the presumptive value of a publicly traded company is its market capitalization, and that such a company's solvency, absent "some reason to distrust" the market's valuation of the company's stock, is determined by comparing its market capitalization with its debts. VFB LLC v. Campbell's Soup Co., 482 F.3d 624 (3d Cir. 2007)("VFB"). Opening Brief at 33 – 38.

The Banks appear not to have a clear view as to the revolution in solvency analysis set forth in VFB. They agree that VFB establishes that market capitalization, obtained by multiplying the number of outstanding shares by the market price of those share, calculates the equity value of a publicly traded company. Response Brief at 34. They agree that a "positive equity value," which is what the market capitalization of a publicly traded company is, must be compared to an "entity's debts" to ascertain that "the sum of such entity's debt's is greater than all of such entity's property, at fair value." Response Brief at 38, quoting from Bankruptcy Code §101(32). Since the $42 million market capitalization of AMCV at transfer date was a miniscule percentage of AMCV's debt, the comparison required by VFB would seem to yield an incontestable finding of insolvency.

The only argument the Banks mount against this straight-forward analysis compelled by VFB 's recognition of "the objective evidence from the public equity and

debt markets," Id. at 633, is that "deducting AMCV's debt from its market capitalization, which already accounts for AMCV's debt, is counterintuitive and unsupported in the record and therefore should be rejected by this Court." Response Brief at 38. The Banks cite nothing in support of the proposition that market capitalization "already accounts for AMCV's debt", but perhaps they mean, in the case of AMCV, that since the debt was guaranteed by the Federal government the market would ignore it in setting the share price. There is no evidence in the record, or as far as counsel has been able to ascertain from other publicly available sources, as to the selling price of AMCV's debt instruments at or around the Transfer Date[2], so for the purposes of this brief let us assume that it was selling at par since it was fully guaranteed.[3]

      As the Banks recognize, such a bifurcated view of an entity's solvency is directly contradicted by VFB, where the Court found that the $500 million of "borrowed funds", i.e. debt, owed by Campbell Soup was exceeded by the $1.1 billion of market capitalization calculated from the share price. Response Brief at 35-36. Far from being "counterintuitive," the VFB formulation makes perfect sense; if investors can buy AMCV for $42 million, but owe, initially, the AMCV debt holders and, ultimately, the Federal government $477 million, then the value of the company as determined in the marketplace is insufficient to pay its debts and it is insolvent.

---

[2] Capitalized terms used herein that are not otherwise defined have the meanings stated in the Opening Brief.

[3] If AMCV's debt was in fact trading below par at the Transfer Date, AMCV would have been insolvent. VFB, at 633: where debt trades below par "This argument shows that [the relevant debtor] was insolvent…".

But even if one were to eliminate the guaranteed debt from the comparison due to the guarantees enjoyed by AMCV, AMCV's market capitalization at the Transfer Date was far less than its remaining liabilities.

AMCV had issued "Trust Preferred Securities" in February of 2000 that bore interest at seven percent and were "convertible at the holder's election into 1.6207 shares of the Company's common stock." AMCV had the option, but not the obligation, to redeem the Preferred Securities for cash after February of 2003. 2 million such securities had been issued with a redemption value of $50 each. Thus, the redemption price for the entire set of securities is $100 million. AMCV annual report for 2000 at 62, annexed to its 10-k filing, Record at 68:35.

Preferred stock, regardless of how it is characterized on a GAAP balance sheet, may be viewed for bankruptcy valuation purposes as equity, depending on the "totality of the circumstances." EBC, 380 B.R. at 358-59. But since -as preferred stock- its accrued interest and its redemption cost had to be paid prior to any potential return to common shareholders, the market capitalization of $42 million meant that the marketplace did not view the fair value of AMCV as sufficient even to meet its obligations to its preferred shareholders. If this "vote" by investors does not destroy the credibility of management's hopelessly rosy projections and Calvert's hopelessly naïve trust in management, what does?

This case demonstrates the common sense correctness of the VFB approach to valuation. Litigants can find experts to construct a turnaround of an under-water company in the far distant future by conjuring up a baselessly optimistic concatenation of events leading to an eventual return to profitability. After all, that is

what the Banks did here with Mr. Calvert and his uncritical acceptance of every fanciful wish of AMCV's incompetent management. The market place knew better; over the year and one-half prior to the disputed transfer AMCV's common shares declined from $35.25 per share to $1.93. See the graph of stock prices over that period, on the following page of this brief. By the Transfer Date the market valued the company at less than one-half of what it would take to retire its preferred stock, let alone pay on its own debts that had been guaranteed by, in this case, the Federal government.

The Banks have the temerity to argue to this Court that a market capitalization of $42 million "shows that AMCV is solvent by $42 million." Response Brief at 38. By such reasoning, any public company, even one already in bankruptcy, would be solvent since there is always some risk taker who will pay a penny on the off chance that lightning will strike and a company may someday return to profitability. This Circuit rejects that sophistry. AMCV was insolvent because the value placed on the company by the markets was woefully less than what it would cost it to pay its debts and to repay its preferred investors. Under VFB, that concludes the inquiry.

**B.    THE BANK'S EXPERT TESTIMONY FAILS TO REFUTE THE PRESUMPTION OF INSOLVENCY**

Nothing in the Response Brief answers AMCV's demonstration that the Banks' solvency case, as presented by their expert Calvert, was woefully inadequate to overcome the presumption of insolvency.

**1.    Calvert failed to make reasonable inquiry**

Far from studying management's projections "to determine whether they were reasonable at the time they were prepared," Response Brief at 16, Calvert did no testing and no due diligence, did not contact management nor even read the critical



American Classic Voyages - Historical Stock Pricing

notes of management interviews taken by Robert Reilly, the expert retained by the settling defendants in other AMCV preference actions that had been joined to this one for trial. See Opening Brief, at 17 – 19.

### 2. Calvert relied on non-probative "indications" supporting management's projections

The "indications" upon which Calvert based his faith in management's projections, Response Brief at 16 (set of bullet points detailing Calvert's indications), were based largely on inaccuracies, irrelevancies, self-serving management statements, or ignorance of reality.

- **Inaccuracies**   While DQSC had renegotiated its line of credit, it did so by reducing the line from $30 million to $10 Million, and even the $10 million replacement line of credit was established only on the oral promise from multi-millionaire and major AMCV shareholder Sam Zell "that JPMorgan will not incur any losses." Record 98.  To insure that JPMorgan incurred no losses AMCV management never drew upon the $10 million line of credit.

- **Irrelevancies**   Calvert's reliance on individual ship performance projections does not lend his analysis any additional credibility or reliability.  Ship-by-ship performance projections are the inevitable presentation when each ship is accounted for separately by AMCV.  The projections are "integrated" because they merely summed up the individual presentations for each ship.  Neither the disaggregation nor the summation demonstrates anything about reliability.

- **Self-serving Statements**   A member of former management testified at depositions that when AMCV made its projections it was using its best

estimates of performance. However, those projections were influenced by a desire to induce Ingalls to renegotiate the AMCV debt which was deep in default, see Opening Brief at 17, and to hide the fact that AMCV had violated its covenants, Record 98 (setting forth the specifics of the violations).

- **Ignorance of reality**   Calvert said repeatedly that AMCV had access to credit. Opening Brief at 19. This was not true. Calvert also did not know – because he did not inquire – that in July 2001, the very month when the predictions were being made, management knew that at best the company would return from negative performance to year 2000 levels, which were far below the projected levels. See Opening Brief at 18. A company that fails to meet sales projections and has no access to capital is a company that exhibits strong indications of insolvency, EBC, 380 B.R. at 356.

### 3.    Calvert's analysis was rash, not conservative

There was nothing "conservative" about Calvert's analysis, see Response Brief at 17 – 18. The sensitivity analyses prepared by AMCV expert Mandarino establish that slight shifts in **any one** of the relevant performance criteria or slight variation in selection of the myriad of multipliers used in Calvert's DCF calculation would render AMCV insolvent under Calvert's own methodology. Mandarino's sensitivity analyses are not "second guessing," Response Brief at 30, or "artificial adjustments," Response Brief at 4. Rather they demonstrate that every single element of Calvert's analysis, every single assumption as to five years of future performance, every single component of projected revenues and expenses, had to be precisely on target in order for AMCV to be solvent. See Opening Brief at. 26 – 30.

### 4. There is no reliable "Additional Evidence of Solvency"

The Banks "Additional Evidence of Solvency", Response Brief at 18 – 19, simply rehash Calvert's points dealt with above. Selling notes guaranteed by the Federal government is no evidence of access to capital market; especially when AMCV Vice President Randall Talcott admitted that without guarantees AMCV had no way to obtain new debt or equity financing. Opening Brief at 9. Cash on hand is no evidence of solvency when one is already in violation of bond covenants, EBITDA is negative and remaining there, and the stock market has already rejected a company's projections by devaluing its shares to nearly nothing. "Booking momentum" means nothing when fill rates have deteriorated and profit margins have disappeared because of price – cutting. Opening Brief at 7.

### 5. Management projections were historically inaccurate

Just four months before it made the projections upon which Calvert based his solvency analysis, management had prepared and published to the investing world the "going concern," or KPMG, projections, that proved to be completely erroneous almost as soon as they had been made. See Opening Brief, at 19 – 20. The Banks comment on this fact? "[I] t does not follow that simply because AMCV missed projections prepared in January or February of 2001, that projections prepared in July 2001 were unreliable." Response Brief at 23.

Well, neither does it follow that the projections which ground Calvert's opinion were "reasonable when prepared," especially when at the time of the July projections EBITDA was negative, fill rates were down, debt covenants had been violated, the stock price was in the cellar, and AMCV had no access to capital. There must be **some** "non-speculative evidence," see Opening Brief at 4, 15, to overcome the

presumption of insolvency. A company that can not predict what will happen in one or two months is not a company whose five year prognostications are worthy of consideration, let alone uncritical acceptance.

### 6. Calvert and DCF calculation was based on false assumptions and faulty data

AMCV devoted a substantial portion of the Opening Brief to demonstrating that the assumptions Calvert used in its DCF calculation were fraught with inaccuracies. These include, in addition to those referred to above, an unrealistically optimistic belief in the delivery date of the huge new vessels that were already a year late, an assumption that no capital expenditures had to be accrued for new vessels or major renovations, and the rather astonishing selection of the wrong "small stock premium" from the very publication that Calvert viewed as authoritative in his report. See Opening Brief, at 21 – 23, 25 – 26.

Most startling, however, was Calvert's way of choosing "comparable companies" as required by his DCF approach. He went to a website, typed in "American Classic Voyages," and up popped five companies that the web design deemed "comparable" in some undefined sense. See Opening Brief, at 22 – 25. The Banks analogize to a lawyer using a key word search in Westlaw to find as set of cases from which, with her experience and education, she would select relevant decisions. Response Brief at 26, n. 15. What Calvert did was abdicate the selection process to a machine and uncritically accept what it spewed out.

## CONCLUSION

AMCV was a publicly traded company that had lost virtually all its market capitalization by the time it was facing imminent bankruptcy and decided to prefer the Banks to its other creditors. Under the VFB decision, and especially in light of the credulous parroting by the Banks' expert of managements' baseless trust that everything would turn out for the best some time long in the future, this Court must find that the Banks failed to rebut the presumption of insolvency and remand this case for plenary trial.

Dated: March 12, 2008

**ROSENTHAL MONHAIT & GODDESS, P.A.**

_/s/ Norman M. Monhait_
Norman M. Monhait (# 1040)
919 Market Street, Suite 1401
Wilmington, DE 19899
Telephone: (302) 656-4433

- and -

**ANDERSON KILL & OLICK, P.C.**
Jeffrey E. Glen
1251 Avenue of the Americas
New York, NY 10020
Telephone: (212) 278-1000

*Attorneys for American Classic Voyages, Co., et al.*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 12th day of March, 2008, a copy of the **Reply Brief Of Appellants, American Classic Voyages Co., et al.** was served, by electronic transmission, upon:

>Michael D. DeBaecke, Esquire
>Blank Rome LLP
>1201 N. Market Street, Suite 800
>Wilmington, Delaware 19801
>
>Laurie S. Silverstein, Esquire
>Gabriel R. MacConaill, Esquire
>Potter Anderson & Corroon LLP
>Hercules Plaza, 6th Floor
>1313 N. Market Street
>Wilmington, Delaware 19801

and a copy was sent, by first class mail, postage prepaid to:

>Anthony G. Stamato, Esquire
>Kaye Scholer LLP
>3 First National Plaza
>Chicago, Illinois 60602
>
>Robert J. Sidman, Esquire
>Tiffany Strelow Cobb, Esquire
>Voyrs Sater Seymour & Pease LLP
>52 East Gay Street, P.O. Box 1008
>Columbus, OH 43215-1008
>
>Jeffrey E. Glen, Esquire
>Anderson Kill & Olick, P.C.
>1251 Avenue of the Americas
>New York, NY 10020

_____
Norman M. Monhait (#1040)